1  Eric H. Gibbs (SBN # 178658)
2  Dylan Hughes (SBN # 209113)
   Caitlyn D. Finley (SBN # 286242)
3  **GIRARD GIBBS LLP**
4  601 California Street, 14th Floor
   San Francisco, CA 94108
5  Telephone:  (415) 981-4800
6  Facsimile:  (415) 981-4846
7  Email: ehg@girardgibbs.com

8  [Additional Counsel Listed on Signature Page]

9  *Attorneys for Plaintiffs*

10

11                **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13  DAPHNE RAY, PHILIP                Case No. 13-cv-08080-DDP-VBKx
14  LIGHTFOOT, CHRISTOPHER
15  WHITE, JACQUELINE YOUNG,          **FIRST AMENDED CLASS ACTION**
    CHRISTOPHER LIGHT,                **COMPLAINT**
16  BRADFORD SOULE, JOHN
17  MELVILLE, and DONALD              **DEMAND FOR JURY TRIAL**
    KENDRICK, on behalf of themselves
18  and all others similarly situated,
19                                    The Honorable Dean D. Pregerson
20              Plaintiffs,
    v.
21
22  CHRYSLER GROUP LLC,
23              Defendant.
24
25
26
27
28

         FILED
   CLERK, U.S. DISTRICT COURT

         JAN - 3 2014

   CENTRAL DISTRICT OF CALIFORNIA
   BY                        DEPUTY

─────────────────────────────────────────
            FIRST AMENDED CLASS ACTION COMPLAINT
              CASE NO. 13-CV-08080-DDP-VBK

1       Plaintiffs Daphne Ray, Philip Lightfoot, Christopher White, Jacqueline Young,

2 Christopher Light, Bradford Soule, John Melville, and Donald Kendrick, on behalf of

3 themselves and all others similarly situated, allege as follows:

### NATURE OF THE CASE

5     1.    Plaintiffs and the Class members they propose to represent purchased or

6 leased 2011-2012 model year Jeep Grand Cherokees, Dodge Durangos, and Dodge Grand

7 Caravans equipped with defective Totally Integrated Power Modules, also known as

8 TIPMs. The TIPM controls and distributes power to all of the electrical functions of the

9 vehicle, including the vehicle safety and ignition systems. Vehicles equipped with

10 defective TIPMs progress through a succession of symptoms that begin with an inability

11 to reliably start the vehicle and lead to, among other things, the vehicle not starting, the

12 fuel pump not turning off and the engine stalling while driving.

13     2.    The problem is so widespread that the part is on national backorder, taking

14 weeks and sometimes months for a replacement part to become available.  Chrysler

15 however, does not acknowledge the problem, leaving consumers, dealers and auto-

16 technicians to sort it out themselves.  Consequently, consumers are stuck with inoperable

17 vehicles for weeks and months on end, forced to pay for unnecessary repairs and car

18 rental costs, and have to pay over $1,000 for the TIPM replacement not knowing whether

19 the replacement part suffers from the same defect.

20     3.    Plaintiffs therefore bring this action on behalf of a proposed nationwide class

21 of consumers who purchased or leased Chrysler vehicles equipped with the defective

22 TIPM, or, in the alternative, on behalf of statewide classes of consumers who purchased

23 or leased their Chrysler vehicles in California, Maryland, Florida, New Jersey,

24 Massachusetts and New Mexico.

### PARTIES

26     4.    Plaintiff Daphne Ray is a citizen and resident of Indio, California located in

27 the County of Riverside.

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1        5.    Plaintiff Philip Lightfoot is a citizen and resident of Danville, California,

2    located in the County of Contra Costa.

3        6.    Plaintiff Christopher H. White is a citizen and resident of Odenton,

4    Maryland, located in the County of Anne Arundel.

5        7.    Plaintiff Jacqueline Young is a citizen and resident of Baltimore, Maryland,

6    located in the County of Baltimore.

7        8.    Plaintiff Christopher Light is a citizen and resident of Palm Harbor, Florida,

8    located in the County of Pinellas.

9        9.    Plaintiff Bradford Soule is a citizen and resident of Plymouth,

10   Massachusetts, located in the County of Plymouth.

11       10.    Plaintiff John Melville is a citizen and resident of Collingswood, New

12   Jersey, located in the County of Camden.

13       11.    Plaintiff Donald Kendrick is a citizen and resident of Carlsbad, New

14   Mexico, located in the County of Eddy.

15       12.    Defendant Chrysler Group, L.L.C., (Chrysler) is a limited liability

16   corporation organized under the laws of the State of Delaware, headquartered in Auburn

17   Hills, Michigan, and has its principal place of business in Auburn Hills, Michigan.

18   Chrysler is the U.S. subsidiary of Italian multinational automaker Fiat S.p.A.

19   **JURISDICTION AND VENUE**

20       13.    This Court has jurisdiction over this action under the Class Action Fairness

21   Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual Class members

22   exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class

23   action in which more than two-thirds of the proposed plaintiff class, on the one hand, and

24   Chrysler, on the other, are citizens of different states.

25       14.    This Court has jurisdiction over Chrysler because Chrysler is registered to

26   conduct business in California and has sufficient minimum contacts in California; or

27   otherwise intentionally avails itself of the markets within California through the

28

1   promotion, sale, marketing, and distribution of its vehicles to render the exercise of

2   jurisdiction by this Court proper and necessary.

3          15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because

4   a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

5   this District.

6                          **SUBSTANTIVE ALLEGATIONS**

7          16.     Chrysler markets, distributes, and warrants automobiles in the United States

8   sold under various brand names including the "Jeep", "Dodge", and "Chrysler" brands.

9   This lawsuit concerns 2011- 2012 model year Jeep Grand Cherokees, Dodge Durangos

10  and Dodge Grand Caravans (the "Class Vehicles").

11         17.     Class vehicles are factory equipped with a Totally Integrated Power Module

12  which is located in the vehicle engine compartment.  The TIPM consists of a computer,

13  relays, and fuses, and controls and distributes power to all of the vehicles' electrical

14  systems.  These electrical systems include the vehicles' safety systems, security system,

15  ignition system, fuel system, electrical powertrain, as well as the vehicles' comfort and

16  convenience systems which include such components as the air bags, fuel pump,

17  windshield wipers, headlights, turn signals, and power windows and doors.

18         18.     The TIPM installed in Class Vehicles fails to reliably control and distribute

19  power to various vehicle electrical systems and component parts.  Typically, the defect

20  manifests as an inability to reliably start the vehicle and progressively escalates to the

21  vehicle failing to start all together and, in some instances, the vehicle stalling during

22  operation.  Vehicle owners also have problems with the fuel pump not shutting off, the

23  headlights going out, and random and uncontrollable activity of the horn, windshield

24  wipers, alarm system, door locks, and airbags.

25         19.     Below are some examples of complaints lodged with the National Highway

26  Traffic Safety Administration ("NHTSA") reflecting consumers' concerns about the

27  safety risks of driving with a defective TIPM:

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- TOTALLY INTEGRATED POWER MODULE IS GOING OUT ON MULTIPLE JEEP VEHICLES.  THE TIPM CONTROLS LIGHTS, HORNS, WIPERS, AIR BAGS, ETC. WHEN THE PART QUITS WORKING IT CAUSES MULTIPLE ISSUES WITH THE VEHICLE. THE VEHICLE WILL NOT START, WHICH CAN LEAVE THE OWNER STRANDED. THE WIPERS, HORN, ETC., JUST TURN ON, WHICH COULD CAUSE AN ACCIDENT. AND THE AIR BAGS MAY NOT DEPLOY IF IN AN ACCIDENT. THE TIPM IS ON NATIONAL BACK ORDER, WHICH MEANS WAITING WEEKS FOR REPAIR AND CHRYSLER IS REFUSING TO PAY FOR A RENTAL CAR FOR THE OWNER, AND WILL, THE REPLACEMENT LAST LONGER THAN THE ORIGINL? THE VEHICLE NEEDS TO BE RECALLED AND REPLACED.

- BEGINNING THE EVENING OF JULY 30, I EXPERIENCED ISSUES WITH STARTING MY GRAND CHEROKEE. THESE ISSUES WERE SPORADIC, HOWEVER ONCE EVERY THREE OR FOUR TIMES I ATTEMPTED TO START THE ENGINE, THE ENGINE WOULD CRANK BUT FAIL TO START. ON JULY 31, I SCHEDULED AN APPOINTMENT WITH MY LOCAL JEEP DEALERSHIP (VIDEON CHRYSLER DODGE JEEP IN NEWTOWN SQUARE, PA) FOR AUGUST 5. BY AUGUST 2, THE JEEP WAS NOT DRIVABLE AS STARTING IT WOULD TAKE 20-30 MINUTES EACH TIME. I WAS FORCED TO RENT A CAR AT MY OWN EXPENSE FOR THE WEEKEND OF AUGUST 3-4. ON AUGUST 5 THE DEALERSHIP DIAGNOSED THE ISSUE AS PERTAINING TO TSB 08-053-11 AND REPROGRAMMED THE TOTALLY INTEGRATED POWER MODULE. ON AUGUST 7, I EXPERIENCED THE NO START ISSUE AGAIN AND SCHEUDLED A SECOND APPOINTMENT WITH THE DEALERSHIP FOR AUGUST 8, THE TIPM WAS IDENTIFIED AS NEEDING TO BE REPLACED. I WAS INFORMED BY THE DEALERSHIP THAT HE NECESSARY PART WAS ON BACKORDER WITH AN ESTIMATED ARRIVAL TIME OF WITHIN A "FEW WEEKS". THE DEALERSHIP ADVISED THAT IT WAS OK FOR ME TO CONTINUE DRIVING THE VEHICLE IN THE MEANTIME DESPITE THE ISSUE. ON THE EVENING OF AUGUST 16, WHILE DRIVING THE VEHICLE AT A SPEED OF APPROXIMATELY 40 MILES PER HOUR, THE ENGINE STALLED, CAUSING THE VEHICLE TO LOSE ALL POWER NEAR THE INTERSECTION OF CROTON ROAD AND KING OF PRUSSIA ROAD IN UPPER MERION TOWNSHIP, PA. GIVEN THE NATURE OF THE ROAD AS WELL AS THE TRAFFIC AROUND ME, THIS SITUATION POSED A SERIOUS SAFETY HAZARD TO MYSLEF, MY PASSENGER, AND OTHERS NEAR MY VEHICLE, AND SINCE THAT POINT I NO LONGER FEEL SAFE OPERATING THE VEHICLE IN ITS CURRENT CONDITION. AS SUCH, I HAVE BEEN ENTIRELY UNABLE TO OPERATE THIS VEHICLE SINCE AUGUST 16.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1   •   CAR WON'T STOP. TIPM FUSE EXPLODED. JEEP DEALER SAYS I WONT
2       HAVE A CAR FOR 2 WEEKS AND JEEP WON'T COVER THIS MAIN
        STREAM ISSUE. I FOUND 1200 COMPLAINTS ON THE SAME ISSUE. WE
3       WANT EXTENDED WARRANTY OR FULL RECALL ON ALL JEEP GRAND
        CHEROKEES. 2011 AND 2012. PEOPLE CAN DIE IF THEIR CAR SHUTS
4       OFF ON THE HIGHWAY. I WAS WARNED I CAN DIE IF I DRIVE THIS
        JEEP BY SHAVER JEEP IN THOUSAND OAKS, CA. TIPM NEEDS RECALL
5       AND WILL END UP KILLING JEEP OWNERS.

6   •   MY PROBLEM IS WITH MY TOTALLY INTEGRATED POWER MODULE
7       (TIPM). IT IS FAULTY AND NEEDS REPLACED AND SO ARE 25,000
        OTHER 2011 VEHCILES IN THE USA. PART IS ON BACKORDER AND
8       THERE IS A BUSINESS PROBLEM WITH THE VENDOR. I AM FLAGGING
        THIS SITUATION AS A LIFE, HEALTH, AND SAFETY MATTER BECAUSE
9       YOU HAVE ON FILE 5-2011 JEEP GRAND CHEROKEE ACCIDENTS
10      WHERE THE AIR BAGS WERE WRITTEN UP IN THE POLICE REPORTS
        AS NOT DEPLOYING. THIS GOES RIGHT BACK TO THE TIPM WHICH IS
11      THE BRAIN OF THE WHOLE VEHICLE. THE AIR BAGS ARE WIRED IN
        TO THE TOTALLY INTEGRATED POWER MODULE. THIS IS THE CASE
12      WHERE YOU NEED TO CONNECT THE DOTS. THERE ARE THOUSANDS
13      OF US OUT THERE THAT WON'T START BECAUSE WE NEED THE TIPM.
        WHAT ABOUT THE OTHER THOUSANDS OUT THERE THAT DIDN'T
14      DEVELOP THE FAULT YET IN THE TIPM BUT IN THE EVENT OF AN
        ACCDIENT THE ODDS THAT THE AIR BAGS DON'T DEPLOY HAS BEEN
15      GREATLY INCREASED. THIS CONSUMER/JEEP OWNER HAS NO FAITH
16      AT ALL THAT MY BAGS WILL EVER DEPLOY WHEN NEEDED. WHEN
        MY JEEP IS RETURNED TO ME I AM IMMEDIATELY TRADING IT IN.
17      NHSTA NEEDS TO FORCE CHRSYLER TO MAKE A RECALL; THEY WILL
18      NEVER DO IT ON THEIR OWN.

19  •   VEHICLE FAILS TO START MULTIPLE TIMES. CAME CLOSE TO
20      STALLING A FEW TIMES. SAME SYMPTOMS AS MENTIONED BY MANY
        WITH THE TIPM MODULE. I BELEIVE THIS TO BE A VERY IMPORTANT
21      SAFETY ISSUE AS WELL AS FINANCIALLY AND EMOTIONALLY. NO
22      WARNING AS TO WHEN AND WHERE THE PROBLEMS CAN ARISE.

23  •   THE VEHICLE JUST DIED WHILE DRIVING IN THE PARKING LOT LOSS
        OF POWER TO EVERYTHING INCLUDING STEERING AND BRAKES. IT
24      WAS RESTARTED AND DRIVEN TO WHERE WERE STAYING. THE NEXT
        MORNING IT WOULD NOT START AFTER MANY ATTEMPTS. WE HAD
25      IT TOWED TO NEAREST DODGE DEALER WHERE WE EVENTUALLY
26      LEARNED IT WAS THE TIPM MODULE. WE ALSO LEARNED THAT THIS
        PROBLEM COULD BE A DANGEROUS ONE. WE WERE ALSO INFORMED
27      THAT THIS PART IS ON ETERNAL BACK ORDER LEAVING US
        STRANDED 12 HOURS FROM HOME WITH A CAR FULL OF KIDS.
28      DODGE NEEDS TO MAKE THIS RIGHT!!! I AM NOT SURE I WILL FEEL

5

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

SAFE DRIVING THIS VEHICLE NOW THAT I KNOW THIS IS A REAL COMMON PROBLEM!

- THE CONTACT OWNS A 2011 JEEP GRAND CHEROKEE. THE CONTACT STATED THAT WHILE DRIVING 70 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER WHERE THE TECHNICIAN DIAGNOSED THAT THE TIPM WAS DEFECTIVE AND NEEDED TO BE REPLACED.

- IT BEGAN WHEN THE CAR WOULD CRANK AND NOT START SEVERAL TIMES BEFORE ACTUALLY STARTING. I TOOK IT IN (FIGURING AT SOME POINT IT WOULD JUST NOT START AT ALL AND LEAVE ME STRANDED) AND THEY SAID THEY COULDN'T DUPLICATE IT AND SENT ME HOME.  IT STARTED DOING IT AGAIN, SO I TOOK IT BACK IN AND THEY REFLASHED SOMETHING OR OTHER AND SENT ME ON MY WAY.  THE REFLASH DID NOT FIX THE PROBLEM, BUT I DID NOT TAKE IT BACK IN, FIGURING I WOULD LEAVE WITH SAME RESULT. FINALLY, THE CAR DIED ON ME WHILE I WAS DRIVING IT, WITH MY SMALL CHILDREN IN THE CAR. NO POWER BRAKES, NO POWER STEERING. I WAS ABLE TO PULL OVER TO THE SIDE OF THE ROAD SAFELY. THANKFULLY I WAS NOT GOING TERRIBLY FAST AND THERE WERE NO OTHER CARS AROUND. I TOOK IT BACK IN AGAIN, AND THEY TOLD ME IT NEEDED A NEW TIPM. AFTER SPEAKING WITH DODGE, THIS IS APPARENTLY A COMMON PROBLEM IN THE '11 DURANGOS. THE NEW TIPM WAS INSTALLED, HOWEVER, FOR SOME REASON, ACTIVATING THE RIGHT TURN SIGNAL NOW FLASHES THE FOG LIGHTS. ACCORDING TO THE SERVICE DEPARTMENT, THIS IS DUE TO A SECOND FAULTY TIPM.

20.     The defect is so widespread that replacement parts are on national backorder forcing consumers to wait weeks or months to have their TIPMs replaced.  In the meantime, Chrysler dealerships and auto-technicians are advising many Class members not to drive their vehicles until the TIPM is replaced, due to safety risks. The financial burden on consumers is reflected in several hundred complaints filed with NHTSA, like the following below:

- I WOULD LIKE TO PLACE A FORMAL COMPLAINT AGAINST CHRYSLER GROUP, LLC. MY FAMILY ALONG WITH SEVERAL HUNDREDS, IF NOT THOUSANDS OF OTHER 2011 JEEP GRAND CHEROKEE OWNERS. THIS ISSUE IS AROUND THE TIPM DEVICE THAT SEEMS TO BE FAILING ON MY AND MANY CONSUMER'S VEHICLES DATING BACK TO THE EARLY PART OF 2013. THE PROBLEM IS THE

6

1    DEALER, NOR THE CHRYSLER GROUP DOESN'T HAVE AN IDEA WHEN
THIS PART WILL BE AVAILABLE LEAVING MANY OF US WITHOUT A

2    CAR FOR AN UNDETERMINED AMOUNT OF TIME. THIS PART (TIPM)
NEEDS TO BE PLACED ON OFFICIAL RECALL BY THE CORPORATION

3    AND UNTIL IT ACTUALLY IS.... IT HAS PLACED UNDUE FINANCIAL
STRAIN ON MANY OF THE OWNERS OF THE JEEP. WE ARE EXPECTED

4    BY THE BANKS TO CONTINUE PAYING OUR CAR NOTE, ALONG WITH
INSURNACE. NOW CHRYSLER IS SAYING THAT WE MUST ALSO COME

5    OUT OF POCKET FOR RENTALS TO REPLACE THE VEHICLES WE HAVE
AND OR PAYING FOR UNTIL THEY RESOLVE THE ISSUE.  THIS IS NOT

6    RIGHT ON SO MANY LEVELS AND APPARENTLY THEY CAN GET
AWAY WITH THIS WITHOUT RECOURSE. IN CONCLUSION, JUST

7    ASKING THE JUSTICE DEPARTEMENT TO LOOK INTO THIS ISSUE AND

8    ASSIST US CONSUMERS BEING HELD HOSTAGE BY CHRYSLER
GROUP, LLC.

9

10

11    •    THE ISSUE HAS TO DO WITH THE TOTALLY INTEGRATED POWER
MODULE (TIPM) USED IN JEEPS AND OTHER MAKES.  THIS PART IS

12    RESPONSIBLE FOR A LOT OF THE POWER
SWITCHING/MODULATION/DISTRIBUTION, AND COMNMUNICATION

13    WITH OTHER SYSTEMS IN THE ELECTRICAL SYSTEM.  THERE ARE
NUMEROUS COMPLAINTS ONLINE REGARDING THIS PART THAT IS

14    ON NATIONAL BACKORDER. OUR CAR HAS BEEN OUT OF SERVICE
SITTING AT A JEEP DEALER SINCE JULY WITH NO ESTIMATE FROM

15    CHRYSLER OF WHEN THE PART MIGHT BE AVAILABLE. THERE HAS
BEEN NO TALK OF A RECALL AT THIS POINT. THE PART ALMOST

16    ALWAYS GOES BAD AFTER THE WARRANTY HAS LAPSED AND COSTS

17    ANYWHERE FROM $900-$1400 DEPENDING ON THE DEALERSHIP, ETC.
ONCE IT GOES, THE CAR IS RENDERED USELESS. WE SPENT $2,000 AT

18    A MECHANIC WHO THOUGHT IT WAS THE FUEL PUMP AND AN
ADDITIONAL $1,000+ ON A RENTAL CARE BEFORE THE CAR WAS

19    TOWED TO THE DEALER. WE ARE UNABLE TO ONLY HAVE ONE CAR,

20    SO WE HAVE NOW BOUGHT A THIRD CAR. FORTUNATELY WE ARE IN
A POSITION TO DO THIS. MANY PEOPLE ARE UNABLE TO AFFORD

21    EVEN A RENTAL. THE SAFETY ISSUE COMES INTO PLAY BECAUSE

22    THE CAR MAY JUST STOP WHILE YOU ARE DRIVING. THIS DID
HAPPEN TO OURS ONCE, BUT IT WAS BEFORE THERE WAS AN

23    OBVIOUS PROBLEM AND THE CAR WORKED FINE AFTER THE
INCIDENT SO WE NEVER LOOKED INTO IT. THERE IS ALSO THE ISSUE

24    THAT SOMETIMES IT MAY START, BUT IF YOU TURN THE CAR OFF IT

25    MAY NOT START THE NEXT TIME POSSIBLY STRANIDNG THE DRIVER
WHO KNOWS WHERE. AT THIS POINT WOULD JUST LIKE THIS ISSUE

26    ACKNOWLEDGED AND INVESTIGATED.

27

28    •    I TOO HAVE BEEN EXPERIENCING THE SAME ISSUE. I NOTICED IT A
FEW WEEKS AGO WHEN MY BATTERY STARTED SHOWING SIGNS OF

7

---

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

GOING DEAD. I ALSO HEARD THE NOISE AFTER EXTING THE TRUCK IN THE EVENINGS.  I THOUGHT THE NOISE WAS SOME ELECTRONICS RESETTING ITSELF, BUT THOUGHT IT WOULD EVENTUALLY SHUTOFF. I DID NOT THINK THIS COULD BE KILLING MY BATTERY. I TOO HAD TO BUY A BATTERY […] COST ME A PRETTY PENNY NOW TO LEARN IT WOULD BE DEAD SOON. AFTER GOING TO THE DEALERSHIP TODAY FOR AN OIL CHANGE THE TRUCK DIED IN THEIR SERVICE BAY.  NOT EVEN FIVE MINUTES AFTER LEAVING, THE SERVICE REP CALLED ME AND EXPLAINED HOW THEY HAD TO PUSH MY TRUCK TO THEIR SERVICE BAY DUE TO A BAD TOTALLY INTEGRATED POWER MODULE (TIPM). WE ARE NOW WITHOUT OUR VEHICLE FOR AN UNDISCLOSED TIME AND STILL HAVE THE OBLIGATION TO PAY FOR A PRODUCT OF NO USE.

- VEHICLE: 2011 JEEP GRAND CHEROKEE 4X4, PURCHASED NEW IN OCTOBER 2010. I EXPERIENCED DIFICULLTY IN STARTING VEHICLE, PROBLEM PERSISTED AND BECAME WORSE. DEALERSHIP INDICATED BAD FUEL PUMP, REPLACED AT A COST OF $1,000.00 +. STARTING PROBLEM PERSISTED AND AGAIN BACK TOO DEALERSHIP. DIAGNOSIS THIS TIME WAS BAD STARTER MODULE (TIPM UNIT) COST $1,000.00 + AND I WAS TOLD THAT THE PART WAS ON "EXTREME" BACK ORDER AND THEY COULD NOT EVEN GIVE ME AN ESTIMATE ON THE ARRIVAL DATE. I WAS ALSO INFORMED THAT THE BAD TIPM HAD CREATED AN ELECTRICAL SHORT THAT HAD LED TO THE INITIAL FAILURE OF THE FUEL PUMP. PRESENT: EIGHT (8) WEEKS HAVE PASSED AND NO PART AVAILABLE AND A VEHICLE SITTING IN MY DRIVEWAY GATHERING THE LEAVES OF THE CHANGE OF THE SEASON. I HAVE BEEN A LOYAL JEEP OWNER FOR THE PAST 25 YEARS WITH AT LEAST SEVEN (7) VEHICLES. THIS ONE IS THE MOST PROBLEM PLAGUED VEHICLE OF THEM ALL, WITH MAJOR ELECTIRCAL/COMPUTER PROBLEMS. I DID NOT LIST ALL THE PROBLEMS (ELECTRICAL AND OTHER WISE) THAT OCCURED IN THE FIRST 36,000 MILES FOR THANKFULLY THEY WERE COVER BY WARRANTY. I MUST SAY I WILL HARD PRESSED TO PURCHASE ANOTHER CHRYSLER (JEEP) PRODUCT IN THE FUTURE. THIS ONE HAS TO BE TOWED INTO THE DEALERSHIP TO BE REPAIRED (NEW TIPM) BEFORE I CAN DRIVE IT TO ANOTHER DEALERSHIP AND HOPE FOR A GOOD TRADE IN!!!

- MY 2011 DURGANO STALLED ONE DAY AT WORK WHEN I TRIED TO CRANK IT. IT TOOK 3 TIMES TO START THE ENGINE AND FINALLY IT CRANKED. LATER THAT WEEK WHILE DRIVING I NOTED THE AIRBAG WARNING LIGHT CAME ON AND THEN WENT OFF MULTIPLE TIMES; IT CONTINUOUSLY DID THAT UNTIL ONE DAY IT STAYED ON AND

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

NEVER WENT OFF. I TOOK IT TO GET IT CHECK AND NO CODES SHOWED. THEY STATED NOTHING WAS WRONG WITH IT. SO I KEPT DRIVING UNTIL I NOTICED A HUMMING NOISE COMING FROM UNDERNEATH THE REAR AND THE VEHICLE AND IT CONTINUOUSLY STALLED OR DIDN'T CRANK AND THAT'S WHEN I HAD TO HAVE MY HUSBAND JUMP IT OFF. THIS CONTINUED FOR A COUPLE OF WEEKS. I TOOK IT TO THE DEALERSHIP IN WHICH THEY TOLD ME THE PCM MODULE WAS BAD BUT WHEN THEY TRIED TO PROGRAM IT, IT SHOWED THAT THE BATTERY WAS BAD SO I PURCHASED A NEW BATTERY. ONCE THEY COMPLETED IT THEY STATED THAT THEY STARTED THE DURANGO AND IT STARTED WITHOUT ANY ISSUE BUT WHEN MY HUSBAND AND I WENT TO PICK IT UP, IT STALLED AGAIN AND IT TOOK ABOUT 10 MINUTES TO GET IT STARTED. I DROVE IT FOR A FEW DAYS UNITL ONE DAY I WENT TO THE STORE AND WHEN I CAME OUT OF THE STORE IT WOULD NOT START AT ALL SO I HAD TO GET IT TOWED TO THE DEALERSHIP, IT SAT THERE FOR ABOUT A WEEK UNTIL THEY FINALLY DIAGNOSED IT AS HAVING A BAD TIPM MODULE (TOTALLY INTEGRATED POWER MODULE). THE SERVICE REP AT THE DEALERSHIP STATED THAT THE TIPM MODULE IS ON BACKRODER (1352 AHEAD OF ME TO BE EXACT). THERE ARE LOTS OF REPORTS ON THE INTERNET ABOUT CHRYSLER VEHICLES HAVING A BAD TIPM. I THINK THERE SHOULD BE A RECALL ON IT. I PRESENTED MY CONCERNS TO CHRYSLER/DODGE ABOUT THIS AND THE ONLY THING I GOT WAS ANY APOLOGY. PLEASE, INVESTIGATE. DODGE IS USING A BAD PRODUCT AND DON'T WANT TO OWN UP TO IT AND THE CUSTOMERS ARE THE ONES THAT HAVE TO PAY FOR IT.

21.     The hardship and inconvenience for Class members is not only economic. Many Class members cannot afford rental cars and are left without transportation impacting their ability to do their jobs and take care of their families. In addition, many consumers complained that they have spent many hours over the course of weeks and months dealing with the TIPM problem, forced to take time off from work, to rescue their stranded families, or deal with their stranded car that would not start, sometimes several miles away from home. Even those who can afford a rental car or are provided one by their dealership while they wait for the backordered TIPM, are often provided too small of cars to transport their families or are limited by per day mileage limits.

**Chrysler Refuses to Acknowledge the TIPM Defect**

22.     Chrysler has long been aware of the issues involving its Totally Integrated Power Modules. There are several hundred complaints on the NHTSA website and

1   elsewhere online dating back to when the TIPM was first introduced in Chrysler vehicles

2   in 2006. There have also been several Chrysler recalls for the TIPM.  For example, in

3   2005, Chrysler recalled 2006 model-year Ram vehicles for a defective TIPM.  The

4   defective TIPM in those vehicles caused the vehicles to inadvertently default to neutral,

5   posing a safety risk that the vehicles might roll away and cause an accident without

6   warning. In 2007, a defect in the TIPM forced Chrysler to recall 80,894 Jeep Wranglers

7   and Dodge Nitro vehicles after an investigation by NHTSA.  Defective TIPMs in the

8   vehicles contained a software glitch "that may allow the engine to stall under certain

9   operating conditions.  This could cause a crash without warning."  Over 200 people

10  lodged detailed complaints with NHTSA describing these engine stalls. This defect in the

11  TIPM resulted in crashes and injuries before Chrysler recalled the affected vehicles.

12       23.     Despite the fact that previously defective TIPMs resulted in crashes and

13  injuries, Chrysler remains silent as TIPM parts go on national backorder and thousands of

14  complaints are lodged regarding ignition problems and stalling as a result of the defective

15  TIPMs in Class Vehicles.

16       24.     Chrysler's refusal to publically acknowledge the defect has created

17  widespread confusion regarding the problem.  Chrysler's failure to notify consumers,

18  dealerships, or auto-technicians prevents the TIPM problem from being efficiently

19  diagnosed.  Consumers whose vehicles' TIPMs have not yet failed do not know to look

20  out for early warning signs of the defect and auto-technicians are equally in the dark.

21  Many auto technicians have trouble diagnosing the TIPM as the root cause of Class

22  Vehicles' problems.  Furthermore, the lack of information about the defect inhibits

23  dealerships and auto-technicians from being able to properly advise Class members about

24  the continued safety of driving Class Vehicles that exhibit the symptoms of the defect.

25       25.     As a result of Chrysler's inaction and silence, many consumers are unaware

26  they are driving unsafe and unreliable vehicles and are spending hundreds to thousands of

27  dollars on unnecessary repairs on what appear to be dead batteries, faulty fuel pumps and

28  wireless ignition node ("WIN") modules, and other issues that are actually caused by the

1    defective TIPM.  Some Class members have even spent over $2,000 replacing their fuel

2    pump only to later find out the problem is actually with the vehicle's TIPM, a repair that

3    typically costs another $1,000 to $1,200 or so.

4        26.    Adding insult to injury, after consumers spend significant sums to replace

5    the defective TIPM, Chrysler does not make any reassurances that the replacement TIPM

6    is not similarly defective or that the vehicles' airbag system has not been affected.

7    **Plaintiff Daphne Ray's Experience**

8        27.    In April 2011, Ms. Ray purchased a new 2011 Jeep Grand Cherokee from

9    the Crystal Chrysler dealership in Cathedral City, California.  Ms. Ray's Jeep Grand

10   Cherokee came with a factory installed TIPM.

11       28.    Ms. Ray is a long-time Chrysler owner, and this was her third Jeep vehicle.

12   Ms. Ray's last Jeep lasted 190,000 miles and required very few repairs. Ms. Ray and her

13   husband purchased their 2011 Jeep Grand Cherokee because their last Jeep was reliable

14   and long-lasting and they believed this new Jeep would be the same.

15       29.    Approximately six to eight months after buying the Jeep, Ms. Ray started

16   experiencing problems with the Jeep's headlights going out.  Since purchasing the Jeep,

17   Ms. Ray and her husband have had to frequently replace the headlights and other lights in

18   their Jeep.

19       30.    Around July 2013, with approximately 57,000 miles, Ms. Ray took the Jeep

20   to a repair shop because it was driving poorly, getting bad gas mileage, and the check

21   engine light was on.  Ms. Ray paid approximately $95.38 for a diagnostic at Pep Boys in

22   Indio, California, whoadvised her she would need to take her Jeep into the Chrysler

23   dealership for repair.  The Chrysler dealership determined there was a problem with the

24   Jeep's software.  Ms. Ray paid approximately $115.00 for the dealership to diagnose the

25   software problem and reflash the car's computer.

26       31.    After the software reflash, Ms. Ray's Jeep continued to manifest electrical

27   issues.  The Jeep's door locks started to fail on the passenger left side and the rear lift

28   gate.  On a few occasions, the Jeep's alarm and horn would spontaneously activate.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1    Recently, Ms. Ray's Jeep started to randomly start on its own and continues to have

2    problems with the headlights coming on and off.  In addition, the Jeep's cruise control

3    only works intermittently.

4         32.    Troubled by all the electrical issues she was experiencing with her Jeep, Ms.

5    Ray went online to do some research.  Ms. Ray discovered several hundred  complaints

6    online about the same symptoms her Jeep exhibited and read that the problems were

7    likely caused by a faulty TIPM. Ms. Ray called Chrysler corporate and asked them about

8    the TIPM problem but Chrysler told her it would not do anything for her. Ms. Ray then

9    contacted the Crystal Chrysler dealership and described her problems. The Chrysler

10   dealership told Ms. Ray that it was likely a problem with the TIPM but that the part was

11   on national backorder and because she was out of warranty, the part would cost her

12   approximately $900 and even more for labor.  The Chrysler dealership would not order

13   the part for Ms. Ray until she brought the Jeep in for diagnosis.

14   **Plaintiff Philip Lightfoot's Experience**

15        33.    In January 2011, Mr. Lightfoot purchased a new 2011 Jeep Grand Cherokee

16   from the Walnut Creek Chrysler dealership in Walnut Creek, California.  Mr. Lightfoot's

17   Jeep Grand Cherokee came with a factory-equipped TIPM.

18        34.    Mr. Lightfoot and his wife bought their 2011 Jeep Grand Cherokee because

19   they wanted a reliable and safe vehicle.  Mr. Lightfoot and his wife traded in their three

20   year old Volvo believing the Jeep Grand Cherokee would be a safer and more reliable

21   car.

22        35.    Mr. Lightfoot is a long-time Chrysler owner, who has owned three Jeep

23   Wranglers and currently owns a Ram pickup truck.

24        36.    Around June 2013, Mr. Lightfoot and his wife began experiencing problems

25   with their Jeep.  Mr. Lightfoot and his wife first had trouble with the Jeep recognizing

26   that the wireless remote key was in the car to make the push-start ignition work.  Around

27   that same time, Mr. Lightfoot's wife began having trouble getting the Jeep to start.  At

28   first, the problem was sporadic, but over time the starting problem worsened.  Around

November 2013, the problem progressed to the point where Mr. Lightfoot could rarely get the Jeep to start at all.  At one point when the Jeep started, Mr. Lightfoot took it to a Chrysler dealership.

37.     The Chrysler dealership diagnosed the problem with Mr. Lightfoot's Jeep as a faulty TIPM.  The Chrysler dealership told Mr. Lightfoot that it would do a Chrysler approved after-market "patch" repair to the TIPM.  Mr. Lightfoot expressed concern about the fix being a patch but the Chrysler dealership told him that without any other symptoms this was the Chrysler approved repair.  Mr. Lightfoot paid approximately $526.90 to have the Jeep's TIPM repaired.

38.     Mr. Lightfoot is still very concerned about the repair to his Jeep's TIPM.  Mr. Lightfoot did research online and discovered numerous complaints about the TIPM and is worried that the patch repair to the TIPM does not fully resolve the problem.

**Plaintiff Christopher White's Experience**

39.     In May 2011, Plaintiff White purchased a new 2011 Jeep Grand Cherokee from the Fred Frederick Chrysler dealership in Laurel, Maryland.  Mr. White's Jeep came with a factory-equipped TIPM.

40.     Mr. White purchased his 2011 Jeep Grand Cherokee because he needed a reliable vehicle for his job which required heavy commuting.

41.     With around 30,000 miles on his Jeep and still under warranty, Mr. White began experiencing numerous problems with his vehicle. Mr. White's vehicle began to have trouble starting and several times the car stalled while he was driving. On one occasion, Mr. White was driving on the highway at 70 miles per hour when the car stalled.   Concerned about the safety and reliability of his vehicle, Mr. White took his Jeep to a local repair shop.  The local repair performed a fuel flush on the vehicle and replaced the vehicle's spark plugs.

42.     Less than a year later, Mr. White began experiencing more problems with his vehicle.  Occasionally when Mr. White would unlock his car the horn and windshield wipers would activate.  Mr. White also continued to have trouble starting his car.  Mr.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1   White took his vehicle in for a second time, this time to the Chrysler dealership, where

2   the problem was diagnosed as the battery in the vehicle's keyless entry remote.  Mr.

3   White paid to have the batteries replaced.

4        43.     Despite the battery replacement, Mr. White continued to have problems with

5   starting the vehicle and stalling.  At this time, Mr. White noticed that the vehicle's fuel

6   pump was not shutting off after he turned off the vehicle, draining the vehicle's battery.

7   Concerned again with the safety and reliability of his vehicle, Mr. White returned to the

8   local repair shop which diagnosed the problem as a faulty fuel pump.  Mr. White paid

9   approximately $2,215.74 to have the fuel pump repaired and the battery replaced.

10  Despite the repair Mr. White continued to experience problems with his ignition and

11  stalling. The repair shop then diagnosed the problem as a faulty TIPM, but told Mr.

12  White that TIPMs were on national backorder.  Mr. White's vehicle was transferred to a

13  Chrysler dealership to wait for the new TIPM.

14       44.     Mr. White contacted Chrysler customer care but received very limited

15  information.  Despite the fact that Mr. White's electrical problems began when his

16  vehicle was still under warranty, Chrysler customer care told him that his vehicle was

17  now no longer under warranty and would have to pay out of pocket for the repair and any

18  rental cars.  Mr. White spent approximately $1095.35 on a rental car while he waited for

19  the repair.  No longer able to afford the high cost of the rental car, Mr. White was forced

20  to buy another car.

21       45.     On September 25, 2013, two months later, Mr. White's vehicle was finally

22  repaired.  Mr. White paid approximately $1,349.59 to have the TIPM fixed.   Mr. White

23  does not know if the new TIPM is an upgraded part or is similarly defective.   Mr. White

24  believes the value of his vehicle is diminished as result of the defective TIPM.

25       **Plaintiff Jacqueline Young's Experience**

26       46.     In January 2011, Plaintiff Young purchased a new 2011 Jeep Grand

27  Cherokee from the Thompson Chrysler dealership in Baltimore, Maryland.  Ms. Young's

28  vehicle came with the factory-installed TIPM.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

47.     Ms. Young purchased her 2011 Jeep Grand Cherokee because she considered Jeep trucks to be sturdy and reliable vehicles that would not leave her stranded.  She bought her vehicle to commute to work and transport her family.  This was Ms. Young's third Jeep vehicle.

48.     In July 2013, with a little more than 40,000 miles on her vehicle, Ms. Young began having trouble starting her car.   On several occasions the ignition would make a prolonged grinding noise and the car would have trouble starting.  Initially believing the problem was with her electronic keyless entry remote, Ms. Young changed her keys.  Despite switching keys, the problem continued to progress with time, forcing Ms. Young to spend more and more time getting her vehicle started, typically around 15 minutes each time.

49.     Frustrated with the increasing difficulty of starting her vehicle, and concerned that it would leave her and her family stranded, in early September 2013, Ms. Young took her Jeep to the Thompson Chrysler dealership, in Baltimore, Maryland.   The dealership told her that the TIPM in her Jeep needed to be replaced, and that the replacement TIPM would cost her approximately $1,280.

50.     Ms. Young put down a $200.00 deposit for the new TIPM but the dealership could not tell her when it would be able to fix her car and told her that she was number 1,501 on a waiting list for a new TIPM.  When Ms. Young asked the dealership if it would provide her with a loaner vehicle while she waited she was told that Chrysler corporate did not have such a policy.  The dealership suggested she contact Chrysler directly.

51.     Ms. Young contacted Chrysler and initiated a claim to obtain an expedited TIPM and was told she would be called back.  Five days later, Ms. Young had not heard back from Chrysler, so she called back.  The customer service representative told Ms. Young that it was not Chrysler's policy to provide loaner-vehicles or rental cars.  Needing her car to commute to and from work, Ms. Young rented a car for approximately

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1  $300.00 a week.  Ms. Young waited approximately three weeks for her car to be repaired

2  and paid approximately $1,052.85 for a rental car.

3       52.     Ms. Young's vehicle was repaired for $1,036.30 and in total paid $2,089.15,

4  together with rental car expenses, as a result of the defective TIPM.  Ms. Young does not

5  know if the newly installed TIPM is an upgraded part or is similarly defective.

6  **Plaintiff John Melville's Experience**

7       53.     In September 2010, Mr. Melville bought a new 2011 Jeep Grand Cherokee

8  from the Cherry Hill Chrysler dealership in New Jersey.  Mr. Melville's Jeep Grand

9  Cherokee came factory-equipped with a TIPM.

10      54.     Mr. Melville is a long-time Jeep owner, and this was his fifth Jeep.  Mr.

11  Melville chooses Jeep vehicles because of car's size and reliability.  Among other things,

12  Mr. Melville uses his Jeep Grand Cherokee to get to and from work.

13      55.     In June 2013, with approximately 48,000 miles on his Jeep, Mr. Melville

14  started to have trouble starting his car.  On several occasions, when Mr. Melville tried to

15  get the car to start with the push-button start it would not work, and would often take six

16  or seven times before the car would start.

17      56.     Mr. Melville took his Jeep to a Chrysler dealership but the dealership could

18  not replicate or diagnose the problem.  The service representatives at Chrysler told Mr.

19  Melville there was nothing wrong with his car.

20      57.     For the next two months, Mr. Melville continuously struggled with the car's

21  ignition.  One night, when Mr. Melville was two hours away from home, his car would

22  not start at all.   Mr. Melville had the car towed to the Sea View Jeep dealership in Ocean

23  Township, New Jersey. The Sea View Jeep dealership diagnosed the problem as a faulty

24  fuel pump.  Mr. Melville did not believe the problem was with the car's fuel pump and

25  decided to have the car diagnosed at the Cherry Hill Chrysler dealership in Cherry Hill,

26  New Jersey.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

58.     The Cherry Hill Chrysler dealership diagnosed the problem as a faulty TIPM but told Mr. Melville that the TIPM was on national backorder.  Mr. Melville was told that it would take approximately two months for the part to come in.

59.     Chrysler would not cover the TIPM repair so Mr. Melville submitted a claim to his extended warranty plan.  Initially, the extended warranty company refused to cover the repair.  After many hours, Mr. Melville eventually convinced his extended warranty servicer to cover the cost of repair and paid a $100.00 deductible under his plan for the repair.

60.     On September 27, 2013, nearly two months after taking his Jeep into the dealership for repair, the dealership replaced the TIPM in Mr. Melville's Jeep.  When Mr. Melville drove off the dealership lot with his Jeep, his check engine light went on.

61.     Mr. Melville is disappointed with Chrysler and the experience he has had with his Jeep.   Mr. Melville was not given any reassurance about the replacement TIPM being an upgraded part.  He remains concerned that the Jeep's problem will occur at any time.  He is also concerned about the reliability of his Jeep's airbag system as a result of the defect.

**Plaintiff Christopher Light's Experience**

62.     In November 2012, when his wife became pregnant with their third child, Mr. Light bought a used 2011 Dodge Grand Caravan, from the Kia dealership in Clearwater, Florida, to accommodate his growing family.  Mr. Light's Dodge Caravan came with a factory-installed TIPM.

63.     In February 2013, while out shopping one day with his pregnant wife and young children, Mr. Light returned to his vehicle to discover one of the van doors open and the keyless entry remote unresponsive.  Mr. Light then attempted to start the vehicle but the vehicle would not respond.   Mr. Light contacted AAA to have the vehicle towed and waited for an hour with his family in the parking lot for the tow truck to arrive.  The tow truck driver told Mr. Light he would not be able to give his children a ride home because his young children needed car seats.  A family friend came to pick up Mr.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1  Light's wife and small children as he had the car towed to his home.  In the morning, Mr.

2  Light contacted AAA again to have his vehicle towed to the Fitzgerald's Countryside

3  Chrysler dealership.

4      64.     The dealership determined that the problem was with the vehicle's Wireless

5  Ignition Node or "WIN" module.  Mr. Light paid a $250 deductible under his extended

6  warranty agreement to repair the WIN.  The dealership told Mr. Light that he would be

7  reimbursed for his rental car during the time of the repair under extended warranty

8  agreement.  Mr. Light, however, was only reimbursed for three of the five days of his

9  rental, because the extended warranty did not cover car rentals due to delayed or back

10  ordered parts and thus incurred an additional car rental expense of approximately

11  $200.00.  Since the repair to the WIN, Mr. Light continued to experience problems with

12  his van doors opening randomly on their own.

13      65.     Six months later, in early August 2013, Mr. Light's vehicle once again

14  failed to start, leaving his wife and young children stranded at home.  Mr. Light took off

15  work to come home and deal with the car.  Mr. Light contacted AAA and determined the

16  battery had died and paid approximately $125.00 dollars for a replacement.  The day after

17  installing the new battery, Mr. Light's vehicle again would not start.  Mr. Light had AAA

18  tow his vehicle to a car repair shop and paid approximately $45.00 for an electrical

19  diagnostic. The repair shop determined the problem was with the vehicle's fuel pump and

20  prepared a cost estimate to fix the problem.  Mr. Light's extended warranty would not

21  cover the estimate so Mr. Light contacted AAA to have the vehicle towed to Fitzgerald's

22  Countryside Chrysler dealership.

23      66.     The dealership told Mr. Light that the problem was not with the fuel pump

24  but rather with the TIPM, a part that is on national backorder.  The dealership did not

25  know when a replacement TIPM would be available for Mr. Light's vehicle, and had

26  three other inoperable vehicles in their service department awaiting TIPM repairs.  The

27  dealership told Mr. Light that it was lucky to receive even one TIPM per week.  The

28  dealership provided Mr. Light with a loaner vehicle while he waited.

18

FIRST AMENDED CLASS ACTION COMPLAINT<br>CASE NO. 13-CV-08080-DDP-VBK

67.     Frustrated there was no timeframe for the repair, Mr. Light contacted the Dayton Andrews Dodge dealership in Clearwater, Florida, and asked whether it had any TIPMs.  The dealership told him that the part was on national backorder and because he was not a high priority customer it would likely take approximately two months.

68.     On September 17, 2013, nearly a month later, the Fitzgerald's Countryside Chrysler dealership told Mr. Light that it still did not know when they would receive the new TIPM for his vehicle.

69.     On September 20, 2013, the dealership notified Mr. Light that it had received the part and repaired his vehicle.  Because the repair was unexpected, Mr. Light was forced to arrange a late payment of his rent in order to pay the $250.00 deductible under his extended warranty to repair the TIPM.

70.     To date, Mr. Light has not received any reassurances that the new TIPM is not defective, and remains concerned that he will have to replace the TIPM again in the future.

**Plaintiff Bradford Soule's Experience**

71.     In February 2013, Plaintiff Soule purchased a Certified Pre-owned 2011 Jeep Grand Cherokee from a Chrysler dealership in Brockton, Massachusetts. Mr. Soule's Jeep came factory-equipped with the TIPM.

72.     Mr. Soule decided to purchase his 2011 Jeep Grand Cherokee as a Certified Pre-owned vehicle through the Chrysler dealership to ensure that he was receiving a reliable vehicle for his sixty-mile commute to work and for transporting his family.  Mr. Soule was reassured from the dealership that Certified Pre-owned vehicles were reliable because these vehicles went through an extensive 250-point checklist and came with a 100,000 mile powertrain warranty.

73.     Five months after buying the car, Mr. Soule began experiencing problems with his Jeep not starting, leaving him stranded on several occasions.  On one occasion, Mr. Soule returned to his vehicle to begin his sixty mile commute home and could not get

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1  the vehicle to start.  Mr. Soule spent forty-five minutes troubleshooting the ignition

2  before he was finally able to get the vehicle to start.

3       74.    Shortly thereafter, Mr. Soule called the dealership and made an appointment

4  to bring in his vehicle.  Prior to bringing in his vehicle for the service, Mr. Soule

5  researched the problem he was experiencing online and found hundreds of complaints

6  which stated that the TIPM in 2011 Jeep Grand Cherokee vehicles frequently caused

7  vehicles to fail to start or stall.

8       75.    On August 17, 2013, Mr. Soule took his vehicle to the Chrysler dealership.

9  Mr. Soule mentioned to the service department he thought the issue may be with the

10 vehicle's TIPM.  Mr. Soule paid approximately $100.00 for the dealership to run a

11 diagnostic and reset the vehicle's TIPM, which did not fix the problem. The dealership

12 told Mr. Soule that he would need to replace the TIPM entirely, and this part was not

13 covered under Chrysler's 100,000 mile powertrain warranty.  The TIPM was also on

14 national backorder. The dealership told Mr. Soule that there was another vehicle there

15 that had been waiting for a replacement TIPM for two months, and it did not know when

16 his vehicle would be repaired.

17      76.    Frustrated by Chrysler's denial of warranty coverage for the repair and the

18 long wait for a replacement TIPM, Mr. Soule contacted the Chrysler corporate office and

19 complained.  After several phone calls, Chrysler agreed to pay for half of the cost of the

20 repair and said it would try to expedite a new TIPM to his dealership.

21      77.    Unaware of the potential safety risks and with no other means of

22 transportation, Mr. Soule brought his vehicle home and continued to drive it.  As time

23 passed, however, the ignition and stalling problems increased in frequency and Mr. Soule

24 became concerned about the continued safety of driving the vehicle.  During this time

25 Mr. Soule also noticed that the vehicle's fuel pump was not shutting off.  Concerned

26 about the safety of fuel continuing to pump through his vehicle while parked in the

27 garage, and the potential to drain the battery, Mr. Soule began disconnecting the battery

28 after he drove.  The battery is located under the passenger seat.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

78.     Unwilling to continue to drive his unsafe and unreliable vehicle, Mr. Soule contacted Chrysler corporate about obtaining a rental car.  Chrysler told Mr. Soule that it would not cover the costs of a rental car upfront but that he may be reimbursed at some later date.  Chrysler suggested that Mr. Soule contact the dealership to see if it would accommodate him.  When Mr. Soule contacted the dealership it informed him it recently received two TIPMs and that he could bring his vehicle in for repair.

79.     On September 3, 2013, Mr. Soule took his vehicle to the dealership to have the TIPM replaced.  With Chrysler paying half, Mr. Soule's out-of-pocket expenses for the diagnostic test and the replacement TIPM totaled approximately $635.00.

80.     Even with the repair, Mr. Soule remains concerned with the safety and reliability of his vehicle's new TIPM, as the replacement TIPM uses the same part number as the original TIPM that came with his vehicle.  Mr. Soule has not received any reassurance that the new TIPM is without the same defect and is also concerned because the TIPM controls the airbag system.

**Plaintiff Donald Kendrick's Experience**

81.     In March 2012, Plaintiff Kendrick bought a used 2011 Jeep Grand Cherokee with an extended warranty from the Hillcrest Ford dealership in Huntsville, Texas.  Mr. Kendrick's Jeep came factory-equipped with a TIPM.

82.     Mr. Kendrick and his wife are long-time Jeep owners. They chose the 2011 Jeep Grand Cherokee because it was a highly-rated SUV and because they believed the vehicle was safe and reliable for driving in the snow.  Mr. Kendrick and his wife purchased the vehicle primarily for getting around town and for occasional trips.

83.     In March 2013, Mr. Kendrick began having problems with his Jeep.  On one occasion the horn in Mr. Kendrick's Jeep randomly activated and would not turn off. Mr. Kendrick eventually had to manually disconnect the horn in order to get it to turn off.

84.     In May 2013, Mr. Kendrick and his wife started having trouble getting their Jeep to start.  At first the no-start problem was intermittent, however, with time the problem progressed.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

85.     In early September 2013, Mr. Kendrick researched the problems he was having with his Jeep online and discovered hundreds of complaints from Jeep owners with similar problems.  Originally Mr. Kendrick contacted the Tate Branch Dodge Chrysler dealership about bringing in the Jeep but was told that it would be three weeks before he could bring it in.  To get faster service on his Jeep, Mr. Kendrick took his Jeep to the Mack Massey Chrysler dealership in El Paso, Texas.  The Mack Massey Chrysler dealership diagnosed a fuel pump problem and recommended a fuel pump repair and fuel system flush.  Mr. Kendrick shared the information he found on the internet with the dealership regarding the TIPM, but the dealership insisted the problem was with the vehicle's fuel pump. Mr. Kendrick paid a $50.00 deductible under his extended warranty to have the fuel pump repaired and approximately $200.00 to have the Jeep's fuel system cleaned.

86.     The day after picking up the Jeep from the Chrysler dealership Mr. Kendrick and his wife experienced the same trouble getting the car to start.   They immediately contacted the dealership but they were told the problems would dissipate as the fuel worked through the system. The dealership also advised them not to use cheap gas.

87.     Later that month, when their Jeep was parked in their garage Mr. Kendrick noticed the fuel pump continuing to run. When Mr. Kendrick tried to start the vehicle he discovered the battery had drained.  Mr. Kendrick had the Jeep towed to the Tate Branch Chrysler dealership in Carlsbad, New Mexico. The service manager at the dealership told Mr. Kendrick that he knew of the TIPM problem and recently had another vehicle in the shop for the same problem.

88.     Mr. Kendrick borrowed a car from his daughter in-law while his Jeep was at the Chrysler dealership for diagnosis and repair because his warranty would only cover a one-day rental car.  The dealership informed Mr. Kendrick that the TIPM was on national backorder and did not know when it would receive the part.  While Mr. Kendrick was waiting for the repair he contacted Chrysler customer care about expediting the part. Mr. Kendrick's TIPM was repaired after ten days.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

89.   Mr. Kendrick paid a $50.00 deductible under his extended warranty for the TIPM repair and paid approximately $345.00 to replace the battery drained by the malfunctioning TIPM. Mr. Kendrick does not know if the new TIPM is an upgraded part or is similarly defective, and is concerned about the future reliability of his Jeep.

**Chrysler Has Exclusive Knowledge of the TIPM Defect and Refuses to Recall Impacted Vehicles**

90.   Chrysler has long known that it equipped Class Vehicles with defective TIPMs.  Chrysler has exclusive access to information about the TIPM defect through its dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data, among other sources of aggregate information about the problem.  In contrast, the TIPM defect was not known or reasonably discoverable by the Plaintiffs and Class members prior to purchase and without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

91.   Despite the pervasive failures of the TIPM in the Class Vehicles, Chrysler has not issued a recall, nor has Chrysler acknowledged that the TIPM is defective or notified current owners and lessees of the potential safety risks in operating a vehicle with a defective TIPM.

92.   Chrysler has not compensated consumers for the losses that have resulted from the defect nor has Chrysler made it clear to consumers forced to replace the TIPM whether the replacement is an upgraded part or just another defective TIPM.

93.   Chrysler knew that potential car buyers and lessees would deem the defect in the TIPM to be material such that reasonable consumers who knew of the defect either would have paid less for the Class Vehicles or would not have purchased or leased a Class Vehicle at all.

94.   As a result of Chrysler's practices, Plaintiffs and Class members purchased vehicles they otherwise would not have purchased, paid more for those vehicles than they would have paid, were subjected to an unreasonable risk to their safety, and paid, and will

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1 | continue to pay, repair costs and out-of-pocket costs for alternative transportation as a
2 | result of the TIPM defect and the long waiting time for replacement parts.

3 |      95.    The TIPM defect has resulted in several thousand consumers incurring
4 | substantial expenses they could not and would not have expected to pay when they
5 | purchased the Class Vehicles, including the high cost of repair, the costs of making
6 | unnecessary repairs, and the additional expense of securing alternative transportation
7 | while waiting for the backordered TIPM.

8 | **CLASS ACTION ALLEGATIONS**

9 |      96.    Plaintiffs bring this action on behalf of themselves and a class of persons
10 | initially defined as follows:

11 |      All persons in the United States who purchased or leased Class Vehicles
12 |      installed with the TIPM, or, alternatively, all persons in California,
13 |      Maryland, Florida, Massachusetts, New Jersey, and New Mexico who
14 |      purchased or leased Class Vehicles installed with the TIPM.

15 |      97.    Excluded from the Class are Chrysler and Chrysler Group, LLC; any
16 | affiliate, parent, or subsidiary of Chrysler or Chrysler Group, LLC; any entity in which
17 | Chrysler or Chrysler Group, LLC, has a controlling interest; any officer, director, or
18 | employee of Chrysler or Chrysler Group, LLC; any successor or assign Chrysler or
19 | Chrysler Group, LLC; anyone employed by counsel for Plaintiffs in this action; any
20 | Judge to whom this case is assigned as well as his or her immediate family and staff; and
21 | anyone who purchased a Class Vehicle for the purpose of resale.

22 |      98.    This action has been brought and may properly be maintained on behalf of
23 | the Class proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

24 |      99.    _Numerosity._  Members of the Class are so numerous that their individual
25 | joinder herein is impracticable.  Hundreds of thousands of Class Vehicles have been sold
26 | or leased in the United States.  Class members may be notified of the pendency of this
27 | action by mail, supplemented (if deemed necessary or appropriate by the Court) by
28 | published notice.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1      100.   <u>Existence and predominance of common questions</u>.  Common questions of

2  law and fact exist as to all members of the Class and predominate over questions

3  affecting only individual Class members.  These common questions include the

4  following:

5          a.     Whether Class Vehicles suffer from the TIPM defect;

6          b.     Whether the TIPM defect creates an unreasonable safety risk;

7          c.     Whether Chrysler knew or should have known about the safety risks

8               created by the TIPM prior to the sale of Class Vehicles;

9          d.     Whether the safety risks created by the TIPM are  material facts;

10         e.     Whether Chrysler has a duty to disclose the defective nature of the

11              TIPM to Plaintiffs and the Class;

12         f.     Whether Chrysler has violated California's Consumers Legal

13              Remedies Act, Civ. Code §1750, *et seq.*, as alleged;

14         g.     Whether Chrysler has engaged in unlawful, unfair, or fraudulent

15              business practices in violation of California Business and Professions

16              Code § 17200 *et seq.*, as alleged;

17         h.     Whether Chrysler has violated the Maryland, Massachusetts, Florida,

18              New Jersey, and  New Mexico Consumer Protection Acts as alleged;

19         i.     Whether Chrysler breached its express emissions warranties by

20              refusing to provide warranty coverage for the defect;

21         j.     Whether Chrysler breached its implied warranties by refusing to

22              provide warranty coverage for the defect;

23         k.     Whether Plaintiffs and the other Class members are entitled to

24              equitable relief, including but not limited to restitution or a

25              preliminary and/or permanent injunction; and

26         l.     Whether Plaintiffs and the other Class members are entitled to

27              damages and other monetary relief as alleged.

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1      101.  <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the Class, because,

2  among other things, Plaintiffs purchased Class Vehicles, which contain the same

3  defective TIPM found in all other Class Vehicles.

4      102.  <u>Adequacy</u>.  Plaintiffs are adequate representatives of the Class because their

5  interests do not conflict with the interests of the members of the Class they seek to

6  represent.  Plaintiffs have retained counsel competent and experienced in complex class

7  action litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of

8  members of the Class will be fairly and adequately protected by Plaintiffs and their

9  counsel.

10      103.  <u>Superiority</u>.  The class action is superior to other available means for the fair

11  and efficient adjudication of this dispute.  The injury suffered by each Class member,

12  while meaningful on an individual basis, is not of such magnitude as to make the

13  prosecution of individual actions against Chrysler economically feasible.  Even if Class

14  members themselves could afford such individualized litigation, the court system could

15  not.  In addition to the burden and expense of managing many actions arising from the

16  TIPM defect, individualized litigation presents a potential for inconsistent or

17  contradictory judgments.  Individualized litigation increases the delay and expense to all

18  parties and the court system presented by the legal and factual issues of the case.  By

19  contrast, the class action device presents far fewer management difficulties and provides

20  the benefits of single adjudication, economy of scale, and comprehensive supervision by

21  a single court.

22      104.  In the alternative, the Class may be certified because:

23         a.    the prosecution of separate actions by the individual members of the

24            Class would create a risk of inconsistent or varying adjudication with

25            respect to individual Class members which would establish

26            incompatible standards of conduct for Chrysler;

27         b.    the prosecution of separate actions by individual Class members

28            would create a risk of adjudications with respect to them which

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1           would, as a practical matter, be dispositive of the interests of other

2           Class members not parties to the adjudications, or substantially impair

3           or impede their ability to protect their interests; and

4     c.     Chrysler has acted or refused to act on grounds generally applicable to

5           the Class, thereby making appropriate final and injunctive relief with

6           respect to the members of the Class as a whole.

7                **FIRST CAUSE OF ACTION**

8          **(Violation of the Consumers Legal Remedies Act,**
               **Cal. Civ. Code. §§ 1750, *et seq.*)**

9
10     105.    Plaintiffs Ray and Lightfoot, on behalf of themselves and all others similarly situated, reallege as if fully set forth, each and every allegation set forth herein.

11
12     106.    Chrysler is "person" within the meaning of Civil Code sections 1761(c) and 1770, and provided "goods" within the meaning of California Civil Code section 1761(b) and 1770.

13
14     107.    Plaintiffs and members of the class are "consumers" within the meaning of Civil Code section 1761(d) and 1770, and have engaged in a "transaction" within the meaning of Civil Code section 1761(e) and 1770.

15
16
17
18     108.    As set forth herein, Chrysler's acts and practices, undertaken in transactions intended to result and which did result in the sale or lease of Class Vehicles, violate Section 1770 of the Consumers Legal Remedies Act in that: (a) Chrysler represents that its goods have sponsorship, approval, characteristics, uses or benefits which they do not have; (b) Chrysler advertises its goods with intent not to sell them as advertised; (c) Chrysler represents that a transaction confers or involves rights, remedies, or obligations which it does not have or involve; and (d) Chrysler represents that its goods have been supplied in accordance with a previous representation when they have not.

19
20
21
22
23
24
25     109.    The acts and practices engaged in by Chrysler that violate the Consumers Legal Remedies Act include failing to disclose, at the point of sale or otherwise, that the TIPM is defective and poses a safety hazard.

26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

110.   Had Chrysler adequately disclosed information about the defective TIPM, Plaintiffs, Class members, and a reasonable consumer would not have purchased, and/or would have paid less for their Class Vehicles.

111.   Pursuant to the provision of California Civil Code § 1780, Plaintiffs seek an order enjoining Chrysler from the unlawful practices described herein, a declaration that Chrysler's conduct violates the Consumers Legal Remedies Act, and attorneys' fees and costs of litigation.

## SECOND CAUSE OF ACTION
### (For unlawful, unfair, and fraudulent business practices under Business and Professions Code § 17200 *et seq.*)

112.   Plaintiffs Ray and Lightfoot, on behalf of themselves and all others similarly situated, reallege as if fully set forth, each and every allegation set forth herein.

113.   Chrysler's acts and practices, as alleged in this complaint, constitute unlawful, unfair and/or fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

114.   The business practices engaged in by Chrysler that violate the Unfair Competition Law include failing to disclose, at the point of sale or otherwise, that the TIPM is defective and poses a safety hazard.

115.   Chrysler engaged in unlawful business practices by violating the Consumers Legal Remedies Act, Civil Code sections 1750 *et seq.*,the Magnuson-Moss Warranty Act, 15 U.S.C 2301(3), and Title 13, Cal. Code of Regulations § 2037.

116.   Chrysler engaged in unfair business practices by, among other things:

117.   Engaging in conduct where the utility of that conduct is outweighed by the gravity of the consequences to Plaintiffs and other members of the class;

118.   Engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and other members of the class; and

119.   Engaging in conduct that undermines or violates the stated policies underlying the CLRA, which seeks to protect consumers against unfair and sharp

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1  business practices and to promote a basic level of honesty and reliability in the

2  marketplace.

3    120.   Chrysler engaged in fraudulent business practices by engaging in conduct

4  that was and is likely to deceive a reasonable consumer.

5    121.   As a direct and proximate result of Chrysler's unlawful, unfair and

6  fraudulent business practices as alleged herein, Plaintiffs Ray and Lightfoot and Class

7  members have suffered injury in fact and lost money or property, in that they purchased

8  Class Vehicles they otherwise would not have, paid more for Class Vehicles than they

9  otherwise would, paid for TIPM diagnoses, repairs, and replacements, and/or rental cars,

10  and are left with Class Vehicles of diminished value and utility because of the defect.

11  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and

12  charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

13    122.   Plaintiffs and Class members are entitled to equitable relief, including

14  restitutionary disgorgement of all profits accruing to Chrysler because of its unlawful,

15  unfair and fraudulent, and deceptive practices, attorneys' fees and costs, declaratory

16  relief, and a permanent injunction enjoining Chrysler from its unlawful, unfair, fraudulent

17  and deceitful activity.

18  **THIRD CAUSE OF ACTION**

19  **(Violation of the Maryland Consumer Protection Act,**

20  **Md. Code Com. Law § 13-101, *et seq.* )**

21    123.   Plaintiffs White and Young, on behalf of themselves and all others similarly

22  situated, reallege as if fully set forth, each and every allegation set forth herein.

23    124.   Plaintiffs White and Young are "persons" within the meaning of the

24  Maryland Consumer Protection Act for all purposes therein.

25    125.   Chrysler is a "person" within the meaning of the Maryland Consumer

26  Protection Act.

27    126.   All of the conduct alleged herein occurred in the course of Chrysler's

28  business and is part of a pattern or generalized course of conduct.

  127.   By failing to disclose, at the point of sale or otherwise, that the TIPM in

29

1  Class Vehicles is defective and poses a safety hazard, Chrysler has violated the Maryland

2  Consumer Protection Act.

3      128.   Plaintiffs White and Young and the Class were injured by Chrysler's

4  conduct.  As a direct and proximate cause of Chrysler's unfair methods of competition

5  and unfair and deceptive acts or practices, Plaintiffs White and Young and the Class have

6  suffered actual economic losses.

7      129.   Pursuant to Md. Code Com. Law § 13-408, Plaintiffs White and Young and

8  the other Class members make claims for damages and attorneys' fees.

9  **FOURTH CAUSE OF ACTION**

10 **(Violation of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat.  § 501.201, *et seq.*)**

11

12     130.   Plaintiff Light, on behalf of himself and all others similarly situated,

13 realleges as if fully set forth, each and every allegation set forth herein.

14     131.   The purpose of the Florida Deceptive and Unfair Trade Practices Act, Fla.

15 Stat. § 501.201 *et seq.*, is to "protect the consuming public…from those who engage in

16 unfair methods of competition, or unconscionable, deceptive or unfair acts or practice in

17 the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

18     132.   Plaintiff Light and the other Class members are "consumers" within the

19 meaning of Fla. Stat. §501.203(7).

20     133.   At all relevant times, Chrysler was engaged in trade or commerce within the

21 meaning of Fla. Stat.  §501.203(8).

22     134.   Chrysler has violated the Act by engaging in the unfair and deceptive

23 practices as described herein which offend public polices and are immoral, unethical,

24 unscrupulous and substantially injurious to consumers.

25     135.   Chrysler's violation of Florida's Deceptive and Unfair Trade Practices Act

26 includes, failing to disclose, at the point of sale or otherwise, that the TIPM in Class

27 Vehicles is defective and poses a safety hazard.

28     136.   Plaintiff and other members of the Class have been aggrieved by Chrysler's

unfair and deceptive practices in that they purchased or leased defective Class Vehicles.

30

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

137.   The damages suffered by Plaintiff and the Class members were directly and proximately caused by the unfair and deceptive practices of Chrysler, as more fully described herein.

138.   Pursuant to Fla. Stat. §501.211(1), Plaintiff Light and the other Class members seek a declaratory judgment and court order enjoining the above-described wrongful acts and practices of Chrysler and for restitution and disgorgement.

139.   Pursuant to Fla. Stat. §501.211(2) and 501.2105, Plaintiff Light and the other Class members make claims for damages, attorneys' fees, and costs.

### FIFTH CAUSE OF ACTION
**(Violations of Massachusetts' Consumer Protection Act,
Mass. Gen Laws, ch. 93A, *et seq*.)**

140.   Plaintiff Soule, on behalf of himself and all others similarly situated, realleges as if fully set forth, each and every allegation set forth herein.

141.   Mass. Gen. Laws ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

142.   At all relevant times, Chrysler was engaged in commerce within the meaning of Mass. Gen. Laws, ch. 93A.

143.   As alleged more fully herein, Chrysler has violated Mass. Gen. Laws, ch. 93A in that it used unconscionable business practices, including the failure to disclose, at the point of sale or otherwise, that the TIPM in Class Vehicles is defective and poses a safety hazard.

144.   Chrysler's practices also violate the Mass Gen. Laws ch. 111 § 142k, *et seq*. and the Magnuson-Moss Warranty Act, 15 U.S.C 2301(3).

145.   Pursuant to Mass. Gen. Laws ch 93A § 9, Plaintiff Soule and the other Class Members seek a declaratory judgment and court order enjoining the above-described wrongful acts and practices of Chrysler, for restitution and disgorgement.

146.   Plaintiff and members of the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

147.    The unfair and deceptive practices of Chrysler, as described herein, present a serious threat to Plaintiff and members of the Class.

148.    Plaintiff made a demand for relief, in writing, to Chrysler at least thirty (30) days prior to filing this amended complaint, as required by Mass. Gen. Laws Ch. 93A, § 9.

149.    Based on the foregoing, Plaintiff and the other members of the Class are entitled to all remedies available pursuant to Mass. Gen. Laws ch. 93A including, but not limited to, refunds, actual damages, or statutory damages in the amount of 25 dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

### SIXTH CAUSE OF ACTION

**(Violations of New Jersey Consumer Fraud Act, N.J. Stat. §56:8-1, *et seq*.)**

150.    Plaintiff Melville, on behalf of himself and all others similarly situated, realleges as if fully set forth, each and every allegation set forth herein.

151.    Class Vehicles are "merchandise" under N.J. Stat. § 56:8-1(c).

152.    Chrysler is a "person" under N.J. Stat. § 56:8-1(d).

153.    Class members' purchase and leases of Class Vehicles are "sales" under N.J. Stat. § 56:8-1(e).

154.    Chrysler's conduct, as alleged herein, violated the New Jersey Consumer Fraud Act, N.J. Stat. 56:8-2, in that it used an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of merchandise or Chrysler's subsequent performance.

155.    Chrysler knowingly concealed, suppressed, or omitted the material fact from Class members that the Class Vehicles' suffers from a TIPM defect which poses a safety risk for consumers and the general public.

156.    Chrysler further knowingly concealed, suppressed, or omitted that the TIPM

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1   is an emissions related part covered under an emissions warranty that Chrysler is

2   obligated to provide under New Jersey law.

3      157.   Chrysler's conduct as alleged herein is an unfair business practice in that

4   many consumers are unaware of the Emissions Related warranty required by New Jersey

5   law.  Chrysler has benefited and continues to benefit from Class members' payments for

6   repairs that, unbeknownst to them, are covered by Chrysler's Emissions-related warranty.

7      158.   As a direct and proximate cause of Chrysler's misconduct, Plaintiff and

8   other Class members have suffered ascertainable loss of money or property in that,

9   among other things: (a) they have paid for repairs that should have been covered by

10   Chrysler's Emissions-related Warranty; (b) they have paid for extended warranties that

11   they would not have otherwise purchased had they known of the Emissions-related

12   Warranty; and (c) they purchased Class Vehicles they otherwise would not have, paid

13   more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs,

14   and replacements, and/or rental cars, and are left with Class Vehicles of diminished value

15   and utility because of the defect.

**SEVENTH CAUSE OF ACTION**

**(Violations of New Mexico Unfair Practices Act, N.M. Stat. §§ 57-12-1, *et seq.*)**

18      159.   Plaintiff Donald Kendrick, on behalf of himself and all others similarly

19   situated, realleges as if fully set forth, each and every allegation set forth herein.

20      160.   The New Mexico Unfair Practices Act declares unlawful unfair or deceptive

21   practices and unconscionable trade practices in the conduct of any trade or commerce.

22      161.   Chrysler is a "person" engaged in "trade" and/or "commerce" under N.M.

23   Stat. § 57-12-1(A), (C).  Chrysler's conduct is part of a pattern or generalized conduct

24   that is still perpetuated and repeated, both in New Mexico and nationwide.

25      162.   Chrysler's use of unfair and deceptive acts and practices was willful and

26   knowing.

27      163.   Chrysler's conduct, as alleged herein, constitutes an unfair or deceptive

28   trade practice, by:

33

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1        a.    Representing that goods or services have characteristics, uses or

2              benefits that they do not have;

3        b.    Representing that goods or services are of a particular standard,

4              quality or grade or that goods are of a particular type or model if they

5              are of another; and/or

6        c.    Using exaggeration, innuendo or ambiguity as to a material fact or

7              failing to state a material fact that deceives or tends to deceive.

8    164.   Chrysler's conduct, as alleged herein, constitutes an unconscionable trade

9    practice, in that Chrysler's practices:

10       a.    Takes advantage of the lack of knowledge, ability, experience or

11             capacity of a person to a grossly unfair degree; and/or

12       b.    Results in a gross disparity between the value received by a person

13             and the price paid.

14   165.   Plaintiff is entitled to damages in the amount of three times their actual

15   damages or $300 (whichever is greater), and the Class members are entitled to damages

16   in an amount equal to their actual damages.  Plaintiff and the Class members are also

17   entitled to equitable relief, including restitution, attorneys' fees and costs, declaratory

18   relief and a permanent injunction enjoining Chrysler from its unfair and deceptive

19   practices.

20   **EIGHTH CAUSE OF ACTION**

21   **(Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*)**

22   166.   Plaintiff Soule, on behalf of himself and all others similarly situated,

23   realleges as if fully set forth, each and every allegation set forth herein.

24   167.   Plaintiff Soule and the other Class Members are "consumers" within the

25   meaning of the Magnuson-Moss Warranty Act, 15 U.S.C 2301(3).

26   168.   Chrysler is a "supplier" and "warrantor" within the meaning of sections

27   2301(4)-(5).

28   169.   The Class Vehicles are "consumer products" within the meaning of section

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1   2301(1).

2       170.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is

3   damaged by the failure of a warrantor to comply with a written or implied warranty.

4       171.   Chrysler's Emission-related Defects Warranty is a "written warranty" within

5   the meaning of section 2301(6). Chrysler's Vehicles' implied warranties are covered

6   under 15 U.S.C. § 2301(7).

7       172.   Chrysler breached the Emissions-related Defects warranty by:

8           a.    Extending, per its legal obligation, the California Emissions-related

9                 Defects Warranty, thereby warranting to repair or replace any parts

10                covered under that warranty at no cost to the owner or lessee;

11          b.    Selling and leasing Class Vehicles with defective TIPMs, which are

12                emissions-related parts, requiring repair or replacement within the

13                warranty period; and

14          c.    Refusing to honor the express warranty by repairing or replacing, free

15                of charge, the TIPM or any of its component parts and instead

16                charging for repair and replacement parts.

17      173.   Chrysler's breach of the Emissions-related Defects Warranty has deprived

18   Plaintiff and the other Class Members of the benefit of their bargain.

19      174.   Chrysler breached the implied warranties by equipping Class Vehicles with

20   a defective TIPM, which poses an unreasonable safety risk to drivers and the general

21   public.

22      175.   Plaintiff and each of the other Class members have had sufficient direct

23   dealings with either Chrysler or its agents (dealerships) to establish privity of contract

24   between Chrysler, on the one hand, and Plaintiffs and the other Class members, on the

25   other hand.

26      176.   Plaintiff and the other Class members are intended third-party beneficiaries

27   of contracts between Chrysler and its dealers, and specifically, of Chrysler's implied

28   warranties. Chrysler dealerships are not intended to be the ultimate consumers of the

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1   Chrysler vehicles and have no rights under the warranty agreements provided with the
2   Chrysler Vehicles; the warranty agreements were designed for and intended to benefit the
3   consumers only.

4       177.   The amount in controversy of the Plaintiff's individual claims meets or
5   exceeds the sum or value of $25.  In addition, the amount in controversy meets or
6   exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the
7   basis of all claims to be determined in this suit.

8       178.   Chrysler has been afforded reasonable opportunity to cure its breach of
9   written and implied warranty, including when Class Members brought their vehicles in
10  for diagnosis and repair of secondary electrical issues caused by the Class Vehicles'
11  defective TIPMs.

12      179.   Resorting to any informal dispute settlement procedure and/or affording
13  Chrysler another opportunity to cure these breaches of warranties is unnecessary and/or
14  futile.  Any remedies available through any informal dispute settlement procedure would
15  be inadequate under the circumstances, as Chrysler has failed to remedy the TIPM
16  problem with the Class Vehicles, and, as such, have indicated no desire to participate in
17  such a process at this time.  Any requirement under the MMWA or otherwise that
18  Plaintiffs resort to any informal dispute settlement procedure and/or afford Chrysler a
19  reasonable opportunity to cure the breach of warranties described above is excused and/or
20  has been satisfied.

21      180.   As a direct and proximate cause of Chrysler's breach of written and implied
22  warranties, Plaintiff and Class members sustained damages and other losses in an amount
23  to be determined at trial.   Chrysler's conduct damaged Plaintiff and Class members, who
24  are entitled to recover damages, consequential damages, specific performance,
25  diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

26      181.   Pursuant to the provisions of 15 U.S.C. § 2310(e), on November 1, 2013,
27  Plaintiff Soule sent notice to Chrysler's principle place of business and registered agent
28  for service to provide it with reasonable opportunity to correct its business practices and

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1  cure its breach of warranties under the MMWA.   Chrysler received the notice on

2  November 7, 2013. Chrysler has not cured the breach of warranties described above.

### NINTH CAUSE OF ACTION

**(Violations of the California Song-Beverly Consumer Warranty Act,
Cal. Civ. Code §§ 1790, *et seq.*)**

182.   Plaintiffs Ray and Lightfoot, on behalf of themselves and all others similarly situated, reallege as if fully set forth, each and every allegation set forth herein.

183.   Class Vehicles are "consumer goods" under Cal. Civil Code § 1791(a).

184.   Plaintiffs Ray and Lighfoot, and other members of the Class, are "buyers" or "retail buyers" under Cal. Civil Code § 1791(b).

185.   Chrysler is a "distributor," "manufacturer," and/or "retail seller" under Cal. Civil Code §§ 1791(e), (j), and (l).  Chrysler knew or had reason to know of the specific use for which the Class Vehicles were purchased.

186.   Chrysler provided Plaintiffs and Class members with an implied warranty that Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they are sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, among other things, the Class Vehicles suffer from a TIPM defect that causes Class Vehicles to fail to reliably start and can put the lives of its occupants, other motorists, and pedestrians at risk.

187.   Chrysler impliedly warranted that the Class Vehicles were of a merchantable quality and fit for such use.  This implied warranty included, among other things: (1) a warranty that Class Vehicles and their TIPMs were manufactured, supplied, distributed, and/or sold by Chrysler were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles and their TIPM would be fit for their intended use while the Class Vehicles were being operated.

188.   Contrary to the applicable implied warranties, the Class Vehicles and their TIPMs at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with reliable, durable, and safe

37

1  transportation. Instead, the Class Vehicles are defective, including but not limited to the

2  defective design and manufacture of their TIPM.

3      189.  Chrysler's actions, as complained herein, breached the implied warranty that

4  the Class Vehicles were of merchantable quality and fit for such use in violation of

5  California Code §§ 1792 and 1791.1.

6  **TENTH CAUSE OF ACTION**

7  **(Violations of Various States' Express Warranty Statutes)**

8      190.  Plaintiffs, on behalf of themselves and all others similarly situated, reallege

9  as if fully set forth, each and every allegation set forth herein.

10      191.  Plaintiffs bring this action on behalf of themselves and on behalf of

11  Statewide subclasses against Chrysler, under the express warranty statutes of the states in

12  which they purchased the Class Vehicles.

13      192.  Chrysler provided all purchasers and lessees of the Class Vehicles in

14  California, New Jersey, New Mexico, Maryland and Massachusetts with the express

15  warranty described hererin, which became part of the basis of the bargain.  Accordingly,

16  Chrysler's express warranty is an express warranty under state law express warranty

17  statutes referred to herein.

18      193.  The TIPM and its component parts, were manufactured and/or installed

19  and/or distributed by Chrysler in the Class Vehicles and are covered by the express

20  warranty.

21      194.  Chrysler breach the express warranty by:

22          a.    Extending, per its legal obligation, the California Emissions-related

23                  Defects Warranty, thereby warranting to repair or replace any

24                  emissions-related parts covered under that warranty at no cost to the

25                  owner or lessee;

26          b.    Selling and leasing Class Vehicles with defective TIPMs, an

27                  emissions related part, requiring repair or replacement within the

28                  warranty period; and

38

c.    Refusing to honor the express warranty by repairing or replacing, free of charge, the TIPM or any of its component parts and instead charging for repair and replacement parts.

195.   Plaintiffs notified Chrysler of the breach within a reasonable time, and/or were not required to do so because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile.  Chrysler was also on notice of the TIPM defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the TIPM or a component thereof, and through its own maintenance records.

196.   As a direct and proximate cause of Chrysler's breach, Plaintiffs and the other Class Members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, *i.e.*, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.  Additionally, Plaintiffs and the other Class Members either have incurred or will incur economic damages in the form of out-pocket costs for the repair.

197.   Plaintiffs and the other Class members are entitled to legal and equitable relief against Chrysler, including damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

198.   Chrysler's practices, as alleged, were and are in violation of Cal. Commercial Code § 2313.

199.   Chrysler's practices as alleged, were and are in violation of Md. Code Ann., Com. Law § 2-313.

200.   Chrysler's practices as alleged, were and are in violation of N.J. Stat. Ann. §12A:2-313.

201.   Chrysler's practices as alleged, were and are in violation of Mass. Gen. Laws Ann., ch. 106, § 2-313.

202.   Chrysler's practices as alleged, were and are in violation of N.M. Stat. Ann. § 55-2-313

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

### ELEVENTH CAUSE OF ACTION
#### (Violations of Various States' Implied Warranty Statutes other than California and Florida)

203.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege as if fully set forth, each and every allegation set forth herein.

204.   Plaintiffs bring this action on behalf of themselves and on behalf of Statewide subclasses against Chrysler, under the implied warranty statutes of the states in which they purchased the Class Vehicles.

205.   Chrysler was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Chrysler knew or had reason to know of the specific use for which the Class Vehicles were purchased.

206.   Chrysler provided Plaintiffs and the Class members with an implied warranty that the Class Vehicles and any parts therof are merchantable and fit for the ordinary purposes for which they are sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, among other things, the Class Vehicles suffer from a TIPM defect that causes Class Vehicles to fail to reliably start and can put the lives of its occupants, other motorists and pedestrians at risk.

207.   Chrysler impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (1) a warranty that the Class Vehicles and their TIPM were manufactured, supplied, distributed, and/or sold by Chrysler were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles and their TIPM would be fit for their intended use while the Class Vehicles were being operated.

208.   Contrary to the applicable implied warranties, the Class Vehicles and their TIPM at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with reliable, durable, and safe transportation, including, but not limited to, the defective design and manufacture of the TIPM.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

209.   Chrysler's practices, as alleged, were and are in violation of Md. Code Ann., Com. Law §2-314.

210.   Chrysler's practices, as alleged, were and are in violation of Mass. Gen. Laws Ann., ch. 106, § 2-314.

211.   Chrysler's practices, as alleged, were and are in violation of, N.J. Stat. Ann. § 12A:2-314.

212.   Chrysler's practices, as alleged were and are in violation, of N.M. Stat. Ann. § 55-2-314.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on Plaintiffs' own behalf and on behalf of the Class, pray for judgment as follows:

a.   For an order certifying the Plaintiff Class and appointing Plaintiffs and their counsel to represent the Class;

b.   For an order awarding Plaintiffs and the members of the Class damages, consequential damages, specific performance, and/or rescission;

c.   For an order awarding Plaintiffs and the members of the Class restitution, or other equitable relief as the Court deems proper;

d.   For an order enjoining Chrysler from continuing to engage in unlawful business practices as alleged herein;

e.   For an order awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest;

f.   For an order awarding Plaintiffs and the members of the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

g.   For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

DATED: January 3, 2014

Respectfully submitted,

**GIRARD GIBBS LLP**

By: _____

Eric H. Gibbs
Dylan Hughes
Caitlyn D. Finley
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
ehg@girardgibbs.com
dsh@girardgibbs.com
cdf@girardgibbs.com

Todd M. Schneider
Joshua G. Konecky
**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**
180 Montgomery Street, Suite 2000
San Francisco, California 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jkonecky@schneiderwallace.com

*Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK