Eric H. Gibbs (SBN 178658)
Dylan Hughes (SBN 209113)
David Stein (SBN 257465)
Scott M. Grzenczyk (SBN 279309)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone:   (415) 981-4800
Facsimile:    (415) 981-4846
ehg@girardgibbs.com
dsh@girardgibbs.com
ds@girardgibbs.com
smg@girardgibbs.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCOS GALVAN, PHILIP LIGHTFOOT, JIMMY PAT CARTER, JACQUELINE YOUNG, BRADFORD SOULE, ELIZABETH DILLON, AND JOHN MELVILLE on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br>  v.<br><br>CHRYSLER GROUP LLC,<br><br>     Defendant. | Case No. 13-cv-08080-DDP-VBK<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

**NATURE OF THE CASE**

1.     This proposed class action is brought by Plaintiffs in six states who allege that Chrysler concealed a known safety defect from its customers and then refused to help with repairs.  The defective component is called the totally integrated power module (or TIPM).  The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle—everything from steering and brakes, to the alarm, headlights, and the fuel pump.

2.     Since the TIPM controls power to a wide variety of essential vehicle systems, including safety and security systems, the defect often leaves the vehicles incapable of providing reliable or safe transportation.  Many class vehicles fail to start (or take dozens of attempts before the engine will turn over) because of the defect, and vehicles start up at other times only to stall, sometimes while traveling at high speeds.  The TIPM defect has caused headlights and taillights to suddenly shut off.  It has also caused horns to honk, car alarms to sound, and windshield wipers to activate all on their own.

3.     Unfortunately, the TIPM defect is as pervasive as it is dangerous.  The defect affects a number of Chrysler's most popular vehicles, including the 2011-2012 Jeep Grand Cherokee, Dodge Durango, and Dodge Grand Caravan.  Beginning in 2011, demand for TIPM replacement parts has been so extreme that the part was often on nationwide backorder.  As a result, when concerned drivers went to their dealer for repairs, they were told that hundreds or thousands of people were ahead of them in line, and it would be months before a replacement part was available.  And because Chrysler continues to conceal the defect from the public, many dealers initially misdiagnose the problem, charging drivers for new batteries, fuel pumps, and other parts unnecessarily, while the underlying defect (and attendant dangers) remain unremedied.

4.     Each of the Plaintiffs has suffered harm as a result of Chrysler's decision not to disclose the TIPM defect.  Each Plaintiff bought or leased a 2011-2012 Jeep Grand Cherokee, Dodge Durango, or Dodge Grand Caravan.  And each Plaintiff has

1

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

experienced TIPM-related problems—with their experiences ranging from trouble starting their vehicles and their fuel pumps not turning off, to stalling on the roads, in intersections, and with their families in the vehicles.

5.     Chrysler's decision to conceal a known safety defect violates well-established consumer protection law in a number of states, including California, and Chrysler has breached its obligations by refusing to cover TIPM repairs under the California emissions warranty that has been adopted in a number of states.

6.     On behalf of the classes they propose to represent, Plaintiffs seek awards of damages and appropriate equitable relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

## PARTIES

7.     Plaintiff Marcos Galvan is a citizen and resident of Granada Hills, California, located in the County of Los Angeles.

8.     Plaintiff Philip Lightfoot is a citizen and resident of Danville, California, located in the County of Contra Costa.

9.     Plaintiff Jimmy Pat Carter is a citizen and resident of Pembroke Pines, Florida, located in the County of Broward.

10.     Plaintiff Jacqueline Young is a citizen and resident of Baltimore, Maryland, located in the County of Baltimore.

11.     Plaintiff Bradford Soule is a citizen and resident of Plymouth, Massachusetts, located in the County of Plymouth.

12.     Plaintiff Elizabeth Dillon is a citizen and resident of Tipton, Missouri, located in the County of Moniteau.

13.     Plaintiff John Melville is a citizen and resident of Collingswood, New Jersey, located in the County of Camden.

14.     Defendant Chrysler Group LLC is a limited liability corporation organized under the laws of the State of Delaware, headquartered in Auburn Hills, Michigan, and

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

has its principal place of business in Auburn Hills, Michigan.  Chrysler is the U.S. subsidiary of Italian multinational automaker Fiat S.p.A.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Chrysler, on the other, are citizens of different states.

16.     This Court has jurisdiction over Chrysler because Chrysler is registered to conduct business in California and has sufficient minimum contacts in California; or otherwise intentionally avails itself of the markets within California through the promotion, sale, marketing, and distribution of its vehicles to render the exercise of jurisdiction by this Court proper and necessary.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

18.     Chrysler manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names including the "Jeep", "Dodge" and "Chrysler" brands.  This lawsuit concerns the following "Class Vehicles":

- 2011-2012 model year Jeep Grand Cherokee
- 2011-2012 model year Dodge Durango
- 2010-2014 model year Dodge Grand Caravan
- 2010-2014 model year Chrysler Town & Country
- 2010-2014 model year Chrysler Grand Voyager
- 2012-2014 model year Dodge Ram Cargo Van
- 2010-2012 model year Dodge Nitro
- 2010-2012 model year Jeep Liberty

3

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

- ▪ 2010-2012 model year Dodge Ram 1500 pickup
- ▪ 2010-2012 model year Dodge Ram 2500 pickup
- ▪ 2011-2012 model year Dodge Ram 3500 Cab Chassis
- ▪ 2011-2013 model year Dodge Ram 4400/5500 Cab Chassis
- ▪ 2010-2012 model year Dodge Ram 3500 pickup
- ▪ 2010-2014 model year Jeep Wrangler
- ▪ 2010 model year Dodge Journey

**The Totally Integrated Power Module (TIPM) Defect**

19.     Class Vehicles are factory-equipped with a Totally Integrated Power Module which is located under the hood in the vehicle engine compartment.  Chrysler equipped each of the Class Vehicles with a TIPM that Chrysler refers to as the "TIPM 7."  In addition to the Class Vehicles, Chrysler installed the TIPM 7 in the following vehicles:

- ▪ 2007-2009 model year Dodge Nitro
- ▪ 2008-2009 model year Dodge Grand Caravan
- ▪ 2008-2009 model year Jeep Liberty
- ▪ 2007-2009 Jeep Wrangler
- ▪ 2008-2009 Dodge Journey

20.     The TIPM is the chief component in Class Vehicles' power distribution systems and consists of a computer, relays, fuses, and controls.  The TIPM provides the primary means of voltage distribution and protection for the entire vehicle and Chrysler acknowledges that the TIPM is intended to provide, safe, reliable, and centralized distribution of power to all of the Class Vehicles' electrical systems.

21.     The electrical systems that receive power distributed by the TIPM include the vehicles' safety systems, security system, ignition system, fuel system, electrical powertrain, and the vehicles' comfort and convenience systems.  These systems control components including the air bags, fuel pump, windshield wipers, headlights, taillights, turn signals, and power windows and doors.

4

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

22.     The TIPM installed in Class Vehicles is defective and thus fails to reliably control and distribute power to various vehicle electrical systems and component parts.

23.     As a result of the TIPM defect, the vehicles:

a.      fail to start promptly and reliably, and some to fail to start entirely,

b.      stall, including at high speeds,

c.      have fuel pumps that do not turn off,

d.      experience headlights and taillights shutting off, which is not always immediately apparent to the driver, and

e.      experience random and uncontrollable activity of the horn, windshield wipers, and alarm system.

24.     Chrysler's discovery responses acknowledge that vehicle stalling, loss of headlight function, and unexpected distractions, such as horn or alarm sounding while on a roadway, may each increase the risk of injury for the driver, passengers, or others on the roadway.

25.     Below are examples of complaints lodged with the National Highway Traffic Safety Administration ("NHTSA") reflecting drivers' concerns about the TIPM defect:

- 2008 Dodge Grand Caravan:  The contact owns a 2008 Dodge Grand Caravan.  The contact stated that the vehicle had a four second delay before starting.  The vehicle was taken to an authorized dealer to have the failure diagnosed.  The dealer was unable to diagnose the failure.  The fuel pump was replaced, but the failure continued.  The manufacturer had not suggested a proper remedy for the failure.  The contact expressed concern over the possibility of the vehicle not starting.  The failure mileage was 60,000.  (June 24, 2011).

- 2008 Dodge Grand Caravan: Same occurrence happened 4 times in 6 months, dealer was not able to diagnose the problem.  While driving on the fwy in the fast lane at night, the wipers go off washer fluid spraying, all lights flashing, horn blaring, transmission disengaged from gas pedal, after managing to pull over took key out of ignition and car was still running.

5

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

Managed to get car to the dealer next day and they said they cannot duplicate the problem. I took my car home and again same incident. I was upset and drove the car with these symptoms happening to the dealer and they witnessed the issue, the technician pulled out all the fuses from the fuse box just to shut the car up.  Still could not find the problem.  Finally after the 4th time the issue was isolated to a TIPM module which Chrysler factory said the part was on back order for 4 to 6 weeks and other dealers do not want to sell this particular part to other dealers (got me thinking why).  Chrysler sells good cars but does not stand behind the safety of them.  If anyone else had a TIPM problem their lives are at risk just as mine and my families was.  The dealer finally got the part after 4 weeks, and so far I pray that my car is safe.  (July 20, 2011).

- 2008 Dodge Grand Caravan:  Having intermittent issues with the van stalling, horn blowing unexpectedly, wipers coming on, and the lights coming on unexpectedly.  If the battery is disconnected it obviously stops, but then will operate fine for a few days 2-3 and then it happens all over again.  (August 8, 2011)

- 2008 Jeep Wrangler: As I was leaving for work one morning I hit the key alarm to unlock doors and Jeep began honking, windshield wipers turned on and began spraying windshield fluid.  I thought it was odd and didn't think much of it.  On the way to work in traffic it began doing the same thing and this occurred 3 times in about 30 minutes.  After getting to work, the Jeep would honk by itself every 2-3 minutes.  I decided to take it into the dealership.  It continued doing this on the way there.  As I was about half a mile from the dealership the Jeep completely turned off and I immediately had to pull out of traffic.  I was able to start backing up but this time all A/C had stopped working.  After getting a call back from the dealership, he said the part was on backorder and there was at least 100 orders waiting to be shipped.  This concerns me because it looks to be a widespread thing with the Jeeps.  In doing some research previous to this email there were problems with the TIPM on the 2007 Jeep and I'm worried some of the bad ones may have gotten into some of the 2008. (August 10, 2011)

- 2008 Jeep Wrangler: The contact owns a 2008 Jeep Wrangler.  The contact stated while driving 60 mph, the exterior lights suddenly failed.  The contact used the fog lamps in order to see while driving at night.  The contact took the vehicle to the dealer and the dealer stated that the TIPM

6

module malfunctioned and needed to be replaced.  The contact did not replace the TIPM module.  The contact stated the vehicle was unsafe to drive at night.  The failure mileage was 50,000.  (September 30, 2011)

- 2010 Dodge Grand Caravan:  Was driving about 40 mph when all electrical power failed no turn signals wipers radio brake lights power windows etc.  Pulled over to side of road and when I turned off ignition all power came back on.  This is the second time this has occurred.  Also, having trouble with the ignition of this vehicle sometimes takes 2 or 3 tries to start.  (October 9, 2011)

- 2008 Jeep Wrangler:  While driving, lights came on, flashers came on, wipers came on and horn blaring.  Was told that it was the TIPM (totally integrated power module).  Checked with dealer, $260 for part, $180 for labor but there are almost 300 on backorder and no estimate time to get the part in (part #RLB92236AI).  Why is this not a recall???  I even felt a loss of power steering during this event.  Are we just suppose to just sit around for 3-6 months to get the part?  (December 12, 2011)

- 2007 Jeep Wrangler:  Windshield wipers and lights failed to work during icy rain/snowy conditions.  Road visibility was significantly impaired and I couldn't see my instrument panel.  I had no option but to continue home at very slow speeds to avoid an accident.  After approximately 20 minutes of driving without wipers, the wipers suddenly turned on by themselves, moving very fast.  I could not adjust the wiper speed at all.  When I arrived home and turned the Jeep off and removed the keys, wipers still would not turn off.  I had to disconnect the battery to stop the wipers.  Dealer claims it was a faulty wiper motor.  I advised them I think it's a faulty TIPM based on what I researched/read online.  They assured me the TIPM was working fine.  When they ordered and installed the new wiper motor, it didn't fix the problem.  They then admitted they were wrong with the diagnostic and the TIPM was faulty.  They advised me that I need a new TIPM and that all TIPMs are on nationwide back order.  Seems TIPM failure is a recurring theme amongst certain Jeep Wrangler models.  If your lights and wipers can go out while operating the vehicle, this is a huge safety hazard.  I called Chrysler to complain and have yet to hear back from them. (February 15, 2012)

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

- <u>2010 Jeep Wrangler</u>: TIPM is creating a major safety issue with my 2010 Jeep Wrangler.  On multiple occasions, the headlights fail to work on my vehicle on start up or once the vehicle is in operation.  The dealership looked at the Jeep and stated the TIPM module was bad and needed to be replaced.  The part was indefinitely on backorder from Jeep, and could not even be replaced if it were under warranty.  Driving this vehicle that is under 2 years old and has a major safety issue is unacceptable.  This appears to be a wide spread issue for a number of years with the TIPM module on Jeep/Chrysler vehicles.  This will happen to someone while driving at night without their knowledge, and create a deadly event.  Would like to see Chrysler take responsibility for this dangerous situation and correct the issue to protect the safety of the missions of people driving their vehicles. (March 6, 2012)

- <u>2008 Dodge Grand Caravan</u>: While stopped at a red light, the van suddenly entered into an electrical chaos.  The horn started blaring, the wipers started going full blast, and wiper fluid starting spraying.  This kind of electrical problem has happened before but this time was the worst.  The vehicle continued to drive while everything electrical flickered and continued to malfunction.  Finally had to stop and remove fuses for horn and wiper fluid in order to get the malfunctions to stop.  Van transmission also stopped shifting during this episode.  Even after vehicle was stopped, there were multiple electrical popping noises throughout the engine as if it was trying to power up things that were no longer operational.  I took vehicle into dealership and they identified problem as a failure of the TIPM (totally integrated power module).  Looking online there are multiple complaints of similar problems and failures.  The TIPM is actually backordered because of the demand.  This is obviously a repeated problem in the Dodge and potentially hazardous.  (July 2, 2012)

- <u>2011 Jeep Grand Cherokee 4x4</u>: Beginning the evening of July 30, I experienced issues with starting my Grand Cherokee.  These issues were sporadic, however once every three or four times I attempted to start the engine, the engine would crank but fail to start.  On July 31, I scheduled an appointment with my local Jeep dealership (Videon Chrysler Dodge Jeep in Newtown Square, PA) for August 5.  By August 2, the Jeep was not drivable as starting it would take 20-30 minutes each time. I was forced to rent a car at my own expense for the weekend of August 3-4. On August 5 the dealership diagnosed the issue as pertaining to TSB 08-053-11 and reprogrammed the totally integrated power module.  On August 7, I

8

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

experienced the no start issue again and scheduled a second appointment with the dealership for August 8, the TIPM was identified as needing to be replaced.  I was informed by the dealership that the necessary part was on backorder with an estimated arrival time of within a "few weeks".  The dealership advised that it was ok for me to continue driving the vehicle in the meantime despite the issue. On the evening of August 16, while driving the vehicle at a speed of approximately 40 miles per hour, the engine stalled, causing the vehicle to lose all power near the intersection of Croton Road and King of Prussia Road in Upper Merion Township, PA.  Given the nature of the road as well as the traffic around me, this situation posed a serious safety hazard to myself, my passenger, and others near my vehicle, and since that point I no longer feel safe operating the vehicle in its current condition.  As such, I have been entirely unable to operate this vehicle since August 16. (August 28, 2013)

- 2011 Jeep Grand Cherokee:  My vehicle would not crank and stalls. Battery replaced, $179.00 later.  Mechanic told me that it had updates and reflashes those for $50.00 and advised me to take back to the dealership for an integrated module.  After service evaluated my Jeep, I was told that the problem existed in the TIPM.   This product is on at least a 6 week back order and that is not a guarantee.  Also, there have been no recalls on this product.  I have a busy commute to work in heavy traffic.  My Jeep stalled on the interstate and I had to veer toward the ditch to avoid an accident.  If I were hit, would my airbags even deploy?  This is a safety violation! (September 1, 2013)

- 2011 Dodge Durango: It began when the car would crank and not start several times before actually starting. I took it in (figuring at some point it would just not start at all and leave me stranded) and they said they couldn't duplicate it and sent me home.  It started doing it again, so I took it back in and they reflashed something or other and sent me on my way. The reflash did not fix the problem, but I did not take it back in, figuring I would leave with same result. Finally, the car died on me while I was driving it, with my small children in the car. No power brakes, no power steering. I was able to pull over to the side of the road safely. Thankfully I was not going terribly fast and there were no other cars around. I took it back in again, and they told me it needed a new TIPM. After speaking with Dodge, this is apparently a common problem in the '11 Durangos…. (October 24, 2013)

9

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

- <u>2011 Jeep Grand Cherokee:</u> The contact owns a 2011 Jeep Grand Cherokee. The contact stated that while driving 70 mph, the vehicle stalled without warning. The vehicle was taken to the dealer where the technician diagnosed that the TIPM was defective and needed to be replaced. (November 11, 2013)

26.     The defect is so widespread that TIPM 7 replacement parts have often been on national backorder, with drivers reporting from 2011 to 2014 that they had to wait weeks or months to have their TIPMs replaced.  In the meantime, Chrysler dealerships and auto-technicians are advising many drivers not to drive their vehicles until the TIPM is replaced, due to safety risks.  The financial burden on consumers is reflected in many of the complaints filed with the NHTSA.

27.     Chrysler has instructed employees in multiple divisions to investigate the TIPM defect.  As recently as spring 2012, teams were investigating Class Vehicles not starting, having difficulty starting, and stalling, attributed to a malfunctioning fuel pump relay integral to the TIPM printed circuit board.

**Chrysler's Knowledge of the TIPM Defect**

28.     Chrysler vehicles have been plagued with severe TIPM problems for the past decade.  As a result, Chrysler has initiated multiple TIPM-related recalls to address safety or emissions concerns.

29.     In 2005, Chrysler conducted a safety recall of 2006 model-year Dodge Ram vehicles.  The defective TIPM caused the vehicles to inadvertently default to neutral, posing a safety risk that the vehicles might roll away and cause an accident.

30.     In 2007, Chrysler conducted a safety recall of 80,894 Jeep Wrangler and Dodge Nitro vehicles (model year 2007).  Defective TIPMs in the vehicles contained a software glitch "that may allow the engine to stall under certain operating conditions. This could cause a crash without warning."  Over 200 people lodged complaints with the NHTSA describing the stalls and there were crashes and injuries before Chrysler recalled the affected vehicles.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

31.     Also in 2007, Chrysler conducted an emission recall of certain 2007 and 2008 model year Sebring, 2008 model year Dodge Avenger, and 2007 model year Dodge Ram 1500, 2500, and 3500 vehicles.  The recall was conducted to reprogram the vehicles' TIPM to prevent a condition where during some trips the vehicles would have only a single forward gear ratio available.

32.     In 2013, Chrysler conducted a safety recall of 2011 and 2012 model year Dodge Nitro and Jeep Liberty vehicles, through which it would "flash" the vehicles' TIPM.  The recall was prompted by the fact that the vehicles could experience illuminated airbag warning lamps and restraints not deploying in collisions.

33.     Notwithstanding the history of TIPM problems in its vehicles, Chrysler chose to begin installing the TIPM 7 in 2007 model year vehicles and continued to install the TIPM 7 into vehicles through the 2014 model year.

34.     Given the repeated, severe problems that plagued the TIPM in its vehicles, Chrysler understood that the TIPMs posed a heightened risk of problems for consumers and Chrysler was particularly aware of and on the lookout for early indicia of TIPM problems.

35.     Chrysler studied and tracked potential TIPM-related issues through exhaustive pre-release testing.  In recent years, Chrysler has tested models for millions of miles before their release.  For example, Chrysler employees put 7 million miles on multiple 2011 Grand Cherokee test cars before production.  Given the speed and frequency with which the TIPM defect typically becomes apparent, it is not plausible that this preproduction testing would not have alerted Chrysler to the existence of the TIPM defect.  Only Chrysler, however, has access to its prerelease testing data.

36.     Chrysler also receives data about how its vehicles are performing in the days, weeks, and months after they are sold.  Chrysler collects information from both drivers and dealerships, including through complaints, warranty claims, replacement parts data, and other aggregated data sources.  Chrysler has exclusive access to this information too.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

37.    For years, Chrysler has monitored drivers' safety-related reports to the NHTSA, which can be viewed on the NHTSA's website.  There are several hundred complaints on the NHTSA website and elsewhere online dating back to when the TIPM 7 was first introduced in 2007 model year Chrysler vehicles.

38.    As early as 2008, drivers of vehicles equipped with the TIPM 7 started contacting the NHTSA to complain that their vehicles were experiencing a host of electrical issues, including uncontrollable activity of the windshield wipers, horn, and alarm system, and the headlights and taillights not working.  Drivers also complained that their vehicles would not start and that the vehicles would stall without warning.  By the end of 2011, over 100 drivers had complained to the NHTSA that they had experienced some combination of these symptoms, and dealers were diagnosing the problems as stemming from a defective TIPM, with some dealers saying the TIPM was already on a nationwide backorder.

39.    In August 2011, Chrysler issued a service bulletin to its dealerships, telling them that about 14 models, including the Grand Cherokee, were experiencing two types of problems. First, "[m]ultiple attempts are required to start the vehicle before the vehicle will start."  Second, "[t]he vehicle theft alarm intermittently sounds for no apparent reason."  The repair calls for a "flash" reprogram of the vehicle's TIPM when a driver brings the vehicle to a dealership complaining of those symptoms.

40.    An automotive manufacturer service bulletin typically takes time to develop and issue because the manufacturer needs to identify and understand the problem, develop and test the new repair instructions, and draft and finalize the bulletin before distributing it to dealerships.

### Chrysler's Failure To Disclose The TIPM Defect

41.    Chrysler has never disclosed the TIPM defect to drivers or potential purchasers or lessees of Class Vehicles, and Chrysler has never instructed its dealerships to disclose the TIPM defect to drivers or potential purchasers or lessees of Class Vehicles.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

42.    The TIPM defect was not known or reasonably discoverable by the Plaintiffs and proposed class members before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

43.    Chrysler has remained silent even as it issued a service bulletin, conducted internal investigations, and saw the TIPM replacement parts go on national backorder and hundreds of complaints for Class Vehicles were lodged with the NHTSA.

44.    Chrysler's refusal to publically acknowledge the defect has created widespread confusion.  Chrysler's failure to notify consumers, dealerships, or auto-technicians prevents the TIPM problem from being efficiently diagnosed.  Drivers often do not realize that the symptoms they are experiencing are due to the TIPM defect or that prompt action is needed to ensure they do not experience stalling, headlight loss, or other dangerous symptoms in the future. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the TIPM defect, or advise class members about the dangers of driving Class Vehicles.

45.    As a result of Chrysler's inaction and silence, many consumers are unaware that they purchased, and continue to drive, unsafe and unreliable vehicles.  As Chrysler knows, a reasonable person would consider the TIPM defect important and would not purchase or lease a vehicle equipped with the TIPM defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

46.    Many purchasers and lessees of Class Vehicles have spent hundreds or thousands of dollars on TIPM repairs as well as unnecessary repairs performed as a result of the confusion caused by Chrysler's silence, including repairs and replacements of batteries, fuel pumps, and wireless ignition node modules.  Some have even spent over $2,000 replacing their fuel pump only to later find out the problem is actually with the vehicle's TIPM, a repair that typically costs more than $1,000.  Many have incurred towing costs too and a number of those who have had to wait for a repair due to the back-order have spent money on alternate transportation such as a rental car.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

47.     Adding insult to injury, after consumers spend significant sums to replace the defective TIPM, Chrysler cannot assure them that the replacement TIPM is not similarly defective.

48.     To this day, Chrysler remains unwilling to notify Class Vehicle owners and lessees about the TIPM defect or assist them with the cost of resulting repairs.

## PLAINTIFFS' EXPERIENCES

### Marcos Galvan

49.     Mr. Galvan purchased a certified pre-owned 2011 Jeep Grand Cherokee from Glen E. Thomas Dodge Chrysler Jeep dealership in Long Beach, California, in or around November 2012.  Mr. Galvan's Jeep Grand Cherokee came with a factory-equipped TIPM.  Mr. Galvan also purchased an extended warranty for the vehicle.

50.     Mr. Galvan and his wife had recently had a baby and needed a safe, reliable, family-friendly car.

51.     In April 2014, Mr. Galvan and his wife began having repeated problems starting the vehicle.  Sometimes it would not start at all, and other times it would start and then stall.

52.     Mr. Galvan called the Rydell Chrysler Dodge Jeep dealership, explained the difficulties he was having, and scheduled a time to bring the vehicle into the dealership. A service technician replicated the problem and said the cause was the vehicle's TIPM.

53.     Mr. Galvan called Chrysler and his extended warranty provider and was told that the part was not covered under warranty.  Although he received a 10% discount, Mr. Galvan paid approximately $900 to have the TIPM replaced, with the vehicle at just over 70,000 miles.

### Philip Lightfoot

54.     In January 2011, Mr. Lightfoot purchased a new 2011 Jeep Grand Cherokee from the Walnut Creek Chrysler dealership in Walnut Creek, California.  Mr. Lightfoot's Jeep Grand Cherokee came with a factory-equipped TIPM.

55.     Mr. Lightfoot and his wife bought their 2011 Jeep Grand Cherokee because they wanted a reliable and safe vehicle.  Mr. Lightfoot and his wife traded in their three year old Volvo believing the Jeep Grand Cherokee would be a safer and more reliable car.

56.     Mr. Lightfoot is a long-time Chrysler owner, who has owned three Jeep Wranglers and currently owns a Dodge Ram pickup truck.

57.     Around June 2013, Mr. Lightfoot and his wife began experiencing problems with their Jeep.  Mr. Lightfoot and his wife first had trouble with the Jeep recognizing that the wireless remote key was in the car to make the push-start ignition work.  Around that same time, Mr. Lightfoot's wife began having trouble getting the Jeep to start.  At first, the problem was sporadic, but over time the starting problem worsened.  Around November 2013, the problem progressed to the point where Mr. Lightfoot could rarely get the Jeep to start at all.  At one point when the Jeep started, Mr. Lightfoot took it to a Chrysler dealership.

58.     The Chrysler dealership diagnosed the problem with Mr. Lightfoot's Jeep as a faulty TIPM.  The Chrysler dealership told Mr. Lightfoot that it would do a Chrysler approved after-market "patch" repair to the TIPM.  Mr. Lightfoot expressed concern about the fix being a patch but the Chrysler dealership told him that without any other symptoms this was the Chrysler approved repair.  Mr. Lightfoot paid approximately $526.90 to have the Jeep's TIPM repaired with 58,229 miles on his vehicle.

59.     Mr. Lightfoot is still very concerned about the repair to his Jeep's TIPM. Mr. Lightfoot did research online and discovered numerous complaints about the TIPM and is worried that the patch repair to the TIPM does not fully resolve the problem.

**Jimmy Pat Carter**

60.     In or around October 2010, Mr. Carter purchased a new 2011 Jeep Grand Cherokee from the Hollywood Chrysler Jeep dealership in Hollywood, Florida.  Mr. Carter's Jeep Grand Cherokee came with a factory-equipped TIPM.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

61.     Mr. Carter purchased his Jeep for personal, family, and household use and to use as a vehicle to travel to locations for his job as a photographer.  He has previously owned five Jeep vehicles.

62.     In late 2013, Mr. Carter twice had to replace the battery in his vehicle. Then, at the end of December 2013, Mr. Carter could not get his vehicle to start.  He called a tow truck to take his vehicle to the Hollywood dealership.  The dealership originally told him that his battery was dead but that it could not determine what else was wrong with his vehicle.  Later that day the dealership called Mr. Carter and told him that the problem was with the Jeep's TIPM and that the repair would cost approximately $1,200.

63.     Mr. Carter contacted Chrysler to complain about the need for and cost of the TIPM repair.  Mr. Carter asked the service representative whether Chrysler would guarantee that the problems with his vehicle would stop if he paid the for the $1,200 repair.   The Chrysler representative said that Chrysler would not make that guarantee. The service representative called Mr. Carter back and told him that he would only have to pay $100 for his TIPM repair.

64.     On December 23, with 77,900 miles on his vehicle, the dealership replaced the TIPM in Mr. Carter's vehicle.  Mr. Carter paid $100 for the repair.

**Jacqueline Young**

65.     On January 3, 2011, Plaintiff Young purchased a new 2011 Jeep Grand Cherokee from the Thompson Chrysler dealership in Baltimore, Maryland.  Ms. Young's vehicle came with the factory-installed TIPM.

66.     Ms. Young purchased her 2011 Jeep Grand Cherokee primarily for personal use.  She chose the Grand Cherokee because she considered Jeep trucks to be sturdy and reliable vehicles that would not leave her stranded.  She bought her vehicle to commute to work and transport her family.  This was Ms. Young's third Jeep vehicle.

67.     In July 2013, with a little more than 40,000 miles on her vehicle, Ms. Young began having trouble starting her car.  On several occasions the ignition would make a

16

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

prolonged grinding noise and the car would have trouble starting.  Initially believing the problem was with her electronic keyless entry remote, Ms. Young changed her keys. Despite switching keys, the problem continued to progress with time, forcing Ms. Young to spend more and more time getting her vehicle started, typically around 15 minutes each time.

68.     Frustrated with the increasing difficulty of starting her vehicle, and concerned that it would leave her and her family stranded, in early September 2013, Ms. Young took her Jeep to the Thompson Chrysler dealership, in Baltimore, Maryland.   The dealership told her that the TIPM in her Jeep needed to be replaced, and that the replacement TIPM would cost her approximately $1,280.

69.     Ms. Young put down a $200.00 deposit for the new TIPM but the dealership could not tell her when it would be able to fix her car and told her that she was number 1,501 on a waiting list for a new TIPM.  When Ms. Young asked the dealership if it would provide her with a loaner vehicle while she waited she was told that Chrysler corporate did not have such a policy.  The dealership suggested she contact Chrysler directly.

70.     Ms. Young contacted Chrysler and initiated a claim to obtain an expedited TIPM and was told she would be called back.  Five days later, Ms. Young had not heard back from Chrysler, so she called back.  The customer service representative told Ms. Young that it was not Chrysler's policy to provide loaner-vehicles or rental cars. Needing her car to commute to and from work, Ms. Young rented a car for approximately $300.00 a week.  Ms. Young waited approximately three weeks for her car to be repaired and paid approximately $1,052.85 for a rental car.

71.     Ms. Young's vehicle was repaired on September 6, 2013, at which point there was 44,365 miles on the vehicle.  Ms. Young paid $1,036.30 for the repair and $2,089.15 in total, including rental car expenses, as a result of the defective TIPM.  Ms. Young does not know if the newly installed TIPM is an upgraded part or is similarly defective.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

**Bradford Soule**

72.     In February 2013, Plaintiff Soule purchased a Certified Pre-owned 2011 Jeep Grand Cherokee from a Chrysler dealership in Brockton, Massachusetts. Mr. Soule's Jeep came factory-equipped with the TIPM.

73.     Mr. Soule decided to purchase his 2011 Jeep Grand Cherokee as a Certified Pre-owned vehicle through the Chrysler dealership to ensure that he was receiving a reliable vehicle for his sixty-mile commute to work and for transporting his family.  Mr. Soule was reassured from the dealership that Certified Pre-owned vehicles were reliable because these vehicles went through an extensive 250-point checklist and came with a 100,000 mile powertrain warranty.

74.     Five months after buying the car, Mr. Soule began experiencing problems with his Jeep not starting, leaving him stranded on several occasions.  On one occasion, Mr. Soule returned to his vehicle to begin his sixty mile commute home and could not get the vehicle to start.  Mr. Soule spent forty-five minutes troubleshooting the ignition before he was finally able to get the vehicle to start.

75.     Shortly thereafter, Mr. Soule called the dealership and made an appointment to bring in his vehicle.  Prior to bringing in his vehicle for the service, Mr. Soule researched the problem he was experiencing online and found hundreds of complaints which stated that the TIPM in 2011 Jeep Grand Cherokee vehicles frequently caused vehicles to fail to start or stall.

76.     On August 17, 2013, Mr. Soule took his vehicle to the Chrysler dealership. Mr. Soule mentioned to the service department he thought the issue may be with the vehicle's TIPM.  Mr. Soule paid approximately $100.00 for the dealership to run a diagnostic and reset the vehicle's TIPM, which did not fix the problem. The dealership told Mr. Soule that he would need to replace the TIPM entirely, and this part was not covered under Chrysler's 100,000 mile powertrain warranty.  The TIPM was also on national backorder. The dealership told Mr. Soule that there was another vehicle there

18

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

1    that had been waiting for a replacement TIPM for two months, and it did not know when
2    his vehicle would be repaired.

3         77.    Frustrated by Chrysler's denial of warranty coverage for the repair and the
4    long wait for a replacement TIPM, Mr. Soule contacted the Chrysler corporate office and
5    complained.  After several phone calls, Chrysler agreed to pay for half of the cost of the
6    repair and said it would try to expedite a new TIPM to his dealership.

7         78.    Unaware of the potential safety risks and with no other means of
8    transportation, Mr. Soule brought his vehicle home and continued to drive it.  As time
9    passed, however, the ignition and stalling problems increased in frequency and Mr. Soule
10   became concerned about the continued safety of driving the vehicle.  During this time
11   Mr. Soule also noticed that the vehicle's fuel pump was not shutting off.  Concerned
12   about the safety of fuel continuing to pump through his vehicle while parked in the
13   garage, and the potential to drain the battery, Mr. Soule began disconnecting the battery
14   after he drove.  The battery is located under the passenger seat.

15        79.    Unwilling to continue to drive his unsafe and unreliable vehicle, Mr. Soule
16   contacted Chrysler corporate about obtaining a rental car.  Chrysler told Mr. Soule that it
17   would not cover the costs of a rental car upfront but that he may be reimbursed at some
18   later date.  Chrysler suggested that Mr. Soule contact the dealership to see if it would
19   accommodate him.  When Mr. Soule contacted the dealership it informed him it recently
20   received two TIPMs and that he could bring his vehicle in for repair.

21        80.    On September 3, 2013, with 51,724 miles on the vehicle, Mr. Soule took his
22   vehicle to the dealership to have the TIPM replaced.  With Chrysler paying half, Mr.
23   Soule's out-of-pocket expenses for the diagnostic test and the replacement TIPM totaled
24   approximately $635.00.

25        81.    Even with the repair, Mr. Soule remains concerned with the safety and
26   reliability of his vehicle's new TIPM, as the replacement TIPM uses the same part
27   number as the original TIPM that came with his vehicle.  Mr. Soule has not received any
28   reassurance that the new TIPM is without the same defect.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

**Elizabeth Dillon**

82.     In March 2013, Ms. Dillon purchased a used 2011 Dodge Durango from the Spieler's Ram Chrysler Dodge Jeep dealership in California, Missouri.  Ms. Dillon's Dodge Durango came with a factory-equipped TIPM.

83.     Ms. Dillon purchased the 2011 Dodge Durango primarily for personal, family, and household use.  She and her husband have two children, and reliability and safety were key considerations in their decision to buy the vehicle.

84.     Around September 2013, the vehicle's engine began having difficulty turning over and starting.  Over the ensuing months the starting problems worsened, with the vehicle becoming more difficult to start.  The vehicle also made noise after it had been turned off, which sounded as though something in the vehicle was still running.  Eventually, it would regularly take 10 minutes or more to get the vehicle to start.  Ms. Dillon grew nervous that the vehicle would not start at all and she could be stranded.

85.     In mid-November Ms. Dillon was driving down a narrow gravel road near her house with her children at about 25-30 miles per hour and the vehicle suddenly shut off and stalled.  Fortunately, Ms. Dillon was able to bring the vehicle to a stop without a collision.  She put the vehicle into park and was able to start it and drove home.  The next morning Ms. Dillon called the Spieler's Ram Chrysler Dodge Jeep dealership and made an appointment for later that day to bring her vehicle.

86.     Ms. Dillon had seen on the internet that many people were having similar problems, and that the cause of those problems was the TIPM.  With 73,211 miles on the vehicle, she took her Durango to the dealership and suggested that there may be a problem with the TIPM.  The dealership service technician confirmed that the TIPM was the problem and said the TIPM in her vehicle needed a software update.  She paid $27.59 to have the TIPM flashed.

87.     The TIPM flash did not alleviate the starting problems.  In late November, with 76,521 miles on the vehicle, Ms. Dillon made another appointment with the Spieler's Ram Chrysler Dodge Jeep dealership.  The dealership was able to replicate the

20

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

problem but could not initially determine the cause.  The dealership told Ms. Dillon that it had contacted an engineer who explained that the problem was the vehicle's TIPM. Ms. Dillon had to wait about three weeks for a replacement TIPM to be available. During this time, Ms. Dillon noticed that the vehicle's fuel pump was continuing to run after she shut off her vehicle, and every time she turned her vehicle off she disconnected the battery to keep the fuel pump from running and draining the battery.  Once a TIPM was available, Ms. Dillon paid approximately $985.92 for the repair.

### John Melville

88.    On September 30, 2010, Mr. Melville bought a new 2011 Jeep Grand Cherokee from the Cherry Hill Chrysler dealership in New Jersey.  Mr. Melville's Jeep Grand Cherokee came factory-equipped with a TIPM.

89.    Mr. Melville is a long-time Jeep owner, and this was his fifth Jeep.  Mr. Melville chooses Jeep vehicles because of car's size and reliability.  Among other things, Mr. Melville uses his Jeep Grand Cherokee to get to and from work.

90.    In or around May or June 2013, with approximately 48,000 miles on his Jeep, Mr. Melville started to have trouble starting his car.  On several occasions, when Mr. Melville tried to get the car to start with the push-button start it would not work, and would often take five or six times before the car would start.

91.    Mr. Melville took his Jeep to a Chrysler dealership but the dealership could not replicate or diagnose the problem.  The service representatives at Chrysler told Mr. Melville there was nothing wrong with his car.

92.    For the next two months, Mr. Melville continuously struggled with the car's ignition.  One night, when Mr. Melville was two hours away from home, his car would not start at all.  Mr. Melville had the car towed to the Sea View Jeep dealership in Ocean Township, New Jersey. The Sea View Jeep dealership diagnosed the problem as a faulty fuel pump.  Mr. Melville did not believe the problem was with the car's fuel pump and decided to have the car diagnosed at the Cherry Hill Chrysler dealership in Cherry Hill, New Jersey.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

93.     In or around late July 2013, the Cherry Hill Chrysler dealership diagnosed the problem as a faulty TIPM but told Mr. Melville that the TIPM was on national backorder.  Mr. Melville was told that it would take approximately two months for the part to come in.

94.     Chrysler would not cover the TIPM repair so Mr. Melville submitted a claim to his extended warranty plan.  Initially, the extended warranty company refused to cover the repair.  After many hours, Mr. Melville eventually convinced his extended warranty servicer to cover the cost of repair and paid a $100.00 deductible under his plan for the repair.

95.     On September 27, 2013, nearly two months after taking his Jeep into the dealership for repair, and with 48,778 miles on the vehicle, the dealership replaced the TIPM in Mr. Melville's Jeep.  When Mr. Melville drove off the dealership lot with his Jeep, his check engine light went on.

96.     Mr. Melville is disappointed with Chrysler and the experience he has had with his Jeep.  Mr. Melville was not given any reassurance about the replacement TIPM being an upgraded part.  He remains concerned that the Jeep's problem will occur at any time.  He is also concerned about the reliability of his Jeep's airbag system as a result of the defect.

## CLASS ACTION ALLEGATIONS

97.     Plaintiffs seek to represent the classes set forth below, within which "Class Vehicle" is defined to include all 2011-2012 Jeep Grand Cherokee, 2011-2012 Dodge Durango, 2010-2014 Dodge Grand Caravan, 2010-2014 Chrysler Town & Country, 2010-2014 Chrysler Grand Voyager, 2012-2014 Dodge Ram Cargo Van, 20010-2012 Dodge Nitro, 2010-2012 Jeep Liberty, 2010-2012 Dodge Ram 1500 pickup, 2010-2012 Dodge Ram 2500 pickup, 2011-2012 Dodge Ram 3500 Cab Chassis, 2011-2013 Dodge Ram 4500 Cab Chassis, 2011-2013 Dodge Ram 4500 Cab Chassis, 2010-2012 Dodge Ram 3500 pickup, 2010-2014 Jeep Wrangler, and 2010 Dodge Journey vehicles.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

**California CLRA Class**

Plaintiffs Galvan and Lightfoot propose to represent:

*All persons who purchased or leased a Class Vehicle in California for personal, family, or household use.*

**California UCL Class**

Plaintiffs Galvan and Lightfoot propose to represent:

*All persons who purchased or leased a Class Vehicle in California.*

**Florida Class**

Plaintiff Carter proposes to represent:

*All persons who purchased or leased a Class Vehicle in Florida.*

**Maryland Class**

Plaintiff Young proposes to represent:

*All persons who purchased or leased a Class Vehicle in Maryland primarily for personal, household, family, or agricultural purposes.*

**Massachusetts Class**

Plaintiff Soule proposes to represent:

*All persons who purchased or leased a Class Vehicle in Massachusetts.*

**Missouri Class**

Plaintiff Dillon proposes to represent:

*All persons who purchased or leased a Class Vehicle in Missouri.*

**New Jersey Class**

Plaintiff Melville proposes to represent:

*All persons who purchased or leased a Class Vehicle in New Jersey.*

**Emissions Warranty Class**

Plaintiffs Philip Lightfoot, Jacqueline Young, Bradford Soule, and John Melville propose to represent:

*All persons who purchased or leased a Class Vehicle in California, Connecticut, Maine, Maryland, Massachusetts, New Jersey, Oregon, Pennsylvania, Rhode*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

*Island, Vermont, or Washington that required a TIPM repair or replacement within seven years and seventh-thousand miles.*

98.     Excluded from each proposed class are Chrysler Group and Chrysler Group LLC; any affiliate, parent, or subsidiary of Chrysler Group or Chrysler Group LLC; any entity in which Chrysler Group or Chrysler Group LLC has a controlling interest; any officer, director, or employee of Chrysler Group or Chrysler Group, LLC; any successor or assign Chrysler or Chrysler Group LLC; anyone employed by counsel for Plaintiffs in this action; any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; and anyone who purchased a Class Vehicle for the purpose of resale.

99.     This action has been brought and may properly be maintained on behalf of the classes proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

100.    <u>Numerosity</u>.  Chrysler sold hundreds of thousands of Class Vehicles, including a substantial number in the states covered by the proposed classes.  Members of the proposed classes likely number in the tens or hundreds of thousands and are thus too numerous practically join in a single action.  Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

101.    <u>Existence and predominance of common questions</u>.  Common questions of law and fact exist as to all members of the proposed classes and predominate over questions affecting only individual class members.  These common questions include whether:

        a.    Class Vehicles were factory equipped with defective TIPMs;

        b.    Chrysler knew or should have known about the TIPM defect and, if so, when Chrysler discovered the defect;

        c.    The existence of the TIPM defect would be important to a reasonable person, for example, because they pose an unreasonable safety risk;

        d.    Chrysler disclosed the TIPM defect to potential customers;

e.      The TIPM qualifies as an emissions part under the applicable statutory emissions warranties; and

f.      Chrysler dealerships have failed to provide free TIPM repairs for Class Vehicles still within the applicable statutory emissions warranty period.

102.   <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the proposed classes.  Each Plaintiff and the class members he or she proposes to represent purchased a Class Vehicle that contains the same defective TIPM, giving rise to substantially the same state and federal claims.

103.   <u>Adequacy</u>.  Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of members of the classes will be fairly and adequately protected by Plaintiffs and their counsel.

104.   <u>Superiority</u>.  The class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Chrysler economically feasible.  Even if class members themselves could afford such individualized litigation, the court system could not.  In addition to the burden and expense of managing many actions arising from the TIPM defect, individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

105.   In the alternative, the proposed classes may be certified because:

    a.    the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent or varying adjudication with respect to individual class members which would establish incompatible standards of conduct for Chrysler;

    b.    the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

    c.    Chrysler has acted or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to the members of the proposed classes as a whole.

**FIRST CAUSE OF ACTION**
**By Plaintiffs Lightfoot and Galvan on Behalf of the California CLRA Class**
**For Violation of the California Consumers Legal Remedies Act**
**Cal. Civ. Code. §§ 1750, *et seq.***

106.   Plaintiffs Lightfoot and Galvan, on behalf of themselves and the proposed California class, hereby re-allege Paragraphs 1-6, 7-8, 14, 15-105.

107.   Chrysler has violated the Consumers Legal Remedies Act (CLRA), California Civil Code sections 1770(a)(5), (7), (14), and (16), by engaging in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions—namely, the sale of Class Vehicles to Plaintiffs and the proposed California CLRA class—that were intended to result and did result in the sale and lease of goods to consumers.

108.   In connection with the sale of Class Vehicles to Plaintiffs and California CLRA class members, Chrysler failed to disclose—at the point of sale or otherwise—

26

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

material information about the Class Vehicles—namely, that the TIPM in Class Vehicles is defective and poses a safety hazard.

109.    As a direct and proximate result of Chrysler's conduct, Plaintiffs and California CLRA class members have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect. Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

110.    Plaintiff Lightfoot, on behalf of himself and class members, notified Chrysler in writing of its CLRA violations and requested that Chrysler cure the violations.  Chrysler has declined Plaintiff's request.

111.    Pursuant to California Civil Code § 1780, Plaintiff Lightfoot seeks actual and punitive damages and appropriate equitable and injunctive relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect, and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future, as well at attorney fees and costs.

112.    Pursuant to California Civil Code § 1780, Plaintiff Galvan seeks appropriate injunctive relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect, and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future, as well at attorney fees and costs.

**SECOND CAUSE OF ACTION**
**By Plaintiffs Galvan and Lightfoot on Behalf of the California UCL Class**
**For unlawful, unfair, and fraudulent business practices under**
**Business and Professions Code § 17200 *et seq*.**

113.    Plaintiffs Galvan and Lightfoot, on behalf of themselves and the proposed California UCL class, hereby re-allege Paragraphs 1-6, 7-8, 14, 15-105.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

114.     Chrysler has violated and continues to violate California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or fraudulent business acts or practices.

115.     Chrysler's acts and practices constitute unlawful business practices in that they violate the Consumers Legal Remedies Act and the Magnuson-Moss Warranty Act, as well as the warranties provided under 13 Cal. Code Regs. § 2037.

116.     Chrysler's acts and practices constitute fraudulent practices in that they are likely to deceive a reasonable consumer.  A reasonable consumer would not have bought a Class Vehicle if Chrysler adequately disclosed that the TIPM installed in Class Vehicles was defective and unreasonably dangerous.

117.     Chrysler's fraudulent acts and practices also constitute unfair practices in that (i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate utility of Chrysler's conduct is outweighed by the harm to consumers; (iii) the injury is not one that consumers reasonably could have avoided; and/or (iv) the conduct runs afoul of the public safety policy embodied in the Highway Safety Act and the policies underlying the CLRA, which seeks to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace, as well as the purpose of the Magnuson-Moss Warranty Act, which seeks to protect consumers by making warranties more readily understood and enforceable.

118.     As a direct and proximate result of Chrysler's unlawful, unfair, and fraudulent business practices as alleged herein, Plaintiffs Galvan and Lightfoot and California UCL class members have suffered injury in fact and lost money or property, in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

119.   Plaintiffs Galvan and Lightfoot and California UCL class members are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to Chrysler because of its deceptive practices, an order requiring Chrysler to adequately disclose and repair the TIPM defect, and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

**THIRD CAUSE OF ACTION**
**By Plaintiff Jimmy Pat Carter on Behalf of the Florida Class**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201,** *et seq.*

120.   Plaintiff Carter, on behalf of himself and the proposed Florida class, hereby re-alleges Paragraphs 1-6, 9, 14, 15-105.

121.   The purpose of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, is to "protect the consuming public…from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practice in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2).

122.   Plaintiff Carter and the Florida class members are "consumers" within the meaning of Fla. Stat. §501.203(7).

123.   At all relevant times, Chrysler was engaged in trade or commerce within the meaning of Fla. Stat. §501.203(8).

124.   Chrysler has violated Florida's Deceptive and Unfair Trade Practices Act by failing to disclose, at the point of sale or otherwise, that the TIPM in Class Vehicles is defective and poses a safety hazard.  This conduct offends public policy and is unethical, unscrupulous, and substantially injurious to consumers.

125.   As a direct and proximate result of Chrysler's conduct, Plaintiff Carter and other members of the Florida class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

126.     Pursuant to Fla.  Stat.  §501.211, Plaintiff Carter and the Florida class seek damages, a declaratory judgment, an order requiring Chrysler to adequately disclose and repair the TIPM defect, and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

**FOURTH CAUSE OF ACTION**
**By Plaintiff Young on Behalf of the Maryland Class**
**For Violation of the Maryland Consumer Protection Act,**
**Md. Code Com. Law § 13-101,** *et seq***.**

127.    Plaintiff Young, on behalf of herself and the proposed Maryland class, hereby re-alleges Paragraphs 1-6, 10, 14, 15-105.

128.    Plaintiff Young is a "consumer" within the meaning of § Md. Code Com. Law § 13-101(c)(1).

129.    By failing to disclose, at the point of sale or otherwise, that the TIPM in Class Vehicles is defective and poses a safety hazard, Chrysler has engaged in unfair or deceptive practices in connection with the sale of consumer goods, in violation of Maryland Consumer Protection Act, Md. Code Com. Law, §§ 13-301(3), 13-303.

130.    All of the conduct alleged herein occurred in the course of Chrysler's business and is part of a pattern or generalized course of conduct.

131.    As a direct and proximate result of Chrysler's conduct, Plaintiff Young and the Maryland class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

132.   Pursuant to Md. Code Com. Law § 13-408, Plaintiff Young and the class bring this action to recover damages resulting from Chrysler's deceptive acts.

### FIFTH CAUSE OF ACTION
**By Plaintiff Soule on Behalf of the Massachusetts Class**
**For Violation of Massachusetts' Consumer Protection Act,**
**Mass. Gen Laws, ch. 93A, *et seq*.**

133.   Plaintiff Soule, on behalf of himself and the proposed Massachusetts class, hereby re-alleges Paragraphs 1-6, 11, 14, 15-105.

134.   Mass. Gen. Laws ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

135.   At all relevant times, Chrysler was engaged in commerce within the meaning of Mass. Gen. Laws, ch. 93A.

136.   As alleged more fully herein, Chrysler has violated Mass. Gen. Laws, ch. 93A in that it used unconscionable business practices by failing to disclose, at the point of sale or otherwise, that the TIPM in Class Vehicles is defective and poses a safety hazard.

137.   Chrysler's practices also violate the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(3).

138.   As a direct and proximate result of Chrysler's conduct, Plaintiff Soule and other members of the Massachusetts class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

139.   Pursuant to Mass. Gen. Laws, ch. 93, § 9(3), Plaintiff Soule seeks damages and appropriate equitable relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect, and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

31

140.   Plaintiff Soule, on behalf of himself and class members, made a demand for relief, in writing, to Chrysler at least thirty (30) days prior to filing this complaint, as required by Mass. Gen. Laws Ch. 93A, § 9.  Chrysler has declined Plaintiff's request.

141.   Based on the foregoing, Plaintiff Soule and the Massachusetts class are entitled to all remedies available pursuant to Mass. Gen. Laws ch. 93A, § 9, including refunds, actual damages, or statutory damages in the amount of 25 dollars per violation, whichever is greater, double or treble damages, attorney fees and other reasonable costs. Plaintiff Soule and the Massachusetts class also request that the Court award equitable relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

### SIXTH CAUSE OF ACTION
**By Plaintiff Dillon on Behalf of the Missouri Class**
**For Violation of Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. § 407.010, *et seq.***

142.   Plaintiff Dillon, on behalf of herself and the proposed Missouri class, hereby realleges Paragraphs 1-6, 12, 14, 15-105.

143.   Chrysler is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

144.   Class Vehicles are "merchandise" as defined by Mo. Rev. Stat. § 407.010(4).

145.   Chrysler's advertising, distribution, offering for sale, and sale of Class Vehicles is "trade or commerce" as defined by Mo. Rev. Stat. § 407.010(7).

146.   By failing to disclose, at the point of sale or otherwise, that the TIPM in Class Vehicles is defective and poses a safety hazard, Chrysler violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.020.1, which precludes the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in or from the state of Missouri.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

147.   Plaintiff and class members purchased their vehicles primarily for personal, family, or household purposes and have suffered an ascertainable loss of money as a direct and proximate result of Chrysler's failure to disclosure the TIPM defect.

148.   As a direct and proximate result of Chrysler's conduct, Plaintiff Dillon and other members of the Missouri class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

149.   Pursuant to Mo. Rev. Stat. §§ 407.025 and 407.100(3)-(4), Plaintiff Dillon and the Missouri class seek an award of damages and appropriate equitable relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

## SEVENTH CAUSE OF ACTION
### By Plaintiff Melville on Behalf of the New Jersey Class
### For Violation of New Jersey Consumer Fraud Act,
### N.J. Stat. §56:8-1, *et seq*.

150.   Plaintiff Melville, on behalf of himself and the proposed New Jersey class, hereby realleges Paragraphs 1-6, 13, 14, 15-105.

151.   Class Vehicles are "merchandise" under N.J. Stat. § 56:8-1(c).

152.   Chrysler is a "person" under N.J. Stat. § 56:8-1(d).

153.   Class members' purchase and leases of Class Vehicles are "sales" under N.J. Stat. § 56:8-1(e).

154.   Chrysler's conduct, as alleged herein, violated the New Jersey Consumer Fraud Act, N.J. Stat. 56:8-2, in that it used an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing,

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of merchandise or Chrysler's subsequent performance.

155.   Chrysler knowingly concealed, suppressed, or omitted the material fact from New Jersey class members that the Class Vehicles' suffers from a TIPM defect which poses a safety risk for consumers and the general public.

156.   As a direct and proximate result of Chrysler's conduct, Plaintiff Melville and other members of the New Jersey class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TIPM diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

157.   Plaintiff and the New Jersey class seek an award of damages and appropriate equitable relief, including an order requiring Chrysler to adequately disclose and repair the TIPM defect and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future.

## EIGHTH CAUSE OF ACTION
**By Plaintiffs Lightfoot, Young, Soule, and Melville,**
**on Behalf of the Emissions Warranty Class**
**For Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2301, *et seq.*)**

158.   Plaintiffs Lightfoot, Young, Soule, and Melville, on behalf of themselves and the proposed Emissions Warranty Class, reallege Paragraphs 1-6, 8, 10, 11, 13, 14, 15-105.

159.   Plaintiffs Lightfoot, Young, Soule, and Melville and the other members of the Emissions Warranty Class are "consumers" within the meaning of 15 U.S.C. 2301(3).

160.   Chrysler is a "supplier" and "warrantor" within the meaning of sections 2301(4)-(5).

161.   Class Vehicles are "consumer products" within the meaning of section 2301(1).

162.   Chrysler provided a written warranty under section 2301(6) to all members of the Emissions Warranty Class (the "Emissions-Related Defects Warranty"), under which Chrysler warranted that Class Vehicles would be free from defects in materials and workmanship which cause the failure of warranted parts within seven years or 70,000 miles, whichever first occurs.  Cal. Health & Safety Code § 43205; 13 Cal. Code Regs. § 2035, *et seq.*; Regs. Conn. State Agencies § 22a-174-36b; 06-096 CMR Ch. 127, § 5; Md. Code Regs. § 26-11-34; 310 Code Mass. Regs. § 7:40; N.J. Admin. Code. § 7:27-29.10; Or. Admin. Rules 340-257-0050; 25 Pa. Admin. Code § 126.431; R.I. Admin. Code § 25-4-37:37.6; Vt. Admin. Code 16-3-100:5-1102 & 1104; Vt. Admin. Code 16-3-100: Appendix F; Wash. Admin. Code 173-423-070.

163.   The TIPM in Class Vehicles is a "warranted part," under 13 Cal. Code Regs. § 2035 and the laws of the states that have incorporated California law, because the TIPM was installed in the Class Vehicles and it affects emissions.  Electronic controls, the fuel pump, and fuel injection components, as well as related components—all of which are affected or controlled by the TIPM—all constitute "emissions-related" parts according to the California Air Resource Board, which oversees California's emissions warranty law and which included those parts on its 1977 "Emissions-Related Parts List" (amended 1981).

164.   The TIPM is a "High Priced" emissions-related part, under 13 Cal. Code Regs. § 2037 and the laws of the states that have incorporated California law because the cost of replacing it, including labor and diagnosis, has consistently exceeded $550.

165.   Chrysler is required to repair or replace TIPMs that fail during the period of warranty coverage at no charge.

166.   Plaintiffs Lightfoot, Young, Soule, and Melville and other Emissions Warranty Class members own Class Vehicles that experienced TIPM failure during the period of warranty coverage.

---

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

167.   Chrysler breached the Emissions-Related Defects Warranty by failing to repair or replace the TIPMs at no charge in Plaintiffs' and other Emissions Warranty Class members' Class Vehicles.

168.   Chrysler's breach of the Emissions-Related Defects Warranty has deprived Plaintiffs Lightfoot, Young, Soule, and Melville and the other members of the Emissions Warranty Class of the benefit of their bargain.

169.   The amount in controversy of the Plaintiff's individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

170.   Chrysler has been afforded reasonable opportunity to cure its breach of the Emission-Related Defects Warranty.  Pursuant to the provisions of 15 U.S.C. § 2310(e), on November 1, 2013, Plaintiff Soule, on behalf of himself and class members, sent notice to Chrysler's principal place of business and registered agent for service to provide it with reasonable opportunity to correct its business practices and cure its breach of warranties under the MMWA.  Chrysler received the notice on November 7, 2013.  In January 2014, Plaintiff Lightfoot, on behalf of himself and class members, also sent notice to Chrysler's principal place of business and registered agent for service to provide it with reasonable opportunity to correct its business practices and cure its breach of warranties under the MMWA.  Chrysler received the notice on January 27, 2014.  Chrysler has not cured the breach of warranties described above and has indicated that it does not intend to provide free TIPM repairs or to provide TIPM-related repair reimbursements to class members.

171.   In addition, resorting to any informal dispute settlement procedure and/or affording Chrysler another opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Chrysler has repeatedly failed to disclose the TIPM defect or provide repairs and replacements at no

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

cost, and, as such, have indicated no desire to participate in such a process at this time. Any requirement under the MMWA or otherwise that Plaintiffs Lightfoot, Young, Soule, and Melville resort to any informal dispute settlement procedure and/or afford Chrysler a reasonable opportunity to cure the breach of warranties described above is excused and/or has been satisfied.

172.   As a direct and proximate cause of Chrysler's warranty breach, Plaintiffs Lightfoot, Young, Soule, and Melville and the other members of the Emissions Warranty Class sustained damages and other losses in an amount to be determined at trial. Chrysler's conduct damaged Plaintiffs Lightfoot, Melville, Soule, and Young, and the other members of the Emissions Warranty Class, who are entitled to recover damages, specific performance, costs, attorney fees, and other appropriate relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a.     For an order certifying the proposed classes and appointing Plaintiffs and their counsel to represent the classes;

b.     For an order awarding Plaintiffs and the members of the classes actual, statutory, punitive or any other form of damages provided by and pursuant to the statutes cited above;

c.     For an order awarding Plaintiffs and the members of the classes restitution, disgorgement or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper;

d.     For an order requiring Chrysler to adequately disclose and repair the TIPM defect and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future;

e.     For an order awarding Plaintiffs and the members of the classes pre-judgment and post-judgment interest;

f.     For an order awarding Plaintiffs and the members of the classes reasonable attorney fees and costs of suit, including expert witness fees; and

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK

g.     For an order awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.


DATED: May 5, 2014                Respectfully submitted,

**GIRARD GIBBS LLP**

By:  _/s/_ Eric H. Gibbs

Eric H. Gibbs
Dylan Hughes
David Stein
Scott M. Grzenczyk
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
Todd M. Schneider
Joshua G. Konecky
180 Montgomery Street, Suite 2000
San Francisco, California 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

*Attorneys for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 13-CV-08080-DDP-VBK