O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PETER VELASCO, CHRISTOPHER WHITE, JACQUELINE YOUNG, and CHRISTOPHER LIGHT, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Case No. CV 13-08080 DDP (VBKx) **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| Plaintiffs, | ) ) ) | [Dkt. No. 42.] |
| v. | ) ) | |
| CHRYSLER GROUP LLC, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

Before the court is Defendant Chrysler Group LLC ("Chrysler")'s Motion to Dismiss Plaintiff's Second Amended Complaint under Rule 12(b)(6). (Dkt. No. 42.) The motion is fully briefed. Having considered the parties' submissions and heard oral argument, the court adopts the following order.

///

///

///

## I.    Background

The named plaintiffs in this putative class action lawsuit are eight individuals who reside and purchased Chrysler vehicles in six different states: Marcos Galvan ("Galvan") and Christopher Lightfoot ("Lightfoot")(California); Jimmy Pat Carter ("Carter") (Florida); Jacqueline Young ("Young") (Maryland); Bradford Soule ("Soule") (Massachusetts); Elizabeth Dillon ("Dillon") (Missouri); and John Melville ("Melville") (New Jersey). Each of the Plaintiffs purchased their vehicles from a Chrysler dealership. (Second Amended Complaint ("SAC") ¶¶ 49, 54, 60, 65, 72, 82, 88.)

Plaintiffs allege that Defendant Chrysler violated the various states' consumer protection statutes by failing to disclose to them and other similarly situated consumers that certain Chrysler vehicles ("Class Vehicles") were manufactured with a defective Total Integrated Power Module ("TIPM").[1] They also allege that Chrysler violated various states' statutory emissions warranties.

Consisting of a computer, relays, and fuses, the TIPM controls and distributes power to a vehicle's electrical systems, including safety systems, security system, ignition system, fuel system, and electrical powertrain, as well as comfort and convenience systems such as air bags, fuel pump, turn signals, power windows, and

---

[1] These vehicles include: 2011-2012 model year Jeep Grand Cherokee; 2011-2012 model year Dodge Durango; 2010-2014 model year Dodge Grand Caravan; 2010-2014 model year Chrysler Town & Country; 2010-2014 model year Chrysler Grand Voyager; 2012-2014 model year Dodge Ram Cargo Van; 2010-2012 model year Dodge Nitro;  2010-2012 model year Jeep Liberty; 2010-2012 model year Dodge Ram 1500 pickup; 2010-2012 model year Dodge Ram 2500 pickup; 2011-2012 model year Dodge Ram 3500 Cab Chassis; 2011-2013 model year Dodge Ram 4400/5500 Cab Chassis; 2010-2012 model year Dodge Ram 3500 pickup; 2010-2014 model year Jeep Wrangler; 2010 model year Dodge Journey. (SAC ¶ 18.)

1  doors. (SAC ¶¶ 20-21.)

2      Plaintiffs allege that the TIPM with which the Class Vehicles
3  are equipped, referred to as "TIPM 7," "fails to reliably control
4  and distribute power to the vehicles' various electrical systems
5  and component parts." (SAC ¶ 19, 22.) They assert that as a result
6  of the alleged TIPM defect, the vehicles fail to start promptly and
7  reliably, and some to fail to start entirely; stall, including at
8  high speeds; have fuel pumps that do not turn off; experience
9  headlights and taillights shutting off; and experience random and
10 uncontrollable activity of the horn, windshield wipers, and alarm
11 system. (Id. ¶ 23.)

12     Plaintiffs allege that they have incurred expenses repairing
13 their vehicles' TIPMs, ranging from $100 in the case of Melville to
14 $1,036.30 in the case of Young. (See ¶¶ 53, 71.)

15     Plaintiffs make various allegations in support of their
16 contention that Chrysler knew of the TIPM 7 problem when the Class
17 Vehicles were sold. They allege that Chrysler vehicles have
18 suffered from TIPM problems for the last decade, leading to
19 multiple TIPM-related recalls. (Id. ¶ 28-32.) Because of the
20 history of recalls, Plaintiffs allege, Chrysler was on the lookout
21 for early indicia of problems with the TIPM 7 and tracked potential
22 TIPM-related issues through exhaustive pre-release testing,
23 including putting 7 million miles on multiple 2011 Grand Cherokee
24 test cars before production. (Id. ¶ 34-35.) Plaintiffs allege that,
25 given the speed and frequency with which the TIPM 7 defect
26 typically becomes apparent, it is not plausible that this
27 preproduction testing would not have alerted Chrysler to the
28 existence of the TIPM defect. (Id. ¶ 35.)

1    Plaintiffs also allege that Chrysler learned of the defect
2  through its monitoring of drivers' safety-related reports to the
3  National Highway Traffic Safety Administration ("NHTSA"), which
4  received complaints from drivers beginning in 2008 concerning
5  electrical issues, including uncontrollable activity of the
6  windshield wipers, horn, and alarm system, and the headlights and
7  taillights not working. (Id. ¶ 38.) By the end of 2011, more than
8  100 drivers had filed reports with NHTSA about problems related to
9  a defective TIPM. (Id. ¶ 38.)

10    Plaintiffs allege that, despite its knowledge of the defect,
11  Chrysler failed to publicly acknowledge the TIPM 7 problem or
12  notify consumers, dealerships, or auto-technicians of the defect,
13  thereby preventing TIPM-related problems from being efficiently
14  diagnosed. (Id. ¶ 44.) They allege that class members have spent
15  hundreds to thousands of dollars on TIPM repairs, as well as
16  unnecessary repairs to fix problems that appeared to be related to
17  a car's battery, fuel pumps, and wireless ignition node modules but
18  were actually caused by the defective TIPM. (Id. ¶ 46.)

19    On the basis of these allegations, Plaintiffs assert the
20  following eleven causes of action: (1) violation of the California
21  Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (brought
22  by Plaintiffs Lightfoot and Galvan); (2) violation of California's
23  Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.
24  (brought by Plaintiffs Lightfoot and Galvan); (3) violation of the
25  Florida Deceptive and Unfair Trade Practices Act, Fla. Stat.
26  §501.201 et seq. (brought by Plaintiff Carter); (4) violation of
27  the Maryland Consumer Protection Act, Md. Code Com. Law, § 13-10 1
28  et seq. (brought by Plaintiff Young);(5) violation of the

4

Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A *et seq.* (brought by Plaintiff Soule); (6) violation of the Missouri Merchandising Practices Act, MO. Rev. Stat. § 407.010 *et seq.* (brought by Plaintiff Dillon); (7) violation of the New Jersey Consumer Fraud Act, N.J. Stat. 56:8-1 *et seq.* (brought by Plaintiff Melville); and (8) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (brought by Plaintiffs Lightfoot, Young, Soule, and Melville). (See SAC ¶¶ 106-172.)

Plaintiffs seek to represent classes of persons who purchased or leased a Class Vehicle in California, Florida, Maryland, Massachusetts, Missouri, and New Jersey, and a class of persons who purchased or leased a Class Vehicle in various states with statutory emissions warranties that require TIPM repair or replacement within seven years/70,000 miles. (See id. ¶ 97.)

## II.  Legal Standard

### A.  Rule 12(b)(6)

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir.2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. Conclusory allegations or

1  allegations that are no more than a statement of a legal conclusion

2  "are not entitled to the assumption of truth." Id. at 679. In other

3  words, a pleading that merely offers "labels and conclusions," a

4  "formulaic recitation of the elements," or "naked assertions" will

5  not be sufficient to state a claim upon which relief can be

6  granted. Id. at 678 (citations and internal quotation marks

7  omitted).

8      "When there are well-pleaded factual allegations, a court

9  should assume their veracity and then determine whether they

10  plausibly give rise to an entitlement of relief." Id. at 679.

11  Plaintiffs must allege "plausible grounds to infer" that their

12  claims rise "above the speculative level." Twombly, 550 U.S. at

13  555. "Determining whether a complaint states a plausible claim for

14  relief" is a "context-specific task that requires the reviewing

15  court to draw on its judicial experience and common sense." Iqbal,

16  556 U.S. at 679.

17  **B.   Rule 9(b)**

18      Claims sounding in fraud are generally subject to the

19  heightened pleading requirements of Federal Rule of Civil Procedure

20  9(b), which requires that a plaintiff alleging fraud state "with

21  particularity the circumstances constituting fraud..." Rule 9(b)

22  "To satisfy Rule 9(b), a pleading must identify the who, what,

23  when, where, and how of the misconduct charged, as well as what is

24  false or misleading about [the purportedly fraudulent] statement,

25  and why it is false." Cafasso, United States ex rel v. Gen.

26  Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)

27  (quotation marks and citations omitted).

28      A fraud by omission or fraud by concealment claim, however,

1   "can succeed without the same level of specificity required by a

2   normal fraud claim." Baggett v. Hewlett-Packard, Co., 582 F.Supp.2d

3   1261, 1267 (C.D. Cal. 2007) (citations omitted). "[A] plaintiff in

4   a fraudulent concealment suit will 'not be able to specify the

5   time, place, and specific content of an omission as precisely as

6   would a plaintiff in a false representation claim.'" Id. (internal

7   citations omitted). However, a plaintiff nevertheless must plead a

8   fraudulent omissions claim with sufficient particularity "so that a

9   defendant can prepare an adequate answer from the allegations."

10  Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir.

11  1989).

12

13  **III. Discussion**

14  **A.    Consumer Protection Statutes**

15  **i.    Particularity of Allegations under Rule 9(b)**

16      Chrysler moves to dismiss Plaintiffs' omissions-based claims

17  under state consumer protection statutes, Counts I through VII, on

18  the grounds that Plaintiffs have failed allege their claims with

19  the particularity required by Rule 9(b). The court is not persuaded

20  that the SAC is deficient in this respect.

21      The parties agree that Rule 9(b)'s heightened pleading

22  standard applies in this case, but disagree regarding the level of

23  specificity required of Plaintiffs to sufficiently plead their

24  claims.

25      Chrysler contends that Plaintiffs' pleading must meet the

26  requirement originally described in Marolda v. Symantec Corp., 672

27  F. Supp. 2d 992 (N.D. Cal. 2009). Marolda involved an alleged

28  fraudulent omission within a particular advertisement produced by

1   the defendant. The plaintiff claimed to know about the

2   advertisement but failed to produce or describe it to the court.

3   See id. at 1001. The court held:

> In this case, to plead the circumstances of omission with
> specificity, plaintiff must describe the content of the
> omission and where the omitted information should or could
> have been revealed, as well as provide representative samples
> of advertisements, offers, or other representations that
> plaintiff relied on to make her purchase and that failed to
> include the allegedly omitted information.

8   Id. at 1002.

9       Relying on Marolda, and two cases that cite the language

10  quoted above[2], Chrysler argues that Counts I through VII should be

11  dismissed because the SAC "contains no references to specific

12  materials where the allegedly withheld information could and

13  should have been revealed, and no factual averments of any

14  'advertisements, offers, or other representations' reviewed by

15  Plaintiffs that omitted the allegedly sought-after information."

16  (Reply at 2.) Chrysler contends that, without such allegations,

17  Plaintiffs have not adequately pled the required element of

18  reliance. (Id.)

19      Plaintiffs contend that the Marolda requirements are not

20  applicable to this case. This court agrees. "As other courts have

21  recognized, the Marolda requirements are not necessarily

22  appropriate for all cases alleging a fraudulent omission." Overton

23  v. Bird Brain, Inc., 2012 WL 909295 (C.D. Cal. Mar. 15, 2012).

24  _____

25      [2] As Chrysler notes, the passage cited from Marolda was
    quoted, in part, in Erickson v. Boston Scientific Corp., 846 F.

26  Supp. 2d 1085, 1093 (C.D. Cal. 2011) and  Eisen v. Porsche Cars N.
    Am., Inc.,, 2012 WL 841019, at *3 (C.D. Cal. Feb. 22, 2012).

27  However, neither the Erickson nor Eisen courts explained the
    factual context that led the Marolda court to describe this

28  standard or compared the facts in Marolda to those in the cases
    before them.

In <u>MacDonald v. Ford Motor Co.</u>, __F.Supp.2d__, 2014 WL 1340339 (N.D. Cal. Mar. 31, 2014), the court declined to apply the <u>Marolda</u> requirements with respect to allegations that Ford failed to disclose that its vehicles contained defective coolant pumps that caused the abrupt loss of power. The <u>MacDonald</u> court distinguished <u>Marolda</u>, observing that, where <u>Marolda</u> involved an omission within a particular advertisement and the plaintiff was thus obligated to describe where in the advertisement the omitted information should have been presented, the <u>MacDonald</u> plaintiffs alleged a pure omission unrelated to any particular defendant statement. <u>Id.</u> at *6. It held that, in such circumstances, the plaintiffs were not required "to point out the specific moment when the Defendant failed to act." <u>Id.</u> (quoting <u>Baggett v. Hewlett-Packard Co.</u>, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007)). Accordingly, the <u>MacDonald</u> court held that the plaintiffs adequately pled their claim, concluding:

> Plaintiffs adequately allege the 'who what when and how," given the inherent limitations of an omission claim. In short, the "who" is Ford, the "what" is its knowledge of a defect, the "when" is prior to the sale of Class Vehicles, and the "where" is the various channels of information through which Ford sold Class Vehicles.

<u>MacDonald</u>, 2014 WL 1340339, at *6.

An argument similar to Chrysler's was likewise rejected in <u>Clark v. LG Electronics U.S.A., Inc.</u>, 2013 WL 5816410 (S.D. Cal. Oct. 29, 2013). That case involved allegations that the defendant failed to disclose a known defect in a refrigerator it manufactured. Similar to the present case, the defendant argued that the plaintiff had not adequately pled that she relied upon the allegedly fraudulent omissions by asserting that she saw a

1    particular advertisement prior to her purchase that could have

2    contained the omitted information. Id. at *6. The court found that

3    this argument "defies common sense and real-world business

4    practice."  The court explained:

> No refrigerator manufacturer would ever advertise its product
> to, in essence, consistently fail. . . . Such advertising
> would be tantamount to an automobile manufacturer advertising
> its vehicle routinely stalls in freeway traffic or a wireless
> telephone provider advertising a high rate of dropped calls.
> Such disclosures do not exist in the real world because they
> represent product or service failure. Product advertising is
> meant to identify and buttress product features and value,
> not denigrate and diminish those qualities.

10   Id. The court concluded that, because the alleged omissions were

11   material, reliance on the part of the plaintiff could be presumed.

12   Id. (citing, e.g., In re Tobacco II Cases, 46 Cal.4th 298, 328

13   (2009).)

14       This court finds the reasoning of MacDonald and Clark

15   persuasive and applicable to the instant omissions-based claims.

16   Accordingly, it considers the sufficiency of Plaintiffs'

17   allegations under the "who, what, when, and where" test. See Vess

18   v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003).

19   Plaintiff has identified the "who" (Chrysler); the "what" (knowing

20   about yet failing to disclose to customers, at the point of sale

21   or otherwise, that the TIPM 7 installed in Plaintiffs' vehicles

22   was defective and posed a safety hazard (¶¶ 1-2, 19); the "when"

23   (from the time of the sale of the first Class Vehicle until the

24   present day (¶¶ 28-40, 97)); and the "where" (the various channels

25   through which Chrysler sold the vehicles, including the authorized

26   dealers where Plaintiffs' purchased their vehicles). The court

27   therefore concludes that Plaintiffs' factual averments are

28   sufficient to allow Chrysler to prepare an adequate answer from

1   the allegations. See MacDonald, 2014 WL 1340339, at *6 (quoted

2   above); Price v. Kawasaki Motors Corp., USA, 2011 Wl 10948588, at

3   *3 (C.D. Cal. Jan. 24, 2011) (applying the same analysis to

4   similar facts); Circulli v. Hyundai Motor Co., 2009 WL 5788762, at

5   *3-4 (C.D. Cal. June 12, 2009) (same).

6   **ii.   Whether a Fiduciary or Other Special Relationship Must Be
        Established to Trigger a Duty to Disclose Under State**

7   **Consumer Protection Statutes**

8       Chrysler next contends that Plaintiffs' omissions-based

9   claims under the consumer protection statutes of Florida,

10  Maryland, Massachusetts, and New Jersey should be dismissed

11  because Plaintiffs have not asserted sufficient facts to establish

12  that Chrysler stood in a special relationship, such as that of a

13  fiduciary, relative to Plaintiffs. (Mot. at 10-13.) It contends

14  that, as a result, Plaintiffs have not shown that Chrysler had a

15  duty to disclose to them the alleged defects in the Class

16  Vehicles. The court is not convinced.

17      Each state's consumer protection statute strengthened

18  existing legal protections for consumers by creating a private

19  right of action to seek remedies for various unfair practices and

20  deceptive acts in the conduct of trade or commerce. See Fla. Stat.

21  §501.201 *et seq.* (Florida Deceptive and Unfair Trade Practices Act

22  ("FDUTPA"); Md. Code Com. Law, § 13-10 1 *et seq.* (Maryland

23  Consumer Protection Act ("Maryland CPA"); Mass. Gen. Laws, ch. 93A

24  *et seq.* Massachusetts Consumer Protection Act ("Massachusetts

25  CPA"); N.J. Stat. 56:8-1 *et seq.* (New Jersey Consumer Fraud Act

26  ("NJCFA")).

27      Courts have routinely found that an auto manufacturer's

28  alleged failure to disclose a material defect can be the basis for

a claim under each statute. See, e.g., Matthews v. Am. Honda Motor Co., Inc., 2012 WL 2520675, at *2-3 (S.D. Fla. June 6, 2012) (holding that the plaintiff's allegation that Honda failed to disclose a known defect that causes paint discoloration on its vehicles stated a viable FDUTPA claim); Doll v. Ford Motor Co., 814 F. Supp. 2d 526, 547-48 (D. Md. 2011) (holding that the plaintiffs stated a viable FDUTSA and Maryland CPA claim where it alleged Ford knew of but failed to disclose a known torque converter defect); Henderson v. Volvo Cars of N. Am., 2010 WL 2925913 (D.N.J. July 21, 2010) (holding that the plaintiffs' allegation that Volvo failed to disclose a known defect that caused premature transmission failure stated a viable claim under the FDUTPA, Massachusetts CPA, and NJCFA); Lloyd v. Gen. Motors Corp., 916 A.2d 257, 275 (2007) (holding that the plaintiffs' allegation that General Motors failed to disclose a defect that caused seats to collapse in rear-impact collisions constituted a viable claim under the Maryland CPA); Rothstein v. DaimlerChrysler Corp., 2005 WL 3093573 (M.D. Fla. Nov. 18, 2005) (holding that allegation that Chrysler knowingly concealed a breaking system defect stated a claim under FDUTPA). None of these cases specifically addressed the question of whether a special relationship was necessary to trigger a duty to disclose. Rather, the parties and the court appear to have taken it as a given that, under the relevant statutes, an automobile manufacturer has a duty to disclose to consumers a known defect in a vehicle it manufactures.

With these cases in mind, the court takes note of the startling nature of Chrysler's position. Chrysler contends that

Plaintiffs' state consumer protection claims must be dismissed on the grounds that--although Plaintiffs purchased vehicles manufactured and warranted by Chrysler at authorized Chrysler dealerships--Plaintiffs have not shown that Chrysler has a sufficiently special relationship with them such that it had a duty to disclose a defect it allegedly knew about at the time of each sale. To reach this conclusion, Chrysler asks the court to read into each of the statutes a fiduciary or special relationship requirement where none is expressly stated. The adoption of this approach would preclude each of the cases cited above, all of which involved purchases at auto dealerships, as well as the current case. Indeed, the rule Chrysler advocates would effectively render each state's consumer protection statute a nullity in virtually every circumstance where a manufacturer or retailer fails to disclose a known defect to consumers who purchase its products. This is because fiduciary or other relationships involving the reposing of special trust rarely exist in typical commercial transactions. See Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994) ("[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (citation omitted); In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig., 932 F. Supp. 2d 1095, 1117 (C.D. Cal. 2013) ("An arms-length commercial transaction is not usually the predicate for [a special] relationship").

Given its far-reaching implications, this court is disinclined to adopt Chrysler's position absent compelling

1    authority requiring such a result. Chrysler has not provided the

2    court with such compelling authority. It asks the court to look to

3    two sorts of cases, both which the court finds inapposite.

4        First, Chrysler points to a number of cases stating that a

5    duty to disclose, created by a fiduciary or otherwise special

6    relationship, is an element of a common law fraudulent concealment

7    claim.[3] These cases are of little instructive value, however,

8    because they do not consider the consumer protection statutes at

9    issue in this case, which, as noted, strengthened existing laws

10   protecting consumers.[4]

11       Second, Chrysler points to cases in several of the states

12   that do address the issue of whether a defendant had a duty to

13   disclose in the context of omissions-based claims brought under

14   state consumer protection statutes. However, as discussed below,

15   these cases concerned facts and issues of law that are far afield

16   from those in the present case.

17

18   _____

19   [3] See Motion at 10-12 (citing, *inter alia*, Taylor, Bean &
     Whitaker Morg. v. GMAC Mortg., 2008 WL 3200286 (M.D. 2008)

20   (analyzing claim for common law "fraudulent inducement"); Advisor's
     Capital Investments, Inc. v. Cumberland Cas. & Sur. Co., 2007 WL

21   220189, at *3 (M.D. Fla. 2007) (same); Gegeas v. Sherrill, 218 Md.
     472, 476-77 (Md. 1958) (same); Latty v. St. Joseph's Soc. of Sacred

22   Heart, Inc., 198 Md. App. 254, 272 (2011) (same); Rhee v. Highland
     Dev. Corp., 182 Md. App. 516, 524 (2008) (same); In re Access

23   Cardiosystems, Inc., 404 B.R. 593, 643 (Bankr. D. Mass. 2009)
     aff'd, 488 B.R. 1 (D. Mass. 2012) (same); United Jersey Bank v.

24   Kensey, 306 N.J. Super 540 (App.Div. 1997) (same); Lightning Lube
     v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (same)).

25       [4] For example, the Massachusetts Supreme Court has observed,

26   with reference to a claim brought under the state's consumer
     protection statute, that "the definition of an actionable 'unfair

27   or deceptive act or practice' goes far beyond the scope of the
     common law action for fraud and deceit." Slaney v. Westwood Auto,

28   Inc., 366 Mass. 688, 703 (1975).

1       **1.   Florida**

2       In the case of Florida, Chrysler relies primarily on <u>Virgilio</u>

3   <u>v. Ryland Group</u>, 680 F.3d 1329, 1337-38 (11th Cir. 2012). In that

4   case, several entities that owned land next to a former bombing

5   range sold the land to builders, who in turn sold homes to the

6   plaintiff-home buyers. The plaintiffs brought suit against both

7   the builders and the original landowners on the ground that both

8   had failed to disclose their knowledge of the former bombing

9   range, which, when its existence became publicly known, caused a

10  diminution in their homes' value. <u>Id.</u> at 1333. The Eleventh

11  Circuit held that the plaintiffs' claims against the landowners,

12  which included common fraud, negligence, unjust enrichment, and

13  violation of the FDUTPA, could not proceed because the plaintiffs

14  had not established that the landowners had a duty to disclose the

15  information to them. Defendant points to the court's rejection of

16  the FDUTPA claim, where the court noted that "the alleged duty of

17  disclosure did not exist under Florida law." <u>Id.</u> at 1337.

18      However, <u>Virgilio</u> does not provide the support Chrysler

19  seeks. The <u>Virgilio</u> court's analysis of the FDUTPA claims turned

20  on legal doctrine related to home sales. Specifically, the court

21  concluded that the case did not fall within an exception to the

22  background rule of caveat emptor for home purchases set forth in

23  <u>Johnson v. Davis</u>, 480 So.2d 625 (Fla. 1985), which allows common

24  law fraudulent concealment claims where a home seller fails to

25  disclose a material known defect to a home buyer. 480 So.2d at

26  629. The court concluded that, although the <u>Johnson</u> rule for home

27  sellers had been extended by Florida courts to apply to real

28  estate brokers acting as the agent of a seller, the doctrine did

1   not apply to persons in the circumstances of the landowner-

2   defendants. Virgilio, 680 F.3d 1336-38. Because Virgilio involved

3   the sale of homes and real property rather than consumer goods and

4   was based on case law related to home sales, Virgilio's relevance

5   for the case at bar is minimal.

6        Second, the Virgilio court expressed concern that imposing a

7   duty to disclose on the original landowners to future purchasers

8   of their land, even though they did not know the identities of

9   such persons, would place the landowners in an unreasonable

10  position in which "the only way Defendants could discharge their

11  duty of care would be through marketing: Defendants could not

12  escape liability unless they saturated the market place with the

13  negative information." Id. at 1341. There is no similar concern in

14  the case of car manufacturers which are in a position to, and

15  regularly do, disseminate information regarding defective

16  components through established channels, such as their dealers and

17  auto-technicians, to customers who have purchased their vehicles.

18       The proposition that an FDUTPA plaintiff must establish a

19  duty to disclose was specifically rejected in a case with facts

20  much more similar to the present one. In Morris v. ADT Sec.

21  Services, 580 F.Supp.2d 1305 (S.D. Fla. 2009), the plaintiff in a

22  putative FDUTPA class action claim alleged that the defendant, a

23  provider of fire and burglary alarms, violated the FDUTPA when it

24  failed to disclose that its analog-based equipment would cease to

25  work within several years as a result of pending industry-wide

26  changes. Id. at 1307. The defendant contended that it had no duty

27  to inform consumers that the equipment would cease to function. In

28  rejecting this argument, the court stated that establishing "a

16

1   duty to disclose is not an element of FDUTPA." Id. at 1310 (citing

2   Fla. Stat. § 501.202(2) ("The provisions of this part shall be

3   construed liberally to promote the following policies: To protect

4   the consuming public and legitimate business enterprises from

5   those who engage in unfair methods of competition, or

6   unconscionable, deceptive, or unfair acts or practices in the

7   conduct of any trade or commerce.")).

8       Chrysler contends that Morris is not applicable to the

9   present case because "there claims were being asserted against a

10  direct seller intimately involved in the transaction at issue,"

11  (Reply at 3 (italics in original)). However, given that the Class

12  Vehicles were manufactured by Chrysler, warranted by Chrysler, and

13  sold at Chrysler dealers, the asserted lack of directness is not a

14  compelling distinction. (SAC ¶ 60.)

15      **2.   Massachusetts**

16      In the case of Massachusetts's consumer protection statute,

17  Chrysler relies most heavily on Nei v. Boston Survey Consultants,

18  Inc., 388 Mass. 320 (1983). (See Mot. at 12, Reply at 4-5.) NEI,

19  however, does not help Chrysler. In NEI, sellers of land hired a

20  surveyor to inspect land they were planning to sell. Id. at 321.

21  The surveyor discovered certain adverse conditions which he

22  accurately reported in a letter to the seller, which the seller

23  then showed to the plaintiffs-purchasers. Id. However, the letter

24  did not explain the significance of the surveyor's test results

25  and the surveyor did not explain these implications to the

26  plaintiffs. Id. at 321, 324. The plaintiffs sued the surveyor

27  under the Massachusetts CPA for his failure to disclose the

28  significance of the results to them. In dismissing the claim, the

1   court found that the relationship between the surveyor and the
2   plaintiffs was not sufficient to imply an actionable duty to
3   disclose on the part of the surveyor under the Massachusetts CPA.
4   It noted that the surveyor "played only a minor role in the
5   purchase of the property by the plaintiffs" and "did not
6   participate in the negotiations or in the signing of the purchase
7   and sale agreement." Id. at 324. The court further explained that,
8   "[a]lthough we recognize that there is no requirement of privity
9   of contract, it is somewhat significant that [the surveyor] had no
10  contractual or business relationship with the plaintiffs." Id. at
11  324.

12      Chrysler contends that, under NEI, Plaintifs' Massachusetts
13  CPA claim must be dismissed because "[t]he SAC is completely
14  devoid of any facts establishing that Chrysler Group played any
15  role in the transaction at issue or affirmatively misrepresented
16  any facts to Plaintiffs." (Reply at 5.) Although Chrysler does not
17  elaborate, its argument appears to be that, because the
18  Massachusetts plaintiff, Soule, allegedly purchased his vehicle
19  from a Chrysler dealership, rather than directly from Defendant
20  Chrysler itself, Chrysler does not have a sufficient relationship
21  with the purchasers to give rise to a duty to disclose latent
22  defects. This position is not tenable. Where in NEI the plaintiffs
23  lacked any contractual or business relationship whatsoever with
24  the defendant-surveyor, nothing similar could be said of the
25  instant case, where Plaintiffs purchased vehicles which Chrysler
26  manufactured and warranted from authorized Chrysler dealerships.
27  The holding in NEI cannot reasonably be stretched to preclude a
28  duty to disclose under the Massachusetts CPA in these

1  circumstances.

2      Indeed, the First Circuit has specifically cited <u>NEI</u> for the

3  proposition that "one difference between a fraud claim and the

4  more liberal 93A is allowance of a cause of action even in the

5  absence of a duty to disclose." <u>V.S.H. Realty, Inc. v. Texaco,</u>

6  <u>Inc.</u>, 757 F.2d 411, 417 (1st Cir. 1985). It noted further, in

7  reference to <u>NEI</u>, that the Massachusetts Supreme "appeared ready

8  to find chapter 93A liability even though it found no duty to

9  speak," and "declined to find the statutory liability only because

10  the defendants played a minor role in the purchase of the

11  property." <u>Id.</u> at 417 and fn5.[5]

12      **3.  New Jersey**

13      In the case of New Jersey's consumer protection statute,

14  Chrysler relies on several inapposite cases which explain that

15  knowledge is required to trigger a "duty to disclose" in an NJCFA

16  omissions claims, but do not support its contention regarding the

17  need for a fiduciary or otherwise special relationship. Chrysler

18

19      [5] Defendant also relies on <u>Indus. Gen. Corp. v. Sequoia Pac.</u>
20  <u>Sys. Corp.</u>, 44 F.3d 40, 43-44 (1st Cir. 1995). In that case, the
    plaintiff, a supplier of molded plastic parts, brought an
    Massachusetts CPA claim against a developer of computerized voting
21  machines with which it contracted. The plaintiff-supplier alleged
    that the defendant-developer had failed to disclose the precarious
22  financial condition of a third company with which both the
    plaintiff and defendant worked. <u>Id.</u> at 42. In concluding that the
23  claim could not go forward, the First Circuit concluded that there
    was not sufficient evidence to support the district court's finding
24  that the defendant stood in a fiduciary relationship to the
    plaintiff. <u>Id.</u> at 45-46. However, this analysis was framed by the
25  fact that plaintiff had presented his claim to the jury, and
    district court had found liability, specifically on the basis of
26  the existence of fiduciary obligations. <u>Id.</u> at 44. This court does
    not read <u>Indus. Gen. Corp.</u> to assert that a duty to disclose *only*
27  arises where there is a fiduciary relationship between the parties.

28

1  quotes from Mickens v. Ford Motor Co., 900 F.Supp.2d 427, 411
2  (D.N.J. 2012), which states that "[i]mplicit in the showing of an
3  omission is the underlying duty on the part of the defendant to
4  disclose what he concealed to induce the purchase." (Reply at 6.)
5  In making this observation, the Mickens court was noting that in
6  order to have a duty to disclose information a defendant must have
7  knowledge of the information at issue because, "[u]nlike
8  affirmative acts or misrepresentations, actionable omissions have
9  intent as a required element." Id. (quoting Cox v. Sears Roebuck &
10 Co., 138 N.J. 2, 17 (1994).) The quoted sentence from Mickens
11 comes from Arcand v. Brother Intern. Corp., 673 F.Supp.2d 282, 297
12 (D.N.J. 2009), where the court made a similar observation.
13 Chrysler likewise cites Glass v. BMW of N. Am., LLC, 2011 WL
14 6887721, *9 (D.N.J. 2011), where the court, also quoting
15 Arcand, 673 F.Supp.2d at 297, observed that "[o]bviously, there can
16 be no unlawful conduct, or reliance for that matter, if the
17 defendant was under no obligation to disclose the information in
18 the first place." The Glass court was making the same observation
19 regarding the requirement to show knowledge in an omissions case.
20 See id. Neither Mickens nor Glass suggested in any way that the
21 existence of a fiduciary or otherwise special relationship is a
22 prerequisite for a duty to disclose under the NJCFA.

23     Chrysler also relies on Marcus v. BMW of N. Am., LLC, 687
24 F.3d 583, 597 (3d Cir. 2012), where the court stated "whether the
25 defendants had a duty to disclose those defects" is a common
26 question of fact or law for purposes of class certification.
27 However, the Marcus court was referencing a dispute between the
28 parties concerning the nature of the claim at issue, not the

20

nature of the relationship between the parties. See id. at 593, fn.5.

A New Jersey court has observed that "notwithstanding a broad and liberal reading of the statute, the CFA does not cover every sale in the marketplace. Rather, CFA applicability hinges on the nature of a transaction, requiring a case by case analysis." Papergraphics Int'l, Inc. v. Correa, 389 N.J. Super. 8, 13 (N.J. Super. Ct. App. Div. 2006). However, the kinds of transactions to which the statute has been held inapplicable involve facts that are dissimilar to the instant case, such as the purchase of non-consumer goods, sales which were consumer transactions, and purchases made by wholesalers. See id. (citing cases). The court has found no authority suggesting that the sale of an automobile by a consumer for personal use is not covered by the statute.

In sum, Chrysler has not pointed to compelling authority supporting its position that Plaintiffs must establish that Chrysler stood in a fiduciary or otherwise special relationship with them in order to owe a duty to disclose latent defects. Accordingly, the court concludes that no relationship beyond that which Plaintiffs have alleged they have with Chrysler is necessary for Plaintiffs to state their omission-based consumer protection claims under the consumer protection statutes of Florida, Maryland, Massachusetts, and New Jersey.

**iii. Sufficiency of Allegations Under Maryland Consumer Protection Act**

Chrysler contends that Plaintiff Young's claim under the Maryland Consumer Protection Act is insufficient because the alleged wrongful conduct did not "occur in the sale or offer for

1  sale to the consumer." (Mot. at 13 (citing <u>Morris</u>, 667 A.2d at

2  624, 635-37).) Essentially, Chrysler contends that it cannot be

3  found liable under an MCPA omissions-based claim because it was

4  not a direct seller of the vehicles containing the allegedly

5  defective TIPM. The court is not persuaded. <u>Morris</u>, on which

6  Chrysler relies, recognizes that liability may be established

7  where, although a defendant did not sell the defective product

8  directly to the consumer, the deceptive act "so infects the sale

9  or offer for sale to a consumer that the law would deem the

10 practice to have been committed 'in' the sale or offer for sale."

11 <u>Morris</u>, 340 Md. at 541. The <u>Morris</u> court provides as an example "a

12 deceptive statement appearing on a manufacturer's packaging that

13 is targeted to consumers. Under such circumstances, the CPA may

14 provide a claim against the manufacturer because the statements

15 were made in the sale or offer for sale of the consumer goods."

16 <u>Id.</u> This court perceives no relevant difference between the <u>Morris</u>

17 court's envisioned deceptive statement by a manufacturer within a

18 particular advertisement and the pure omission of a known defect

19 alleged in the present case. Given the substantial power Chrysler

20 presumably exercises in overseeing the marketing of its vehicles

21 and their distribution by authorized dealerships, Chrysler's

22 alleged failure to disclose a defect about which it had exclusive

23 knowledge can be considered to have infected the sale of the Class

24 Vehicles such that its conduct is deemed "committed 'in' the sale

25 or offer for sale" of the vehicles. <u>Id.</u> at 541.

26      ///

27      ///

28      ///

22

## iv.   Sufficiency of Allegations Under New Jersey Consumer Fraud Act

Chrysler contends that Plaintiffs have failed to state a claim under the NJCFA on the ground that the New Jersey plaintiff, Melville, has alleged a defect that manifested itself after the expiration of the basic limited warranty issued by Chrysler. (Mot. at 6; Reply at 12.)

Several courts have held that a manufacturer's alleged failure to inform a consumer of a defect that becomes apparent after the life of a warranty issued by the manufacturer cannot be the basis for an NJCFA omissions-based claim against the manufacturer. In Perkins v. DaimlerChrysler Corp., 383 N.J. Super. 99, 112 (App. Div. 2006), the plaintiff filed a complaint against the defendant under the NJCFA for failing to notify her that her vehicle's exhaust manifold was susceptible to defects and unlikely to function for the industry lifetime standard, a period longer than the warranty the defendant granted the plaintiff. Id. at 103. The court held that the plaintiff did not state a claim under the NJCFA because "[a] defendant cannot be found to have violated the CFA when it provided a part--alleged to be substandard--that outperforms the warranty provided." Id. at 112. At least two courts have since followed the rule adopted in Perkins in similar cases. See Noble v. Porsche Cars N. Am., Inc., 694 F. Supp. 2d 333, 337 (D.N.J. 2010) (holding, in the case of an alleged engine design defect, that "a plaintiff cannot maintain an action under New Jersey's CFA when the only allegation is that the defendant

1  'provided a part—alleged to be substandard—that outperforms the

2  warranty provided.'" (quoting <u>Perkins</u> at 694 F. Supp. at 112));

3  <u>Duffy v. Samsung Electronics America, Inc.</u>, 2007 WL 703197, at *8

4  (D.N.J. March 2, 2007) (holding that a plaintiff, whose microwave

5  failed outside of the warranty period, could not maintain a NJCFA

6  claim because "[t]o recognize Plaintiff's claim would essentially

7  extend the warranty period beyond that to which the parties

8  agreed.").

9        Chrysler contends that the New Jersey claim must be dismissed

10 because the New Jersey Plaintiff alleges that his vehicle first

11 experienced "trouble" at 48,000 miles, which was after the

12 expiration of Chrysler's basic limited 36,000-mile warranty.

13 (Reply at 6 (citing SAC ¶¶ 88-96).)

14        Plaintiffs make two attempts to counter this asserted basis

15 for dismissal. First, Plaintiffs contend that the TIPM defect did

16 not manifest itself outside of the warranty. This argument is

17 premised on the notion that, although the defect became evident

18 after the expiration of Chrysler's express warranty, it manifested

19 itself within the 7-year/70,000 mile lifetime of the statutory

20 emissions-related warranty enacted by New Jersey, among other

21 states. This argument fails, however, because, for the reasons

22 discussed in the following subsection, the court finds that the

23 TIPM is not covered by the state statutory emissions-related

24 warranties.

25        Second, Plaintiffs contend that the TIPM defect may be the

26 basis for an NJCFA claim, even though it manifested itself outside

27 of the period of the express warranty, because the defect created

28 a dangerous condition. (<u>See</u> Opp. at 13.) The <u>Perkins</u> court

suggested that an exception to the general rule barring claims for
defects that appear post-warranty may exist for defects that pose
safety issues, but it did not express a view on this question. <u>See</u>
<u>Perkins</u> at 694 F. Supp. at 112.

Since <u>Perkins</u>, at least two courts have held that no safety
exception applied in case of NJCFA omissions-based claims. In
<u>Noble</u>, the court dismissed an NJCFA claim where an allegedly
"'defective' engine outperformed its limited warranty," even
though safety issues were alleged. 694 F. Supp. 2d at 338. The
court noted that, "[t]hough the Court in <u>Perkins</u> was careful to
note that its decision did not address 'those circumstances in
which safety concerns might be implicated,' we agree with the
Appellate Division's rationale and find its holding just as
applicable here, in a case where safety concerns are alleged." <u>Id.</u>
(quoting <u>Perkins</u>, 694 F. Supp. at 112). The <u>Noble</u> court cited
<u>Duffy</u>, where the court dismissed the plaintiff's omissions-based
NJCFA claim concerning a defective microwave because the defect
became apparent post-warranty, even though the plaintiff had
experienced safety issues when the microwave turned on while he
was away on a trip. <u>Id.</u> at 2; <u>Duffy</u>, 2007 WL 703197, at *8.

On the other hand, in <u>Nelson v. Nissan N. Am., Inc.</u>, 894 F.
Supp. 2d 558, 569 (D.N.J. 2012), a case cited by Plaintiffs, the
court denied a motion to dismiss an NJCFA claim alleging that
Nissan failed to disclose a vehicle's faulty transmission, which
caused plaintiff safety issues for the plaintiff, including a
delayed and unpredictable acceleration response. <u>Id.</u> at 569. The
<u>Nelson</u> court distinguished <u>Perkins</u>, partly on the ground that,
unlike in <u>Perkins</u>, the claim before it involved allegations of

1  safety issues, suggesting the existence of a safety exception. Id.

2  at 569.

3      New Jersey law is thus unsettled on whether an exception

4  exists for dangerous defects that become apparent after the

5  expiration of an express warranty. In this case, however, this

6  court need not speculate on how the New Jersey Supreme Court would

7  address this issue. Even assuming a safety exception exists

8  generally, this court concludes that it would not apply in the

9  instant case because the New Jersey plaintiff, Melville, has not

10 alleged having actually experienced any safety issue resulting

11 from the alleged TIPM defect. Though he alleges that his vehicle

12 would not start, (SAC ¶¶ 90-96), he has not alleged, for example,

13 that the defect caused his vehicle to stall while in operation or

14 to turn off the vehicle's headlights without warning, or facts

15 suggesting genuine danger of such a circumstance occurring. As a

16 result, it would be too great a leap from existing precedent to

17 find a safety exception applicable in the particular circumstances

18 of this case.

19     It follows from this discussion that the court must dismiss

20 Plaintiffs' claim under the NJCFA.

21 **B.   Magnuson-Moss Warranty Act ("MMWA")**

22     Chrysler moves to dismiss Count VIII, in which Plaintiffs

23 Lightfoot, Young, Soule, and Melville allege that Chrysler Group

24 violated the Magnuson-Moss Warranty Act ("MMWA").

25     The MMWA permits a "consumer" to sue for damage caused "by

26 the failure of a supplier, warrantor, or service contractor to

27 comply with any obligation under this [act], or under a written

28 warranty, implied warranty, or service contract." 15 U.S.C. §

2310(d)(1). Plaintiffs' MMWA claim asserts that Chrysler breached a 7-year/70,000 miles statutory "Emissions-Related Defects Warranty" enacted by California, Maryland, Massachusetts, and New Jersey, among other states. See SAC ¶ 162; 13 Cal. Codes Regs. § 2035, et seq. (California); N.J. Admin. Code. § 7:27 (New Jersey); Md. Code. Regs. § 26:11:34 (Maryland); 310 Code Mass. Regs. § 7:40 (Massachusetts). The statutory emissions warranty, which is generally consistent in substance across the states, requires manufacturers to warrant that a vehicle is "[f]ree from defects in materials and workmanship which cause the failure of a warranted part," where warranted parts are defined to include "any part ... which affects any regulated emissions." 13 Cal. Codes Regs. §§ 2035, 2037. The duration of the warranty depends on the cost of the part, labor, and standard diagnosis. §§ 2037(b), (c)(2). If the part is a "High Priced part," as determined by the California Air Resources Board (CARB) (typically ranging from $550 to $580[6]), the warranty is "seven years or 70,000 miles, whichever comes first." § 2037(b)(3).

The CARB issued a list of examples of emissions-related parts in its 1977 "Emissions-Related Parts List" (amended 1981). (Plaintiff's Request for Judicial Notice Ex. B (Dkt. No. 34-1).) The list does not include the TIPM.

Plaintiffs contend that the TIPM is a warranted, high priced

---

[6] See, e.g., Air Resources Board, Manufacturers Advisory Correspondence 2009-02), available at http://www.arb.ca.gov/msprog/macs/mac0902/mac0902.pdf (setting 2010 model year cost limit at $550); Air Resources Board, Manufacturers Advisory Correspondence 20131-01 (setting 2013 model year cost limit at $580), available at http://www.arb.ca.gov/msprog/macs/mac1301/mac1301.pdf.

emissions-related part and is covered by the statutory warranty
because it "affects emissions." (SAC ¶ 163.) In particular, the
SAC asserts that the TIPM affects emissions because it affects or
controls other vehicle components, including electronic controls,
the fuel pump, and fuel injection components, which were
designated "emissions-related" parts by CARB in its emissions-
related parts list. (Id.; RFJN Ex. B.)

The court is not persuaded. As Chrysler points out, under the
logic of Plaintiffs' argument, a multitude of motor vehicle
components would be emissions-related parts because they
indirectly affect emissions by affecting or controlling emissions-
related parts. (Opp. at 15.) For instance, utilizing Plaintiffs'
line of reasoning, the fact that a vehicle's battery provides
power to the catalytic converter, which the CARB has designated an
emissions-related part, would render the battery an emissions-
related part even though it is not included in the CARB's list of
emissions-related parts. Similarly, the accelerator pedal would be
an emissions-related part because it controls the flow of fuel
into the engine and affects various emissions-related fuel
injection parts. Given the lack of authority from the CARB
interpreting the statute in the manner Plaintiffs propose and in
the absence of any logical limiting principle, the court does not
believe the emissions warranty statutes can reasonably be
construed to have such a sweeping scope.[7]

---

[7] Plaintiffs note that Chrysler has carried out an emissions-
related recall involving the TIPM. (SAC ¶ 31.) However, the court
was not presented with sufficient information concerning the
context of this recall to conclude that the TIPM is an emissions-
related part. Chrysler represented at oral argument that the defect
(continued...)

1    Accordingly, the court agrees with Chrysler that Plaintiffs'

2    MMWA claims must be dismissed. The court need not reach Chrysler's

3    additional arguments in support its position.

4

5    **IV.   Conclusion**

6        For the reasons stated herein, Defendant Chrysler's Motion to

7    Dismiss Plaintiffs' Second Amended Complaint is GRANTED IN PART

8    and DENIED IN PART as follows: The Motion is GRANTED with respect

9    to Count VII of the SAC (violation of the New Jersey Consumer

10   Fraud Act) and Count VIII of the SAC (violation of the Magnuson-

11   Moss Warranty Act), both of which are DISMISSED WITH PREJUDICE.

12   Chrysler's Motion to Dismiss is DENIED in all other respects.

13

14   IT IS SO ORDERED.

15

16   Dated: August 22, 2014

17                                      DEAN D. PREGERSON
                                        United States District Judge

18

19

20

21

22

23

24

25   _____

26       [7](...continued)
     at issue in that recall was not a problem with the TIPM but another
27   part whose signals to the TIPM were effectively overridden by
     "flashing" the TIPM. Plaintiffs did not challenge this
28   characterization.