Eric H. Gibbs (SBN 178658)
ehg@girardgibbs.com
David Stein (SBN 257465)
ds@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone:  (415) 981-4800
Facsimile:   (415) 981-4846

Todd M. Schneider (SBN 158253)
tschneider@schneiderwallace.com
Joshua G. Konecky (SBN 182897)
jkonecky@schneiderwallace.com
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER VELASCO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CHRYSLER GROUP LLC,<br><br>Defendant. | Case No. 2:13-cv-08080-DDP (VBKx)<br><br>**FILED UNDER SEAL**<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Date: January 11, 2016<br>Time: 10:00 a.m.<br>Judge: Hon. Dean D. Pregerson<br>Courtroom: 3 |

PLAINTIFFS' MEM. IN SUPPORT OF MOTION FOR FINAL APPROVAL
CASE NO. 2:13-cv-08080-DDP (VBKx)

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1
II. OVERVIEW OF THE LITIGATION AND SETTLEMENT ............................... 1
    A. The Litigation ................................................................................................ 1
    B. Overview of the Proposed Settlement .......................................................... 3
        1. The Settlement Class ............................................................................ 3
        2. Recall of Class Vehicles ...................................................................... 4
        3. Refunds for Past Repairs ..................................................................... 5
        4. Warranty Extension ............................................................................. 6
        5. Release ................................................................................................. 6
        6. Class Notice ......................................................................................... 6
        7. Attorney Fees, Costs, and Service Awards ......................................... 7
III. ARGUMENT ......................................................................................................... 7
        1. The Strength of Plaintiffs' Case .......................................................... 8
        2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation ............................................................................................. 9
        3. The Risk of Maintaining Class Action Status Through Trial ........... 10
        4. The Amount Offered In Settlement .................................................. 10
        5. The Extent of Discovery Completed and the Stage of Proceedings .... 12
        6. The Experience and Views of Counsel ............................................. 13
        7. The Presence of a Governmental Participant ................................... 13
        8. The Reaction of Class Members ....................................................... 14
        9. Lack of Collusion Among the Parties ............................................... 14
IV. CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Ahdoot v. Babolat VS N. Am., Inc.,* No. CV 13-02823-VAP VBKX, 2015 WL 1540784 (C.D. Cal. Apr. 6, 2015) ....................................................................................... 14

*Cholakyan v. Mercedes-Benz, USA, LLC,* 281 F.R.D. 534 (C.D. Cal. 2012) ................... 10

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ...................................... 8

*Garcia v. Chrysler Group*, No. 1:14-cv-08926-KBF (S.D.N.Y. Oct. 22, 2015) ............... 12

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .................. 14

*In re Gen. Motors Corp. Pickup Truck Fuel Tank Products Liab. Litig.*, MDL 961, 1993 WL 204116 (E.D. Pa. June 10, 1993).............................................................................. 14

*Kirchner v. Shred-It USA Inc.*, No. CIV. 2:14-1437 WBS, 2015 WL 1499115 (E.D. Cal. Mar. 31, 2015) ........................................................................................................ 15

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ......................................... 9

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). ......................................... 10

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ........................................... 7

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ............................................................ 15

**Statutes**

49 C.F.R. § 573.13(c)(1)(iii), .................................................................................................. 5

49 C.F.R. §§ 573.1-573.14 ...................................................................................................... 4

49 U.S.C. §§ 30118-20 ............................................................................................................ 4

**Rules**

Fed. R. Civ. P. 23(e)(2). .......................................................................................................... 7

Fed. R. Civ. P. 53 ..................................................................................................................... 5

I. **INTRODUCTION**

In August, the Court preliminarily approved the parties' proposed class action settlement, which was contingent upon Chrysler implementing a voluntary recall of 2011-13 Dodge Durango and Jeep Grand Cherokee vehicles, and included reimbursements for prior repair and rental car expenses along with an extended warranty. (8/31/15 Order [No. 143].) The Court found the settlement to be fair, reasonable, and adequate at that time, and nothing has changed over the past few months that would undermine that determination. To the contrary, the vehicle recalls have proceeded as intended and over 227,000 class members have taken advantage to date, at a cost of FCA US of approximately $▓▓▓▓▓▓ (Stein Decl., ¶ 10.) Over the next six months to a year, the participation rate is expected to exceed 75%, at a total value to class members of over $▓▓▓▓▓▓ (*Id.*) Whether the recalls are viewed as part of the settlement or as voluntary action influenced by the pressure of litigation, this action has conferred valuable benefits on the class.

The deadline for class members to object to or opt-out of the settlement is not until December 9th, after which time Plaintiffs will address any objections that they receive and provide the Court with a list of opt-outs to be included with the final judgment. The high level of class member participation observed to date, however, indicates that the class as a whole values the benefits achieved through this litigation. In addition, the other *Churchill* factors continue to favor settlement approval. Accordingly, Plaintiffs request that the Court affirm its preliminary finding the settlement is fair, reasonable, and adequate and finally approve the settlement pursuant to Rule 23(e).

II. **OVERVIEW OF THE LITIGATION AND SETTLEMENT**

   A. **The Litigation**

Plaintiffs filed this case in November 2013, alleging that FCA US had equipped many of its vehicles with defective Totally Integrated Power Modules (or TIPMs). (Compl. [Doc. 1], ¶¶ 1-3.) After two rounds of briefing, the Court found that Plaintiffs had stated claims for relief under various state consumer protection laws, and FCA US

began producing documents concerning the allegedly defective TIPM.  (8/22/14 Order [Doc. 46].)  Those documents revealed a lengthy internal investigation that had come to focus on the TIPM's fuel pump relay—a fuse-like component that is supposed to convey power to the vehicle's fuel pump when instructed to by the TIPM's computer.   The combination of certain heat factors (namely, the amount of current flowing to the fuel pump, the voltage applied across the switch, and under-the-hood temperatures) were conspiring to gradually deform the fuel pump relay in certain FCA US vehicles.  As the relay deformed, it stopped reliably transmitting power to the fuel pump—leading to problems starting the engine, fuel pumps that would not turn off, and vehicles stalling in traffic.

TIPM failures were already widespread when Plaintiffs filed suit and had continued to accumulate over the first year of litigation.  ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████  Plaintiffs moved for a preliminary injunction.  They asked the Court to order FCA US to either notify its customers of the TIPM defect and attendant safety risks, or turn over its customer data so that Plaintiffs could notify them.  (9/18/14 Mot. [Doc. 49].)

FCA US had previously refused to acknowledge that a defect existed, had twice rebuffed Plaintiffs' requests that it voluntarily provide its customers with relief, and had recently provided discovery responses that stated that it had no intention of providing its customers with a remedy of any kind.  (10/13/14 Hughes Decl., Ex. G [Doc. 68-2].)  Yet shortly after Plaintiffs filed their motion, FCA US informed Class Counsel that they had decided to "voluntarily" recall the 2011 Jeep Grand Cherokee and 2011 Dodge Durango.  It asked the Court to deny Plaintiffs' motion on that basis, and argued that a recall of

2

other vehicles was not necessary because, although they all shared the same TIPM-7, they did not share the same high amperages, voltages, and under-hood temperatures that led to TIPM failures in the 2011 Jeep Grand Cherokee and Dodge Durango. (10/3/14 Opp. [Doc. 61].) In their reply, Plaintiffs challenged that assertion as to the 2012 Durango and Grand Cherokee, ███████████████████████████████████ ██████ (10/13/14 Reply [Doc. 73] at 5.) With respect to other vehicle models, Plaintiffs agreed that those models had suffered fewer TIPM failures to date, but pointed out there was no assurance they would not eventually experience an uptick in failures. (*Id.* at 6.)

At the hearing on Plaintiffs' motion, the Court expressed concern for the public's safety and questioned FCA US's counsel on the differences between the vehicles—in particular, why the 2012 Durango and Grand Cherokee should be treated differently than the 2011 model year. The Court ultimately denied Plaintiffs' motion, but told the parties it would be willing to expedite class certification proceedings. The parties negotiated an accelerated schedule, with FCA US producing additional documents and a corporate deponent in expedited fashion. Prior to the filing of Plaintiffs' class certification motion, the parties agreed to mediate the dispute with Hon. Edward A. Infante (Ret.). After a full-day session before Judge Infante and follow-on telephonic sessions, the parties agreed to the terms of the settlement now before the Court. (*See* 6/10/15 Gibbs Decl. [Doc. 124-1], ¶ 3.)

  **B.** **Overview of the Proposed Settlement**

    **1.** **The Settlement Class**

The parties' settlement provides relief for members of the following proposed class:

> *All persons who purchased or leased a model-year 2011, 2012, and/or 2013 Dodge Durango or Jeep Grand Cherokee vehicle in the United States.*

(Stein, Ex. 1 ("Settlement"), II.A.) FCA US and all of its affiliates, parents, subsidiaries, successors, and assigns; the officers, directors, and employees of FCA US; all entities

which purchased a vehicle solely for purposes of resale; and any judge to whom this case is assigned and his or her spouse. (*Id.*)

### 2. Recall of Class Vehicles

One of the primary benefits of resolving this litigation sooner rather than later—the immediate recall of Class Vehicles—is already under way. As a contingency of finalizing the Settlement and presenting it to the Court for approval, FCA US was required to notify the NHTSA of its intent to conduct a voluntary safety recall of the 2012-2013 Durango and Grand Cherokee—just as it had previously notified the NHTSA of its intent to recall the 2011 Durango and Grand Cherokee. (*See* Settlement II.B.) FCA US is now obligated to follow federally mandated procedures for notifying owners, purchasers, dealers, and distributors of the TIPM defect in Class Vehicles, and remedying that defect without charge. *See* 49 U.S.C. §§ 30118-20; 49 C.F.R. §§ 573.1-573.14. FCA US is in the midst of complying with these procedures. At the time of preliminary approval, it had sent recall notices to owners of the 2011 model year and interim recall notices to owners of the 2012-13 model years. (Stein Decl., ¶ 3.) In August, FCA US supplemented its interim notice to owners of the 2012-13 model years, informing them that free repairs were available for those model years as well. (*Id.*, ¶ 3, Ex. 3.)

As owners bring their vehicles to Jeep, Chrysler, or Dodge dealerships in response to the recall notices, FCA US is fixing the TIPM defect by installing a new, more robust fuel pump relay in Class Vehicles free of charge. (Settlement, II.B.3.) So far, over 227,000 class members have taken advantage of the free TIPM repair, at a cost to FCA US of approximately $▮ per vehicle. (Stein Decl., ¶¶ 7-10, Exs. 4-6.) Because owners of 2012-2013 model years did not receive their recall letter until August 2015, their participation rates is still relatively low compared to 2011 model year owners: 29% for the 2012-2013 model years versus 69% for the 2011 model year. (*Id.*) In the coming months, participation rates are expected to converge, with over 400,000 owners taking advantage of the free TIPM repair. (*Id.*, ¶ 8.)

### 3. Refunds for Past Repairs

As part of its recall of Class Vehicles, FCA US offered refunds to class members who paid to repair the TIPM defect prior to the recall. (*See* Settlement, II.C.) Federal law only requires voluntary recalls to reimburse consumers for expenses incurred over the past year, 49 C.F.R. § 573.13(c)(1)(iii), but FCA US's recall will include no such limitations. In addition, the Settlement provides prominent notice—through a postcard mailed to members—that these reimbursements are available and includes a checklist for class members to follow in obtaining those reimbursements. (Settlement, Ex. A-1.) It clarifies that any expenses reasonably incurred as a result of the TIPM defect are covered, including rental car expenses. (Settlement, II.C.2.b.) It allows class members to submit reimbursement claims even if they do not have a receipt—so long as the repair was conducted at a Jeep, Dodge, or Chrysler dealership, in which case FCA US will attempt to locate proof of repair for class members. (*Id.,* II.C.2.a.) And it permits any class member who has a claim denied to contact Class Counsel, who will serve as a watchdog and attempt to resolve any dispute amicably with counsel for FCA US. (*Id.*, II.C.2.c.) Should those efforts fail, the Court will retain jurisdiction over this matter and can resolve any reimbursement disputes, either directly or by assigning a special master. (*Id.*, III.1.f.; Fed. R. Civ. P. 53.)

These remedies provided by the Settlement are significant for class members. Although FCA US's recall letter included an offer of reimbursement, it was buried deep in the letter. (Stein Decl., Exs. 2-3.) Many class members did not see the language and of those that did, some no longer had their receipts and others were denied reimbursement for expenses that were reasonably related to the TIPM defect, such as rental car expenses. (Stein Decl., ¶ 13.) Because the waiting list for replacement TIPMs was so long, many class members incurred hundreds or thousands of dollars in rental fees as they waited for their vehicle to be repaired. (*Id.*, ¶ 14; *see also* SAC, ¶ 3.) In addition, the TIPM defect was often incorrectly diagnosed, leading class members to pay hundreds of dollars for new starters, new batteries, or new fuel pumps, as their dealers

struggled to correctly diagnose the problem. (*Id.*) The Settlement clarifies that all these costs are fully reimbursable and gives class members recourse if their claims are wrongly denied.

### 4. Warranty Extension

Lastly, FCA US will provide class members with a warranty extension under the settlement to cover the recall fix. (Settlement, II.D.) FCA US's Basic Limited Warranty ends 3 years or 36,000 miles after the vehicle is put in service, whichever comes first. This standard warranty will be extended to 7 years or 70,000 miles and cover the external fuel pump relay installed as part of the recall.

### 5. Release

In exchange for the relief FCA US is providing, Plaintiffs and the Settlement Class agree to release all claims asserted in the Second Amended Complaint, as well as all claims that could have been brought based on the facts alleged in the Second Amended Complaint. (Settlement, VI.1.) The Settlement will not, however, release any claims for personal injury or property damage that class members may have. (*Id.*, VI.2.)

### 6. Class Notice

Following the Court's preliminary approval of the settlement, FCA US has paid to notify class members of the proposed settlement and give them an opportunity to opt out or submit an objection. (*See* Settlement, III.B; Exs. A-1, A-2 (postcard and long-form notices).) FCA US provided Dahl Administration with the names and most recent mailing addresses of all class members who could be reasonably identified from FCA US's records. (Settlement, III.B.2.) Dahl Administration in turn mailed each identified class member a copy of the class notice, a process that was completed as of October 30th. (*Id.*, III.B.3.) It also set up and is maintaining a settlement website where class members can obtain additional information. (*Id.*, III.B.1; www.TIPMsettlement.com.) Class members have until December 9th to object to the settlement or opt-out of the settlement class. (8/31/15 Prelim. Approval Order, ¶¶ 15, 18.)

### 7. Attorney Fees, Costs, and Service Awards

After reaching agreement on the essential terms of the Settlement, the parties separately negotiated Class Counsel's claims for attorney fees and reimbursement of litigation expenses, as well as the Class Representatives' right to service awards. (6/10/15 Gibbs Decl. [Doc. 124-1].) With Judge Infante's assistance, the parties agreed that FCA US would not oppose an award to Class Counsel of $3,526,000 million in attorney fees and up to $120,000 in costs, or service awards of $4,000 to each of the six Class Representatives. (Settlement, VII.2.) Class Counsel is separately petitioning the Court for awards in these amounts.

## III. ARGUMENT

A proposed class action settlement may be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). When assessing a proposed settlement, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)

Assessing whether the parties' Settlement is "fundamentally fair, adequate and reasonable," requires the Court to balance a number of factors, including:

(1) the strength of the plaintiff's case;
(2) the risk, expense, complexity, and likely duration of further litigation;
(3) the risk of maintaining class action status throughout the trial;
(4) the amount offered in settlement;
(5) the extent of discovery completed and the stage of the proceedings;
(6) the experience and views of counsel;
(7) the presence of a governmental participant;
(8) the reaction of the class members to the proposed settlement; and
(9) whether the settlement is a product of collusion among the parties.

1 *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).  The reaction of the class cannot be fully evaluated until after the deadline for opt-outs and objections has passed, but in Plaintiffs' view, the remaining factors confirm this Settlement to be advantageous to the class and worthy of judicial approval.

### 1. The Strength of Plaintiffs' Case

Plaintiffs each own a 2011 Jeep Grand Cherokee or a 2011 Dodge Durango, and with respect to those vehicles, believe they can mount a very strong case that FCA US violated state consumer protection laws by failing to disclose a known defect.  As set forth in Plaintiffs' motion for a preliminary injunction, FCA US's internal records show that it was investigating TIPM-related problems in the 2011 Durango and Grand Cherokee for over a year and had identified the fuel pump relay as the source of the problems.  (*See* 9/18/14 Mem. [Doc. 54] at 4-6; 10/14/14 Reply [Doc. 73] at 6.)  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  (*See* 9/18/14 Mem. at 2-3.)

FCA US's internal investigation focused almost exclusively on the 2011 model year of the Dodge Durango and Grand Cherokee, so proving the existence of a known and systemic defect in the 2012 and 2013 Dodge Durango and Grand Cherokee would prove more challenging.  FCA US has argued that the 2012 and 2013 model years do not necessarily share precisely the same heat factors as the 2011 model year, and therefore may not fail at the same high rates.  (*See* 10/3/14 Opp. [Doc. 66] at 6-7.)  Plaintiffs believe they can counter this argument by showing that, ████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  (*See* 10/13/14 Reply [Doc. 73] at 5.)  Different vehicle geometry may account for small differences in temperature, but Plaintiffs are confident they can show through expert testimony that the major heat factors are very similar and that, as more time passes, the 2012 and 2013 model years will track the high failure rates experienced by the 2011 model year.

8

PLAINTIFFS' MEM. IN SUPPORT OF MOTION FOR FINAL APPROVAL
CASE NO. 2:13-cv-08080-DDP (VBKx)

Plaintiffs' case is weakest with respect to vehicle models other than the 2011-2013 Dodge Durango and Jeep Grand Cherokee. As Plaintiffs alleged in their complaint, other models use the same TIPM-7 and so are susceptible to the same type of failures. In practice, however the data Plaintiffs have collected from FCA US, online complaints, and their own interaction with class members all show markedly lower failure rates. (Stein Decl., ¶ 11; 9/18/14 Stein Decl. [Doc. 57], Ex. A-4.) The TIPMs in other models have failed on occasion, but probably not in large enough numbers to evidence a known and systemic defect. FCA US has argued that other models have sharply different heat profiles—including lower fuel pump currents, battery voltages, and under-the-hood temperatures—and so the fuel pump relays in these vehicles are far less likely to deform and fail over time. (*See* 10/3/14 Opp. [Doc. 66] at 6-7, 19-21.) Plaintiffs have found little that would undercut FCA US's argument. TIPM failures could conceivably spike in other models at some point, but as of today the TIPM-7 has been used for as many as 8 years in some vehicle models, and that possibility still remains purely speculative.

### 2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

Almost all class actions involve a high level of risk, expense, and complexity, which is one reason that judicial policy so strongly favors resolving class actions through settlement. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998). In this case, however, it is the passage of time that poses the greatest risk to class members—and the most compelling reason to settle now. The remedies Plaintiffs sought through litigation—and have obtained through settlement—would benefit class members far less if they took years to achieve. Informing class members of the TIPM defect today may save them from untold amounts of trouble and inconvenience, but it will mean far less in a few years, after many class members' TIPMs will have already failed. Likewise, a free TIPM repair is not very helpful if it is offered only after a class member has already paid out-of-pocket for a TIPM repair. And while repair costs can

theoretically be reimbursed at any time in the future, as a practical matter that money will be far more useful to class members the sooner it is received.

### 3. The Risk of Maintaining Class Action Status Through Trial

Were litigation to continue, Plaintiffs would face significant risk at the class certification stage. In resisting Plaintiffs' motion for a preliminary injunction, FCA US detailed the many design variations—in both the TIPM-7 and the vehicles themselves—that it claimed would make it impossible for Plaintiffs to demonstrate a common defect. (*See* 10/3/14 Opp. [Doc. 66] at 19-20.) Plaintiffs believed they could overcome those variations and show that class certification was nonetheless warranted, but FCA US may well have persuaded the Court that class litigation involving multiple TIPM versions, multiple models, and multiple model years could not be effectively managed. *See, e.g., Cholakyan v. Mercedes-Benz, USA, LLC,* 281 F.R.D. 534, 554 (C.D. Cal. 2012) (denying certification based on substantial design variation among class vehicles).

The presence of multiple state laws would also pose a problem at the certification stage, likely requiring certification of several statewide classes rather than a single nationwide class. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012). Aside from further complicating the litigation, the Court may well have decided that some state consumer protection statutes—such as those that do not allow for evidentiary presumptions of reliance—could not be effectively managed and excluded residents of those states from the case.

### 4. The Amount Offered In Settlement

While continued litigation offers the uncertainty of class certification and the diminishing returns associated with the passage of time, the proposed settlement would provide class members with virtually everything they asked for in their complaint. FCA US is disclosing the TIPM defect and providing a free repair through government-supervised recalls. (Settlement, II.B.) It is also reimbursing class members for past repair expenses in full—including those incurred for rental cars—and is not requiring documentation if the repair was performed at an authorized dealer. (*Id.*, II.C.) And FCA

US is extending its standard 3-year/36,000-mile warranty to cover its free TIPM repair for 7 years or 70,000 miles, whichever comes first.  (*Id.*, II.D.)

The value of these benefits to the class are considerable.  So far, over 227,000 class members have taken advantage of the free TIPM repair, at a cost to FCA US of approximately $███████.  (Stein Decl., ¶¶ 7-10, Exs. 4-6.)  These figures are likely to rise to over 400,000 class members and $███████ respectively.  (*Id.*)  The repairs that class members are receiving also bring with them significant benefits in terms of safety and peace of mind, as it will help ensure that class members do not unexpectedly stall in traffic as a result of the TIPM defect or suffer unexplained difficulties starting their engine or battery failures.  Class members have also recently received the postcard notice, which prominently informs them of their right to seek repair and rental car reimbursements and provides a checklist for them to follow, which will further increase the value of the settlement.

The only possible downside of the settlement, as far as Plaintiffs are concerned, is that the class could be broader in scope.  Plaintiffs would have preferred that, as a precautionary matter, FCA US recall all vehicle models with a TIPM-7.  But the reality is that those other models have a significantly lower heat profile, and as a result have experienced TIPM failures at much lower rates.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  (9/18/14 Stein Decl. [Doc. 57], Ex. A-4.)  FCA US's failure rate projections exhibited a similarly wide disparity, as did Class Counsel's independent analysis of owner complaint data.  (Stein Decl., ¶ 11.)  With such markedly lower failure rates, Plaintiffs would be hard-pressed to demonstrate that the TIPM defect extended to models other than the Durango and Grand Cherokee, and it was reasonable for FCA US to refuse to treat them the same.  The settlement therefore will not help owners of other FCA US models, but it will not hurt them either.  They will not be releasing any claims and remain free to pursue relief through a separate action should they choose.

Simply stated, Plaintiffs could not in good faith reject a settlement that offered complete relief to vehicle owners with strong claims because FCA US refused to extend the same settlement offer to vehicle owner with much weaker claims. Two subsequent developments have borne out the wisdom of that decision. On July 24, 2015, the NHTSA denied a petition from the Center for Auto Safety to investigate other vehicle models, finding it unsupported by fact and concluding that the TIPM defect "has been addressed by [FCA US's] safety recalls." (Stein Decl., Ex. 7 at 21.) Then on October 22, 2015, the plaintiffs in a related case pending in the Southern District of New York, informed the court that they would not be proceeding with class claims on behalf of other models equipped with the TIPM-7. *See Garcia v. Chrysler Group*, No. 1:14-cv-08926-KBF, ECF No. 92 (S.D.N.Y. Oct. 22, 2015). The plaintiffs in that putative case are represented by two firms with extensive experience prosecuting automotive class actions, who evidently concluded—like Plaintiffs' counsel here and like the NHTSA—that the case for a TIPM defect in vehicles other than 2011-13 Durangos and Grand Cherokees is lacking in evidence.

### 5. The Extent of Discovery Completed and the Stage of Proceedings

Before mediating and ultimately settling the case, Plaintiffs had reviewed nearly 100,000 pages of documents produced by FCA US. Those records included detailed TIPM specifications and testing data, warranty and customer complaint data, FCA US's internal failure analysis and root cause assessments, statistical projections, and summary reports about the TIPM defect prepared for FCA US executives. (6/10/15 Gibbs Decl. [Doc. 124-1], ¶ 5.) Plaintiffs worked with an automotive expert throughout the case, who helped them better understand FCA US's documents as well as the nature of the underlying defect. (*Id.*) Plaintiffs also had the benefit of two rounds of briefing on the pleadings and a preliminary injunction motion, where both sides set forth their evidentiary and legal positions. By the time the case was resolved, Plaintiffs thus had a very good sense of the strength and weakness of their and were well-situated to make an informed decision about settlement.

### 6. The Experience and Views of Counsel

Class Counsel have successfully litigated a number of consumer class actions against automotive companies, including:

- *In re Hyundai and Kia Fuel Econ. Litig.*, No. 2:13-ml-024240-GW (C.D. Cal.)
- *Parkinson v. Hyundai Motor Am.,* No. 06-CV-345-AHS (C.D. Cal.)
- *In re Mercedes-Benz Tele Aid Contract Litigation,* MDL No. 1914 (D.N.J.)
- *In re GM Dex-Cool Cases,* JCCP No. 4495 (Cal. Super. Ct., Alameda Cty.)
- *Browne v. Am. Honda Motor Co., Inc.,* No. CV 09-06750-MMM (C.D. Cal.)
- *Bacca v. BMW of North America, LLC.,* No. CV 06-06753-DDP (C.D. Cal.)
- *Sugarman v. Ducati North America, Inc.*, No. CV 10-05246-JF (N.D. Cal.)

(*See* 11/17/15 Gibbs Decl., ¶ 18, Ex. A.)

Based on their experience in similar cases, and thorough familiarity with the strengths and weaknesses of this particular case, Class Counsel believe the proposed settlement to be in the best interests of the class and respectfully request that the Court approve it.

### 7. The Presence of a Governmental Participant

In September 2014, the National Highway Traffic Safety Administration (NHTSA) opened a file in response to a petition filed by the Center for Auto Safety seeking a governmental investigation of the TIPM defect. (*See* 10/3/14 Bielenda Decl., Ex. D [Doc. 61-2].) Although petitions are supposed to be granted or denied within 120 days, the NHTSA was still deliberating when the parties reached their Settlement and did not issue a decision until this past July.

The agency is empowered to order manufacturers like FCA US to recall their vehicles to address a safety defect, but as its response to the Center for Auto Safety's petition illustrates, that process is exceedingly slow. Even when the NHTSA does grant a petition, it then must conduct a Preliminary Evaluation (which the NHTSA endeavors to complete within 4 months, but can take over a year), and an Engineering Analysis (which the NHTSA endeavors to complete within a year after the Preliminary

1  Evaluation, but can take significantly longer) before sending a recall request letter to the
2  manufacturer—who then has an opportunity to contest the NHTSA's findings through a
3  public forum and, that failing, through the federal courts.  (*See* 10/13/14 Hughes Decl.,
4  Ex. D [Doc. 68-2]); *In re Gen. Motors Corp. Pickup Truck Fuel Tank Products Liab.
5  Litig*., MDL 961,1993 WL 204116, at *3 (E.D. Pa. June 10, 1993) ("[I]f the NHTSA
6  proceedings were to continue, it could take several years for the process to conclude.")
7       One of the great benefits of the parties' settlement is that it has avoided such a
8  protracted process and ensured that class vehicles are recalled immediately.  In addition,
9  as discussed above, the NHTSA's ultimate conclusion was consistent with Class
10 Counsel's in that it agreed that FCA US's voluntary recall of the 2011-2013 Durangos
11 and Grand Cherokees—which was well underway by the time the NHTSA issued its
12 decision—had addressed the TIPM defect.  (Stein Decl., Ex. 7 at 20.)

### 8. The Reaction of Class Members

14     The class was only just notified of the settlement and given an opportunity to
15 object, so Plaintiffs are not yet in a position to fully address the class's reaction.  Class
16 members will have until December 9th to object to the Settlement or opt out of the
17 settlement class, after which time Plaintiffs will address any objections are received and
18 provide the Court with their assessment of this factor.

### 9. Lack of Collusion Among the Parties

20     In addition to assessing the preceding eight factors, the Court should assure itself
21 the settlement was not the product of collusion among the negotiating parties.  *Churchill
22 Vill.*, 361 F.3d at 575; *In re Bluetooth Headset Products Liab. Litig*., 654 F.3d 935, 947
23 (9th Cir. 2011).  Here, neither the procedure used by the parties to arrive at the
24 settlement nor the settlement's terms indicate a collusive deal.  The settlement was
25 negotiated by experienced class counsel only after contested motion practice, extensive
26 discovery and with the assistance of a well-respected mediator.  (Gibbs Decl., ¶¶ 3, 5);
27 *see Ahdoot v. Babolat VS N. Am., Inc.,* No. CV 13-02823-VAP VBKX, 2015 WL
28 1540784, at *6 (C.D. Cal. Apr. 6, 2015) ("Settlements reached with the help of a

mediator are likely non-collusive."). The settlement's terms are favorable to the class and very close to what Plaintiffs sought for the class in their original complaint—strongly suggesting that class benefits were not traded for individual benefits. And the awards that the Class Representatives and Class Counsel will receive for their services (if approved by the Court) are not atypical—further indicating that class members were not betrayed for the benefit of the individuals charged with representing class interests.

In addition, while FCA US has agreed not to oppose a fee award to Class Counsel of $3,526,000, that agreement was a result of a separate fee negotiation that FCA US insisted upon before it would settle the case—as is its right. *See Staton v. Boeing Co.*, 327 F.3d 938, 971 (9th Cir. 2003) (defendants have a right to assurance as to the limits of their liability exposure, including exposure to any attorney fee award). The amount that FCA US agreed to pay was the result of a mediator's proposal and is less than might have been awarded if the amount of the fee were litigated. (*See* Pls.' Motion for Attorney Fees.) The parties' fee agreement thus represents a legitimate compromise and not a collusive agreement to pay Class Counsel more in exchange for paying the class less. Likewise, the $4,000 service awards that FCA US has agreed to pay the class representatives are reasonable and bear no sign of collusion. *See Kirchner v. Shred-It USA Inc.*, No. CIV. 2:14-1437 WBS, 2015 WL 1499115, at *5 (E.D. Cal. Mar. 31, 2015) ("In general, courts have found that $5,000 incentive payments are reasonable.").

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the parties' settlement and enter judgment consistent with its terms.

DATED:  November 18, 2015            Respectfully submitted,

**GIRARD GIBBS LLP**


By:   */s/ Eric H. Gibbs*

15
PLAINTIFFS' MEM. IN SUPPORT OF MOTION FOR FINAL APPROVAL
CASE NO. 2:13-cv-08080-DDP (VBKx)

|    |                                                   |
|----|---------------------------------------------------|
| 1  | Eric H. Gibbs                                     |
| 2  | David Stein                                       |
|    | 601 California Street, 14th Floor                 |
| 3  | San Francisco, California 94108                   |
| 4  | Telephone:  (415) 981-4800                        |
|    | Facsimile:   (415) 981-4846                       |

Todd M. Schneider
Joshua G. Konecky
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone:  (415) 421-7100
Facsimile:   (415) 421-7105

*Attorneys for Plaintiff*